No. 13-1557

# United States Court of Appeals
## For the First Circuit

———————————

**JOHN P. SERRA, II,**

**Plaintiff-Appellant.**

**v.**

**QUANTUM SERVICING, et. al.**

**Defendant –Appellee.**

———————————

ON APPEAL FROM A JUDGMENT
IN A CIVIL CASE ENTERED IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————————

**APPELLANT'S OPENING BRIEF**

———————————————————————

Glenn F. Russell, Jr., Esq
Glenn F . Russell, Jr.
& Associaes, P.C.
38 Rock Street, Suite 12
Fall River, MA, 02720
Ct. of Appeals Bar No. 1146877
Phone    (508) 324-4545
Fax       (508) 938-0244
russ45esq@gmail.com

October 28, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………….....…………4

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD.....………………7

JURISDICTIONAL STATEMENT………………………….....………...……….....8

STATEMENT OF THE ISSUES……..………………………………………...........10

STATEMENT OF THE CASE………………………………………… ...…...11

STATEMENT OF THE FACTS………………………………………… ...…...15

SUMMARY OF ARGUMENT……………………………………………….......20

ARGUMENT…………………………………………………………….… ..... 22

    I.  THE DISTRICT COURT JUDGE COMMITTED CLEAR ERRORS
       OF LAW BY FAILING TO PROPERLY CONSIDER, INTERPRET,
       REVIEW,  AND/OR CRITICALLY EXAMINE, MR. SERRA'S
       PLAUSIBLY PLED LEGAL FOUNDATIONAL BASIS FOR HIS
       PLAUSIBLY PLED CLAIMS RELATED TO THE DEFENDANTS
       TWO WRONGFUL FORECLOSURE ACTIONS…………………………25

         A.  Quantum Initiated The Non-Judicial Foreclosure of The Serra
            Mortgage Under Statute By Its Intentional Act(s) of Causing the
            Publication of The Statutory Mandated Notice of Auction Sale
            Under G.L. c. 244 § 14…..……………………………………….28

            1.  The District Court Judge Erred By His Reliance Upon Butler v.
               Deutsche Bank, 1:12-cv-10337-DPW Regarding the Purported
               Legally Effectivness of MERS Under The Peculiar
               Requirements of Massachusetts State
               Law……………………..34

         B.  The District Court Judge Clearly Erred Where He Failed To
            Recognize That Liability Under Count IV Attendant to G.L c. 183
            § 28C Attaches to Purported Assignee(s)…………………………36

1

C. The District Court Judge Erred Where He Failed to Recognize The Continued Existence of a Genuine Dispute(s) Related to Serra's Count V- Claim Regarding His Exercise of His Extended Right of Rescission Under G.L. c. 140D (MCCCDA), and not TILA………...24

1. Determination If A Fee id Bona Fide and Reasonable………….41

    a. Affidavit of Rod Correia……………………………….......42

2. Tender Requirement and the MCCCDA……………………….48

3. Where Serra's Validly Notice of Rescission Was Received By Quantum, Prior To A Foreclosure Auction Sale, A Subsequently Held Foreclosure Auction Sale Does Not Extinguish Serra's Right of Rescission Under the MCCCDA……………………………………………………...49

4. The Credit Report Fee Is Conspicuously Apparent Upon The Face of The Plaintiff's HUD-1 Disclosure Statement………….53

5. Plaintiff Need Not Establish Damages………………………...55

6. Serra Is Entailed To His Attorneys Fees Under G.L. c. 140D § 33(a)

D. The District Court Judge Erred By Not Recognizing That Any Finding For Serra Under Count V of His Second Amended Complaint Related to G.L. c. 140D Above Was An Automatic Violation of G.L. c. 93A…………………………….……………...58

1. The District Court Judge Further Erred By Relying Upon A Citation From A 1989 Case Making That Made Findings That Assignee(s) Could Not Be Held Liable For Any Unfair or Deceptive Act of the Originating "Lender"…………………..59

II. THE DISTRICT COURT JUDGE CLEARLY ERRED IN GRANTING SUMMARY JUDGMENT TO THE DEFENDSANTS REGARDING COUNTERCLAIMS……………………………………………………61

    A. Breach of Contract.……………………………………………...61

    B. Possession…………………………………………………….61

III.  CONCLUSION……………………………………………………62

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)…………………..63

CERTIFICATE OF SERVICE………………………………………………65

ADDENDUM……………………………………………………………..66

# <u>TABLE OF AUTHORITES</u>

## MASSACHUSETTS STATE CASES

<u>Bank of New York v.</u> Bailey
     951 N.E.2d. 331 (Mass. 2011)……………………………….………...60

<u>Bevilacqua v. Rodriguez</u>
     460 Mass. 762, 771 (2011) …………………………………………...30,31,35

<u>Eaton</u> *v*. <u>Federal National Mortgage Ass'n,</u>
     462 *Mass*. 569 (2012)………………….…………........................4,16,28

<u>Galiastro v. MERS</u>
     SJC-11299 (Pending) …………….……………………...………………21,33

<u>Drakopoulos & another vs. U.S. Bank Nat'l Ass'n, trustee, & another</u>
     465 Mass. 775 (2013)….………………………………………..35,58

<u>Ford Motor Credit Co. v. Morgan</u>
     536 N.E.2d. 587 (1989)………………………………….………...35,58

<u>Lamson & Co. v. Abrams</u>
     305 Mass. 238 (1940)………………………………………........28

<u>Mayo v. Key Financial Services, Inc.</u>
     424 Mass. 862 (1997)…………………………….………………37,38,54,55

<u>U.S. Bank Nat'l Ass'n v. Ibanez</u>
     458 Mass. 637 (2011) ……..………………..………………..17,24,25,26,44

## FEDERAL CASES

<u>Belini v. Washinton Mutual Bank, F.A.,</u>
     412 F.3d 17 (1st Cir. 2005)…………………………….………..47

Butler v. Deutsche Bank, as Trustee, et. al.
        Dckt No. 1:12-cv-10337-DPW (D.Mass. 2012)…………………10,20,32,33

DeMelo v. U.S. Bank Nat'l Ass'n ,
        Dckt No. 1:12-cv-2485 (D.Mass. August 13, 2013)………………………33

In re Crisomia
        2002 WL 31202722  (Bankr. E.D. Pa. 2002)………………………...………39

In re Grigsby
        119 B.R. 479  (Bankr. E.D. Pa. 1990)…………………………….............39

In re DiMare
        462 B.R. 283  (Bankr. D. Mass. 2011)……………………...……………..35

Jepson v. HSBC Bank, N.A.,  as Trustee, et.al.
        Ca. No. 1:12-cv-1279-LTS-DJC (2013)……………….…....................24

McDermott v. Mortgage Elec. Registration Systems
        2010 WL 3895460  (D. Mass. 2010)………………………………………52

McKenna v. Wells Fargo Bank, N.A.
        2012 WL 3553475  (D. Mass. 2012)………………………………………52

Ofor v. Ocwen Loan Servicing
        Dckt No. 09-cv-1402 (D.Minnesota. 2009)………………………………48

## MASSACHUSETTS STATUTES

G.L. c. 93A……………………………………………19,20,21,22,29,35,36,56,57,58

G.L. c. 140D…………………………………..8,18,19,21,22,37,42,49,51,52,54-57,58

G.L. c. 183 § 28C…...……………………………………………19,21,29,34,35,36,58

G.L. c. 183, §54B………………………………………..…….............31

G.L. c. 239…………………………………………………………………..22,60

G.L. c. 244, § 14…………………………………..7,10,18,20,24,25,26,31-33,53,60

G.L. c. 244 § 18……………………………………...……………………………15

## CODE OF MASSACHUSETTS REGULATIONS

209 Mass. C.M.R. 32.00…………………………………………..10,18,34,42,47

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Since the Plaintiff's original complaint was filed in the Norfolk Superior Court on March 04, 2011, there have been considerable, and profound, developments in Massachusetts state law, and attendant decisional case law interpretation thereof, by the Massachusetts Supreme Judicial Court, as well as this Court, attendant to the procedures regarding mortgage foreclosure in the Commonwealth.   Additionally, the instant appeal may present first impression argumentation in this Circuit related to whether a completed foreclosure sale would "extinguish" a borrower's validly noticed request for rescission that was received prior to such purported foreclosure auction sale.   Therefore, the Plaintiff respectfully requests the opportunity, and honor, to be heard in this matter to more accurately and succinctly articulate, with exactitude, the true historical perspective of the requirements G.L. c. 244 § 14 as well as the new holdings by this Court, as well as the Massachusetts state courts, as it relates to the instant appeal, and the intersection of the requirements attendant to "securitized" mortgage lending and the requirements of the Massachusetts statutory foreclosure requirements when seeking to enforce the non-judicial power of sale in this Commonwealth.

## JURISDICTIONAL STATEMENT

(A)    The United States District Court for the District of Massachusetts assumed jurisdiction over this case pursuant 28 U.S.C. §1653 following a Notice of Removal filed by Defendant, stating diversity of citizenship. (A-10)

(B)    Plaintiff's Second Amended Complaint included six (6) causes of action, all rooted in Massachusetts State law, request for equitable remedy, and no federal questions were presented. (A-18)

(C)    The United States Court of Appeals for the First Circuit has jurisdiction over the Plaintiff-Appellant's appeal pursuant to 28 U.S.C. § 1291, which vests in the United States Court of Appeals jurisdiction of appeals from all final decisions of the United States District Courts.

(D)    The District Court for the District of Massachusetts issued a written Memorandum of Order partially granting Defendants' Motion to Dismiss on August 15, 2012, and also directed further briefing on issues for summary judgment (ADD-001). On August 15, 2012, the District Court also issued a Procedural Order directing the Plaintiff to file a Partial Summary Judgment with regard to Plaintiff's claim that Defendants failed to comply with G.L. c. 140D, and the amount of money damages owed by Defendant as a result of such violation, and for the Defendants to submit briefing as to the viability of its Unjust Enrichment Counterclaim (ADD-041) On March 29, 2013, the District Court

8

Issues a Memorandum and Order Allowing Summary Judgment for Defendants on all counts in the Plaintiff's Second Amended Complaint (ADD-043). On April 23, 2013, The District Court Enters Judgment Allowing Summary Judgment for Defendants on all counts of the Plaintiff's Second Amended Complaint (ADD-045). On April 29, 2013, the Plaintiff filed a timely appeal (ADD-046).

## STATEMENT OF THE ISSUES

I.  Whether the District Court Judge committed clear errors of law, by failing to properly interpret, review, and/or properly examine, Mr. Serra's plausibly pled legal foundational basis for his plausibly pled claims that establish existing dispute(s) of material fact related to the Defendant's institution of two wrongful foreclosure actions, and the Wells Fargo Bank, N.A. as Trustee for the RMAC Pass-Through Trust Series 2010-A, completed purported foreclosure auction sale.

  A.  Where the District Court Judge Erred In Not Considering That Quantum Initiated The Foreclosure Against Serra Through Its Intentional Publication of the Statutory Mandated Notice of Auction Sale Under G.L. c. 244 § 14.

  B.  Where the District Court Judge Failed To Recognize The Existence of Remaining Issues In Material Dispute Related to Serra's Exercise of His Extended Right of Rescission Under the MCCCDA, Not TILA

II.  Whether the District Court Judge erred in making a finding That Serra's Validly Noticed Right of Rescission To Quantum Prior to Wells Fargo's Purported Auction Was Extinguished Upon The Purported Auction Sale

  A.  Where the District Court Judge Erred By Failing To Recognize That A Charge For A Credit Reporting Fee In An Amount of $224.48 Was Not Bona Fide Nor Reasonable Under 209 C.M.R. 32.04(3)(g)

  B.  Whether the District Court Judge erred in his reliance Upon His Decision In Butler v. Deutsche Bank, et. al., Regarding the Legal Validity of MERS Under the Peculiar Requirements of Massachusetts State Law.

  C.  Whether The District Court Judge Erred In Allowing the Defendants Counterclaim related to Breach of Contract

  D.  Whether The District Court Judge Erred In Granting The Defendants Counterclaim for Possession Where Such Claim was Never Raised In The Massachusetts State Court, Nor Brought As A Summary Process Action Under G.L. c. 239

## STATEMENT OF THE CASE

On March 04, 2011, Plaintiff filed his original verified complaint, in the Norfolk County Massachusetts Superior Court against Equifirst Corporation, Quantum Servicing Corp. and John Does 1-5 (A-328). On June 01, 2011, Plaintiff requested to default Quantum Servicing . On June 01, 2011 was defaulted.

(A-708) Coincidentally, only after being defaulted on the instant lawsuit, Quantum Servicing, Inc. purports to "assign" the Serra Mortgage to Wells Fargo Bank, N.A. as Trustee for the RMAC Pass-Through Trust Series 2010-A on the very same day June 01, 2011. (A-641).  On June 13, 2011, the Defendants requested that the default be set aside, which Motion was granted on June 14, 2011. (A-708) On July 01, 2011, Plaintiff filed his First amended Complaint (A-708) On August 02, 2011; Quantum filed an Answer to the Plaintiff's First Amended Complaint (A-708). On August 03, 2011, the Quantum Answer was Stricken (Fishman, J.), under MRCP 60(a) (A-708). On October 03, 2011, Fishman, J. Allows the Plaintiff's Motion to Submit a Second Amended Complaint, which was filed on the same day. (A-18). On October 19, 2011 this matter was Removed to the U.S. District Court for the District of Massachusetts. (A-10). On October 26, 2011, Plaintiff filed his Motion for Preliminary Injunction, along with an Affidavit and Memorandum of Law in Support (A-79). On November 02, 2011 Defendants filed an Affidavit in Opposing to the Plaintiff's Motion for Preliminary Injunction (A-211). On November 10,

2011, Plaintiff filed a Reply to Defendants Response to Plaintiff's Motion for Preliminary Injunction (A-275). On November 21, 2011, the Plaintiff filed a Revised Affidavit In Support of his Motion for Preliminary Injunction (A-280). On November 21, 2011, a hearing was held before the District Court Judge related to the Plaintiff's Motion for Preliminary Injunction (A-841). On November 23, 2011, the Defendant Quantum filed a Response to Plaintiff's Motion for Preliminary Injunction (A-306). On December 14, 2011, the Defendants filed the STATE COURT Record (A-325). On January 26, 2012, Plaintiff's current counsel files his Notice of Appearance (A-497). On February 13, 2012, the Defendants file their Answer and Counterclaims to the Plaintiff's Second Amended Complaint (A-499).. On March 01, 2012, the Plaintiff files his Answer to the Defenses Counterclaims. On April 09, 2012, Plaintiff files his Motion to Amend Answer to Counterclaims (A-571). On April 27, 2012, the Defendants file their Motion for Summary Judgment (A-580), along with a Memorandum of Law In Support (A-582), Statement of Facts (A-597), Affidavit of Christine K. Sahyers (A-608), and Affidavit of Reneau Longoria (A-658). On May 18, 2012, Plaintiff Filed his Statement of Material Facts under L.R. 56.1 (A-750), and Opposition to Motion for Summary Judgment (A-766). On May 24, 2012, both parties filed their Joint Statement. On May 31, 2012, the Defendants filed a Response to the Plaintiff's Statement of Material Facts (A-801). On May 31, 2012, a Status Conference

12

Hearing is held before the District Court Judge (A-832). On June 08, 2012, Plaintiff filed a Motion to Strike the Defendants' Response to Plaintiff's Response to Plaintiff's Statement of Material Facts for failure to seek leave. (A-824) On June 08, 2012, Defendants file a Motion for Leave to Submit their Response to the Plaintiff's Statement of Material Facts (A-821). On July 06, 2012, Defendants submit a Memorandum In Support for their Motion for Summary Judgment on Counterclaims (A-828). On July 20, 2012, the Plaintiff files his Opposition to the Defendants Motion for Summary Judgment as to Counterclaims (A-872). On August 08, 2012, hearing was held on Defendants' Motion for Summary Judgment (A-1049). On August 15, 2012, the District Court Judge issued a Memorandum and Order Granting Defendants Motion for Leave to file a Reply in Response to Plaintiff's 56.1 Response by Quantum [A-821], Denying Plaintiff's Motion to Strike [A-824], and Granting in part and Denying in part, Defendants' Motion for Summary Judgment [A-580], and directing further briefing on issues for summary judgment (ADD-001). On August 15, 2012, the District Court Judge also issued a Procedural Order directing the Plaintiff to file a Motion for Summary Judgment related to remaining issues (ADD-041). On August 17, 2012, Defendants file an Affidavit In Support related to discussion during Oral Argument for Motion for Sumy Judgment (A-933). On August 24, 2012, Plaintiff files his Motion for Partial Summary Judgment, as Ordered by the Court (A-937), with Memorandum of Law

In Support (A-940), Statement of Undisputed Material Facts (A-948), Affidavit In

Support (John P. Serra, II) (A-953), and Affidavit of Glenn F. Russell, Jr. (A-970).

On September 04, 2012, Defendants file their Opposition to Plaintiff's Motion for

Partial Summary Judgment (A-1002), Response to Plaintiff's Undisputed Material

Facts (A-1011), and Affidavit In Support (A-1017). On September 14, 2012,

Plaintiff files a Motion for Leave to submit a Reply to Defendants Response (A-

1027). On October 03, 2012, the District Court Judge allows Plaintiff's Motion for

Leave (A-1040). On October 07, 2012, Plaintiff files his Reply to Defendants

Response to Plaintiff's Motion for Summary Judgment (A-1041). On March 29,

2012, the District Court Judge Issues his Memorandum and Order Granting

Smarmy Judgment for the Defendants on all Counts of Plaintiffs' Second

Amended Complaint, and Denying Summary Judgment for the Plaintiff (ADD-

043). On April 04, 2013, the Defendants file for a Writ of Assistance requesting

that the District Court Judge enforce the Ruling for Possession.(A-8) On April 16,

2013 the Plaintiff files his Affidavit In Opposition to the Defendants Writ of

Assistance (A-8). On April 23, 2013, the District Court Judge Enters his Order of

Judgment regarding his March 29, 2013 Memorandum and Order allowing the

Defendants' Motion to Dismiss. (ADD-045). On April 24, 2013 Defendants file

Reply to the Plaintiffs Affidavit In Opposition to Defendants' Writ of Assistance

(A-8). On April 29, 2013, the Plaintiff timely filed his Appeal  (ADD-046)

### STATEMENT OF FACTS

On May 02, 2007, Mr. Serra refinanced an existing mortgage loan on his principal residence, located at 61 Scott Hill Road, Bellingham, Norfolk County Massachusetts 02139, by executing a document that purports to be an "Adjustable Rate Note", payable specifically to *Equifirst Corporation.* in the amount of $276,250.00, (A-147-153). The *copy* of the said purported "Interest Only Period Fixed Note", purports *on its face* to contain an undated "Allonge", containing an "indorsement in blank", in which it has not been established when this purported indorsement was created, and/or if such purported "Allonge" was ever "firmly affixed" to the purported Note. (A-123). Also on May 02, 2007, in order to secure the above referenced purported promissory note, the Plaintiff also entered into a contractual agreement, whereby he executed a Security Instrument that states specifically granted to the "Lender", Equifirst Corporation, the power of sale for breach of conditions contained within the Security Instrument contract (A-160)[1]. At Paragraph C of the aforementioned mortgage contract (A-159), *Equifirst Corporation*, as the "Lender", purports to delegate to Mortgage Electronic Registration Systems, Inc. ("MERS") to act as its "nominee" only upon the security instrument, and that MERS is to remain on the Norfolk County Registry of

---

[1] This also represented Mr. Serra's grant of his title to the real property in issue, in a fee to Equifirst Corporation, subject to defeasance, only as to Mr. Serra's statutory right of redemption under G.L. c. 244 § 18.

Deeds as the "mortgagee" of record.[2]. The Plaintiff's mortgage contract terms are clear, in that the security instrument contract creates a clear distinction, in that it only grants the Power of Sale to the "*Lender*", and *not* MERS. The Plaintiff's mortgage also had characteristics of a type that the Massachusetts Supreme Judicial Court to be "structurally unfair", including but not limited to" a) the loan had an introductory period of three (3) years or less, (b) the introductory interest rate was substantially below the "fully-indexed rate"; (c) at the fully indexed rate the Plaintiff's mortgage, tax, and insurance payments would be at least 50% of his monthly gross income, (d) the loan to value ratio was nearly 100%, (e) the loan was not fully amortizing, but instead provided for a substantial balloon payment at maturity, and (f) the instant loan paid off an existing hoe loan that had been consummated within the prior 60 months, indeed was in fact within the previous 6 (six) months. Additionally, in the disclosures made to Serra on the HUD-A Disclosure statement, conspicuously on the face of this document, at line 804, is stated that Mr. Serra was charged $224.48 for a credit report fee (A-487)

---

[2] As of the time of filing the instant Opening Appellate Brief, the Plaintiff affirmatively states that the SJC has clearly opined that the meaning of the term *"nominee"* in the mortgage context is currently *"unclear"*, and thus it is currently an open question under Massachusetts state law as to the connotation to be given to MERS claim as "nominee" on the Serra mortgage contract. See *Eaton v. Fed Nat'l Mortgage Ass'n* 462 Mass. 569, at n. 29. (2011)

EquiFirst Corporation was acquired by Barclays Bank PLC, which also owned Sutton Funding, LLC, thereby allowing Barclays Bank, LLC to control sales and servicing of residential home mortgages that purportedly have been "securitized" into the secondary mortgage market, where rights to the borrower monthly principal and interest payments were sold as investments to "investors", however, the mortgages securing the right to payment (notes) are still title to land in the Commonwealth, and must be treated as such, see *U.S. Bank Nat'l Ass'n v. Ibanez* 458 Mass. 637, 649 (2011).[3] Subsequent to the "origination" of the Serra mortgage by Equifirst (who is clearly named as the "Lender"), there are a series of purported "assignments" of the Serra mortgage filed and recorded upon the Norfolk County Registry of Deeds. On April 07, 2009, a purported "assignment" is executed, indicating that Mortgage Electronic Registration Systems, Inc., "transfers" to Barclay's Bank, PLC "all of MERS interest in a certain mortgage made to John Serra" (A-236). Also on April 07, 2009, Barclays Bank, PLC, purports to have "transferred" the Serra mortgage to Sutton Funding, LLC (A-238). Then on November 25, 2009, Sutton Funding, LLC tow purports to have "transferred" the Serra mortgage solely and directly to Quantum Servicing, in its own name, and not

---

[3] "Where, as here, mortgage loans are pooled together in a trust and converted into mortgage-backed securities, the underlying promissory notes serve as financial instruments generating a potential income stream for investors, but the mortgages securing these notes are still legal title to someone's home or farm and must be treated as such" *Ibanez* at 649

as "agent" for any other entity (A-240).[4] Thereafter Quantum Servicing, caused to be published numerous foreclosure auction sales, which initiated the foreclosure process under statute, G.L. c. 244 § 14 (A-242-55). On October 25, 2010, the Plaintiff sent a Notice of Rescission to Quantum Servicing under G.L. c. 140D, and its implementing regulation 209 C.M.R. 32.00, basing such request for rescission based upon an unreasonable charge of $224.48, that is clearly in excess of any prevailing market rate for such charge at that time. The Defendants never refused the Plaintiff's request, only demanding to know if Plaintiff could tender as a condition precedent. Only after Serra had filed the instant complaint in the Norfolk Superior Court, and when Quantum Servicing was defaulted, on June 01, 2011, there was another purported "assignment" created and filed upon the Norfolk County Registry of Deeds, indicating that Quantum Servicing purports to have "transferred" the title to the Serra real property at issue to "Wells Fargo Bank, N.A., not in its individual capacity but solely as Trustee for RMAC Pass-Through Trust Series 2010-A", which coincidentally is also dated June 01, 2011 (A-257). Quantum Servicing admits that it is merely a "mortgage servicer", who at all times relevant to this matter was purporting to act on behalf of the same entity that Quantum purports to have "assigned" the Serra mortgage to. Subsequent to the

---

[4] This represented a purported transfer of the defeasible fee interest in the title to the Serra real property at issue in this matter.

18

purported "assignment" Wells Fargo Bank, N.A., as a Trustee for the named Defendant Trust, on December 07, 2011, by and through its current attorney, "sold" the Serra real property at a purported foreclosure auction sale back to Wells Fargo Bank, N.A., as Trustee for RMAC Pass-Through Trust, Series 2010-A for $191,000.00 (A-655).

This matter represents a <u>first impression examination</u>; where a borrower submits a legally viable Notice of Rescission, and the purported foreclosing entity only responds with a legally incorrect demand to know whether the borrower can tender as a condition precedent, under G.L. c. 140D, and subsequent to such Notice, purports to "assign" the borrower's mortgage to a purported principal it purported to act for, and subsequent to such purported "assignment", the purported "assignee" forecloses on the mortgage, the District Court Judge makes a finding that all of the preceding "extinguishes" the Plaintiff's Right of Rescission. The Plaintiff argues that this cannot be a correct interpretation of a consumer protection statute. Further this matter also involves the District Court Judge making incorrect application of the law with regards to liability extending to assignees related to G.L. c. 183 § 28C, and G.L. c. 93A. The District Court Judge also erred where he failed to carefully examine the issues related to Rescission, specifically under G.L. c. 140D, and further erred by failing to acknowledge that it was impossible for any charge of $224.48 for a credit report fee to be "reasonable" and/or "bona fide",

under the Massachusetts state statute and implementing regulation, especially where the Defendants only submitted a purported "Affidavit" reciting that such charge was a "hard cost", which Plaintiff takes as a tacit admission that such charge was "unreasonable" in amount. For all of the foregoing, and as will be more full set out below, at a bare minimum, the District Court Judge's dismissal of the Plaintiff's claims were premature under a summary judgment standard as there clearly remain issues in dispute, and in fact with regard to the Plaintiff's Rescission claim, summary judgment, and G.L. c. 93A claims should enter in Plaintiffs' favor

## SUMMARY OF THE ARGUMENT

Based upon the Plaintiff's plausibly pled claims regarding the foundational basis of his argument, the District Court Judge erred by failing to properly consider and/or review, (and in fact completely disregarded the same), which clearly, at a minimum, leaves remaining issues in dispute under an analysis Fed. R.Civ.P.R. 56.

The District Court Judge erred by not recognizing that the non-judicial foreclosure process under Massachusetts law is imitated under statute <u>at the time of the publication of the auction sale</u> under G.L. c. 244 § 14 (25-34). The District Court Judge further erred by relying on his ruling in *Butler v. Deutsche Bank*, 1:12-cv-10337-DPW, regarding the legal effectiveness of Mortgage Registration Systems, Inc., as this is an unsettled issue of Massachusetts state law that (at the

time of drafting of the instant Appellant's Opening Brief), is currently under review before the Massachusetts Supreme Judicial Court, in *Galiastro v. MERS*, SJC-11299 (34-36). The District Court Judge further erred in making a finding. (47-49) The District Court Judge further erred by not recognizing that any finding for Plaintiff under Count IV (G.L. c. 183 § 28C) would attach to assignees (36-39). The District Court Judge erred in his analysis related to Count V, G.L. c. 140D, by failing to recognize there are clearly remaining issues in dispute, at a bare minimum, and in fact that the Plaintiff has established that he sent a legally valid Notice of Rescission to Quantum Servicing, where Quantum never denied such request to rescind, nor complied with its requirements under G.L. c. 140D, and its implementing regulation. Further, the District Court Judge incorrectly held that the purported foreclosure auction sale "extinguished the Plaintiff's right to rescind, where Quantum was acting at the behest of the entity that purportedly ultimately foreclosed, and thus had scienter of the Plaintiff's request to rescind prior to such purported auction sale. As a result of the foregoing, the Defendants violated G.L. c. 140D, and Plaintiff is entitled to his costs, and because the basis of the Plaintiff's claim for Rescission is based upon a credit report fee of $224.48, that appears conspicuously on the face of the HUD-1 Settlement Statement, Plaintiff is also entitled to his attorneys fees (39-58). The District Court Judge erred in his analysis related to G.L. c. 93A, as he failed to recognize that any finding for Plaintiff with

21

regard to Count V regarding any violation of G.L. c. 140D, is an automatic violation of G.L. c. 93A, under G.L. c. 140D § 34. Further the District Court Judge erred in making a finding that liability under G.L. c. 93A does not attach to assignee(s) (58-61). With Regard to the Defendants' Counterclaims, the District Court Judge erred, where he Granted the Defendants' Claim for Breach of Contract, where the preceding issues remain in dispute between the party(s), and/or Plaintiff has affirmatively established his claim(s) as against the Defendants. (61). The District Court Judge further erred in Granting the Defendants Claim for "Possession", where such claim was never raised in the Norfolk Superior Court, and therefore never Removed to the District Court, and thus the federal District Court lacks the subject matter to opine on this issue, which clearly attempts to circumvent the Massachusetts Summary Process statutory requirements under G.L. c. 239.[5]

## **ARGUMENT**

**I.      THE DISTRICT COURT JUDGE COMMITTED CLEAR ERROR BY FAILING TO PROPERLY; CONSIDER, INTERPRET, REVIEW AND /OR CRITCALLY EXAMINE, MR. SERRA'S PLAUSIBLY PLED FOUNDATIONAL BASIS RELATED TO REMAINING MATERIAL ISSUES IN DISPUTE AS TO THE DEFENDANT QUANTUM'S INITIATION OF FORECLOSURE AND WELLS FARGO BANK N.A. AS TRUSTEE, et. al. PURPORTED FORECLOSURE AUCTION SALE**

---

[5] Additionally, the Defendants abandoned their claim for Unjust Enrichment.

Defendants contend that they were entitled to Summary Judgment in this action because (1) "*Serra has produced no evidence* to show that Quantum did not have standing to foreclose at the *times* that it commenced foreclosure proceedings, and (2) that the only foreclosure that was completed was conducted by Wells Fargo, not Quantum. However, Defendant Quantum admits that it is purportedly only a mere "*servicing agent*" for the very same Wells Fargo Bank N.A. as Trustee for the named Defendant Trust, and therefore as such would only be a purported "agent" for the very same Trust that ultimately foreclosed upon Serra, purportedly making this one continuous transaction. (A-126).[6]

Due to the fact that foreclosure actions are commonly "defended" by *pro-se* homeowner litigants who lack the financial wherewithal to hire counsel to competently oppose the financial bar's advancement of legally "inaccurate" argumentation, there has developed a growing body of case law in this Circuit that has adopted only the financial industry self-interested unopposed viewpoint of an extremely complicated area of the law. It is because foreclosure is much more complex legal issue than would appear on its face, that some rulings from the District Court of Massachusetts have held that because the borrower "initiating"

---

[6] Which therefore, renders meaningless the purported "assignment" from Quantum to Wells Fargo Bank, N.A. as Trustee, with regard to any distinctions purportedly drawn from such purported "assignment" with relation to the Serra Rescission claim.

the lawsuit, therefore that it is the borrower that has the burden to prove a negative,

i.e. that the foreclosing entity *does not* have the standing to foreclose.

The historical Massachusetts state case law *ratio decidendi* that has

examined this issue closely, clearly indicates that only an entity/person with

"jurisdiction and authority" to act under statute (G.L. c. 244 § 14), can utilize the

harsh, indeed draconian, non-judicial foreclosure process:

> "Recognizing the substantial power that the statutory scheme affords
> to a mortgage holder to foreclose without immediate judicial
> oversight, we adhere to the familiar rule that "one who sells under a
> power [of sale] must follow strictly its terms. If he fails to do so there
> is no valid execution of the power, and the sale is wholly void."
> Moore v. Dick, 187 Mass. 207 , 211 (1905). See Roche v. Farnsworth,
> 106 Mass. 509 , 513 (1871) (power of sale contained in mortgage
> "must be executed in strict compliance with its terms"). See also
> McGreevey v. Charlestown Five Cents Sav. Bank, 294 Mass. 480 ,
> 484 (1936)." *Ibanez* at 646-647

Indeed, recently in *Jepson v. HSBC Bank NA.,as Trustee, et. al.*  CA. No.

1:12-cv-1279-LTS, currently under review by this Court (Ca. No. 13-1364),

Magistrate Judge Sororkin made such errant finding, stating that if a borrower

challenges the purported standing of the foreclosing entity, the borrower is

"*circumventing Massachusetts statutory requirements*". Thus, whereas here, where

a borrower makes a challenge to the "jurisdiction and authority" of only a

purported "assignee" of their original lender to act under statute, and that now

claims to have such current "jurisdiction and authority" to utilize the harsh non-

24

judicial foreclosure remedy to foreclose the Serra Right of Redemption upon a mortgage, *it is the foreclosing entity itself*, and **_not_** Serra, who has the affirmative burden to prove such "jurisdiction and authority" to act extra-judicially under statute, especially here in a motion for summary judgment.[7]

### A. Quantum Initiated The Non-Judicial Foreclosure of The Serra Mortgage Under Statute By Its Intentional Act(s) of Causing Publication(s) of The Mandatory Notice of Auction Sale Under G.L. c. 244 § 14

The foreclosure process in Massachusetts "plays out" extra judicially, as this Commonwealth is a "non-judicial" foreclosure jurisdiction. In order for a purported foreclosing entity to take advantage of the statutory non judicial process in this Commonwealth, the foreclosing entity must be a proper party with "jurisdiction and authority" under G.L. c. 244 § 14. Indeed, any purported foreclosure auction conducted by a purported foreclosing entity seeking to enforce the power of sale in a borrower's mortgage, who fails in these particulars creates a sale that is *void ab initio.*

> "....Any effort to foreclose by a party lacking "jurisdiction and authority" to carry out a foreclosure under these statutes is void. [citing *Chace v. Morse*, 189 Mass. 559 , 561 (1905), and *Moore v. Dick* 187 Mass. 207  (1905).........Because only a present holder of the mortgage is authorized to foreclose on the mortgaged property, and because the mortgagor is entitled to know who is foreclosing and

---

[7] See <u>*U.S. Bank Nat'l Ass'n v. Ibanez*</u> 458 Mass 637, 647 (2011).

selling the property, the failure to identify the holder of the mortgage in the notice of sale may render the notice defective and the foreclosure sale void. See Roche v. Farnsworth, supra (mortgage sale void where notice of sale identified original mortgagee but not mortgage holder at time of notice and sale). See also Bottomly v. Kabachnick, 483-484 (1982) (foreclosure void where holder of mortgage not identified in notice of sale). " *Ibanez* at 647-648.

The foreclosing party must also have proper "jurisdiction and authority" under

statute, *at the time of the publication  of the mandatory notice of sale*:

"….a judge is entitled to ask for proof that the foreclosing entity was the mortgage holder at the time of the notice of sale and foreclosure, or was one of the parties authorized to foreclose under G. L. c. 183, § 21, and G. L. c. 244, § 14." *Ibanez* at 650-651

In Counts I and VI of his Second Amended Complaint, Serra clearly

challenged the jurisdiction and authority of both Quantum and Wells Fargo Bank,

N.A. in its capacity of a purported Trustee for a common law trust, as a proper

party under statute to utilize the Massachusetts non-judicial foreclosure scheme.

(A436-37; A-442-43).[8] While Serra's predecessor counsel seemingly concentrated

on issues relative to "the Note",  at ¶15 of the Second Amended Complaint, Serra

also alleged

"Despite the purported assignment to Quantum, at no time has Quantum been the true assignee of the mortgage as defined by G.L. c. 244 § 14" (A-436-37)

---

[8] Indeed, Serra states that as Quantum could only purport to act for Wells Fargo, as "mortgage servicer", these two entities should be considered as "two peas in a pod".

In its Memorandum In Support of Its Summary Judgment, Defendant Quantum incorrectly states that "*A Wrongful foreclosure case cannot lie against Quantum as a matter of law*" (A-587). As discussed above, the non-judicial foreclosure process is _intimated_ under statute in this Commonwealth _at the time of the publication of the Mandatory Notice of Sale_. Indeed, it was precisely due to the publications by Quantum that Serra was forced to defend the scheduled auction sale(s) of his primary residence through numerous counsel (A-673-75; A-687-90, 98,99; A-700; A-706). Thus under the Massachusetts non-judicial statutory construct, Quantum clearly _imitated numerous wrongful foreclosure actions_ as against Serra, in which Serra has articulated were _wrongful_, based upon the totality of the claims in his Second Amended Complaint.[9] The initiation of these actions clearly caused Serra financial damages, as he was forced to defend the same. _More problematic_ for the Defendants is their admission that Quantum is only a mortgage servicer that was acting at the behest of the previously undisclosed Common law trust (RMAC Pass-Through Trust, Series 2010-A) that ultimately purportedly foreclosed upon the Serra residence. (A-126).

Indeed, the historical case law holdings of this Commonwealth has

---

[9] Indeed, if Massachusetts was a "judicial" foreclosure jurisdiction, the result would be the same, albeit imminently more clear.

found that a borrower's note and mortgage "can travel independently".[10] Thus, whereas here, where the District Court Judge made a bright line distinction that the holding in *Eaton v. Fed. Nat'l Ass'n* 462 Mass. 569 (2012) (holding that a foreclosing entity must have rights of enforcement of a borrower's promissory note [or establish that 1) it is an agent for and 2) one validly holding the promissory note]; does not apply to the instant matter.

In the District Court Judge's Memorandum and Order of August 15, 2012, (respectfully submitted), he incorrectly states, and applied a legally incorrect standard(s) and incorrect statutory framework, where he states that:

> "Serra speculates that the assignment to Quantum to Wells Fargo might have been invalid and states that "it remains a genuine issue of dispute as to whether in fact Quantum played a role in the wrongful foreclosure of the Serra residence". Serra provides no evidence in support of his proposition that the assignment was invalid. He fails to explain why an invalid assignment would result in liability for wrongful foreclosure on the part of Quantum where the foreclosure auction was conducted by Wells Fargo." (ADD-010)

The above statement, fails to consider the following; <u>First</u>, in Serra's Opposition to the Defendants' Motion for Summary Judgment, he succinctly pointed out to the District Court Judge that a purported "Affidavit" of one Christine K. Sahyers (A-608-12), proffered by Defendants as its sole evidentiary foundational indicia to support that in fact Quantum was a proper "assignee of

---

[10] See *Lamson v Abrams*, 305 Mass. 238 (1940)

record", was _hearsay_ as it spoke to legal conclusions and matters that are beyond Ms. Sayhers ken, and/or ability to claim first hand personal knowledge thereof. (A-770-73). <u>Second,</u> in Ms. Sahyers purported "Affidavit", she confirms that "Quantum, servicing agent for Wells Fargo, at or near the time of the act, condition or event to which they relate, by persons employed by Quantum, servicing agent for Wells Fargo, who had a business duty to Wells Fargo to accurately and completely take, make, and maintain, such records" Thus, it can be said that Ms. Sahyers, also makes the **_admission_** that _at all times relevant in this matter_ that Quantum was only purportedly acting as a purported "agent" for the very same _Wells Fargo trust_ that Wells Fargo **_as Trustee_** purportedly foreclosed upon Serra.

Thus, Ms. Sahyers confirms that the purported "assignment" of the Serra mortgage to Wells Fargo was a _sham_, in that it purported only to "assign" the Serra mortgage back to the very same purported original principal that Quantum purportedly was acting at the behest of all along[11]. <u>Third,</u> the District Court Judge completely ignored the fact that the purported "assignment" from Quantum to Wells Fargo Bank, N.A. as Trustee only took place **_after_** Serra had initiated the instant litigation as an apparent dilatory attempt to separate Serra from his family

---

[11] Indeed, this fact is also materially relevant to Serra's claims related to G.L. c. 93A, G.L. c., 183 § 28C, as well as other claims Serra has levied at Defendants, as the entirety of this action appear to part of one continuing action.

29

abode.[12] <u>Fourth</u>, while the District Court Judge remained myopically focused upon the "Serra allegations failing to explain why an invalid assignment would result in liability for wrongful foreclosure on the part of Quantum where the foreclosure auction was conducted by Wells Fargo", the District Court Judge erred in not reviewing the Massachusetts state law discussed above Supra, law in that; a) the foreclosure process is ***<u>initiated at the publication of the mandatory Notice of Auction</u>*** (especially where Quantum admits to serially publishing such notice(s), forcing Serra to defend these action(s)), and further, where Quantum purports to have "assigned" the Serra mortgage while currently named as a Defendant in the instant "*imbroglio*", back to the purported original principal is was acting for all along.

The Massachusetts Supreme Judicial Court has also clearly spoken to this fact that *<u>mere recordation</u>* of a document(s), such as purported "Assignment(s) of Mortgage, ***<u>do not</u>***, in and of themselves, establish any legal effectiveness of the purported document(s).  In *Bevilacqua v. Rodriguez*, 460 Mass. 762 (2011) it was stated that:

> "……there is nothing magical in the act of recording an instrument with the registry that invests an otherwise meaningless document with legal effect. See S & H Petroleum Corp. v. Register of Deeds for the

---

[12] A situation that is also further complicated with regard to the fact that after the purported "assignment" to Wells Fargo Bank, N.A. as Trustee, Quantum answered Serra's complaint, which was stricken.

County of Bristol, 46 Mass. App. Ct. 535 , 537 (1999) ("The function of a registry of deeds is to record documents. It is essentially a ministerial function . . ."). Recording may be necessary to place the world on notice of certain transactions. See, e.g., G. L. c. 183, § 4 (leases and deed); G. L. c. 203, §§ 2-3 (trust documents). Recording is not sufficient in and of itself, however, to render an invalid document legally significant. See Arnold v. Reed, 162 Mass. 438 , 440 (1894); Nickerson v. Loud, 115 Mass. 94 , 97-98 (1874) ("mere assertions . . . whether recorded or unrecorded, do not constitute a cloud upon title, against which equity will grant relief"). As a result, it is the effectiveness of a document that is controlling rather than its mere existence. See Bongaards v. Millen, 440 Mass. 10 , 15 (2003) (where grantor lacks title "a mutual intent to convey and receive title to the property is beside the point")." _Bevilacqua_ at 771.

Thus, the District Court Judge erred by seemingly taking the recordation of the purported "assignment" from Quantum to Wells Fargo, to have definitively established the  legally "valid" of the purported assignment, merely because it was recorded, and therefore failed to ever seriously consider Serra's arguments. Related to the challenge to Quantum and/or Wells Fargo's claim of having proper jurisdiction and authority under statute to enforce the power of sale in the Serra mortgage under G.L. c. 244 § 14.[13]

---

[13] Further any discussion related to G.L. c. 183 § 54B, would have to establish that there is actually a legally valid principal, for any purported "agent to act at the behest of", as this statute only speaks to the authority of an agent **_to bind a principal_**, not to the validity of the document itself. Thus it is well beyond peradventure that there must be and actual principal with legally viable claim(s) to the legal interest in the Serra mortgage, and defeasible fee title to his real property, as **_a condition precedent_** for any agent to act on the behalf of such entity.

**a. The District Court Judge Erred By His Reliance Upon**
***Butler v. Deutsche Bank*** **1:12−cv−10337−DPW Regarding**
**The Purported Legal Effectiveness of MERS Under The**
**Peculiar Requirements of Massachusetts State Law**

Indeed, the District Court Judge issued his Memorandum and Order in this matter almost contemporaneously with his Ruling and decision in *Butler v. Deutsche Bank* 1:12−cv−10337−DPW. The District Court Judge acknowledges this fact at p. 29 of his 40 page opinion, and further opines that

> "Serra contends that the sale was invalid because assignments from MERS are invalid and consequently Wells Fargo did not have authority to foreclose pursuant to G.L. c. 244 § 14. This contention is incorrect as a matter of law for the reasons described in Butler v. Deutsche Bank Trust Co. Americas as Trustee for RALI 2007 QS3, also litigated before me by Serra's counsel." (ADD-029).

The District Court Judge further states that "many decisions of this district have held that MERS may validly assign a mortgage", relying upon citation of entirely five (5) decisions, all from the federal court,  two (2) of which involve matters decided by an Article I Bankruptcy Court Judge, that lacks the subject matter jurisdiction to specifically opine on matters related to title to land under the specific requirements attendant to the Massachusetts State statutes, as a mortgage in Massachusetts is not a "lien" that can be determined by the Bankruptcy Court, as Massachusetts is a title theory jurisdiction. (ADD-029) Additionally, the District Court Judge provided no citation from the Massachusetts Supreme Judicial Court ("SJC") regarding any "validity of assignments made by MERS". Indeed, Serra's

counsel presently has the *first ever* matter before the SJC, where the legal validity of MERS under Massachusetts state law, has come squarely under review in *Galiastro v. MERS*, SJC-11299. The SJC may finally make definitive rulings regarding this issue.

Additionally, as the time of filing of the Serra Opening Brief, *Butler* is still a pending matter before this Court's docket, where Mr. Butler has provided copious documentation relative to his position, which is consistent with the Serra Second Amended Complaint, alleging that due to the presence of MERS, Quantum and Wells Fargo are not parties with legal "jurisdiction and authority" under statute to enforce the power of sale under G.L. c. 244 § 14. Therefore, at a bare minimum, there remain issues in dispute as to Quantum's initiation of the foreclosure of the Serra residence through its numerous publication(s) of the auction, the purported subsequent "assignment" while this matter was being litigated as to Quantum, and finally as to what effect all of the preceding discussion had upon Wells Fargo Bank N.A., as Trustee for the RMAC Series 2010-A common law trust to have enforced the power of sale under the strictures of G.L. c. 244 § 14. A further issue that the District Court Judge failed to consider, is the Defendants admission that due to the failure of the Notarial acknowledgment to state the purported year that the mortgage was executed, the Defendant Quantum took it upon itself to merely "re-record the Serra mortgage and manually entering the year "2007" (A-128); also

reference original mortgage recorded at (A-157), with the re-recorded section at issue at (A-162). This is an additional disputed issue that the District Court Judge failed to acknowledge.

### B.  The District Court Judge Clearly Erred Where He Failed To Recognize That Liability Under Count IV Attendant to G.L. c. 183 § 28C Attached to Purported Assignee(s)

Count IV of Serra's Second Amended Complaint Seeks Declaratory and Equitable Relief as against Defendants' Quantum and Wells Fargo Bank, N.A. as Trustee, et. al., claiming that the Serra loan at issue was not made in his best interest, as one covered under 209 C.M.R. 53.02, et. seq, and G.L. c. 183 § 28C. (A-425-426).  Moreover, at  ¶7 of his Second Amended Complaint, Serra states that:

> "¶7. The loan paid off all or part of an existing home loan that had been consummated within the prior 60 months, as well as other debt of plaintiff, but was not in plaintiffs interest. Factors which indicate the loan was not in plaintiffs interest include, but are not necessarily limited to: (a) the amount of plaintiffs monthly mortgage payment increased; (b) the amortization period of the loan exceeded that of plaintiffs prior loan; ( c) the loan carried an adjustable interest rate; and ( d) the costs and fees for the new loan exceeded the amount of cash received by plaintiff. (A-420-421)."

The entirety of the Defendants request for Summary Judgment on Count IV of the Serra Second Amended complaint was based solely upon the erroneous proposition that any liability related to the instant offending mortgage loan not being made in Serra's best interest, as defined under statute and regulation, "does

not extend to any assignee of Equifirst." (A-590-591)[14].  Indeed, at oral argument on Serra's Motion for Preliminary Injunction, on <u>November 21, 2011</u>, the District Court Judge clearly undertakes a detailed examination of Defendants' counsel, with respect to "assignee liability" regarding G.L. c. 183 § 28C. (A-855-66). Indeed, the district Court Judge opined that

> "As it stands right now, I am satisfied that there is some likelihood of success on the part of the plaintiff with respect to the borrower's interest statute, Chapter 183, Section 28C" (A-866)

Thereafter, the  District Court Judge erroneously adopted Defendants' position in its entirety that any liability under the borrower's interest statute would not extend to any assignee of the "lender",)[15], and made definitive erroneous finding(s) that common law contract liability "would not extend to an assignee", citing *Ford Motor Credit Co. v. Morgan*, 536 N.E.2d 587, 591 (Mass. 1989).

However, in a recent decision enunciated by the Massachusetts Supreme Judicial Court in; *Drakopoulos & another vs. U.S. Bank Nat'l Ass'n, trustee, & another*, 465 Mass. 775, 782 (2013), the SJC also considered *Morgan's* application

---

[14]  Indeed, the District Court Judge further erred by failing to undertake any examination whatsoever as to the Plaintiff's plausibly pled allegations relative to this issue, which therefore currently leave genuine issues clearly in dispute.

[15]  "That being said, the Debtor correctly notes that "a lender may run afoul of Chapter 93A by knowingly setting up a borrower for default."[119] Unfortunately, she did not allege a violation of Mass. Gen. Laws ch. 93A in the Complaint". *In re Dimare*, Ca. No. 08-10598, Adv. Pro. 08-1046, 462 B.R. 283, (2011) (Hillman J.)

and stated:

> "To the extent that the bank may thus have liability as an assignee by virtue of the act, it would extend to "all affirmative claims and defenses with respect to the loan" that the plaintiffs could assert against the lender, including the statutory claims asserted under the Consumer Protection Act, G. L. c. 93A; **and the Borrower's Interest Act, G. L. c. 183, § 28C**, as well as the affirmative defense of unconscionability."[16]

Therefore, as Serra made plausible allegations at ¶7, and ¶¶27-31(i)-(iv), related to Count IV of his Second Amended Complaint,(A-19, A-24-25), which the District Court Judge clearly initially accepted as providing him some likelihood of success on the merits of this issue, he later applied an incorrect legal standard by ***never fully reaching the merits on this issue*** by finding that any liability would not extent to assignees. Thus, it would be clear beyond peradventure that the said dismissal of Count IV, under a Summary Judgment Motion cannot stand, "*allowing summary judgment in the bank's favor on those three claims, to the extent that it is based on the bank's status as assignee, is premature*" <u>Drakopoluos</u>, at 781.

### C. The District Court Judge Erred Where He Failed to Recognize The Continued Existence of Genuine Issues In Dispute Related to Serra's Count V Claim Regarding His Exercise of His Extended Right of Rescission Under the MCCCDA, and <u>not TILA</u>

In <u>Count V</u> of the Serra Second Amended Complaint, he specifically

---

[16] See also G.L. c. 183C § 15.

36

alleges that due to a credit reporting fee of $224.48, which was not reasonable as the "prevailing market rate" at the time was no more than $50.00 , resulted in an understatement in the finance charge,." See ¶35 of the Serra Second Amended Complaint (A-427). [17] The said understatement was also clearly apparent on the face of the HUD-1 Settlement disclosure statement, at line 804 (A-302). G.L. c. 140D §1 defines "material disclosure" as follows:

> "Material disclosure", the disclosure, as required by this chapter, of the <u>annual percentage rate</u>, <u>the method of determining the finance charge</u> and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, and the due dates or periods of payments scheduled to repay the indebtedness."

The Massachusetts Supreme Judicial Court has interpreted that the definition above provides _no flexibility_ in deciding whether an understatement of a finance charge is "_material_", and therefore strict compliance is the statutory **_mandate_** See _May v. Key Financial Services_, Inc. 424 Mass. 862, 865 (1997). G.L. c. 140D §4(e)(6) defines a "credit report fee" as a "finance charge"[18] The SJC has further opined that "decisions elsewhere concerning the issue before us support our

---

[17] The District Court correctly "notes" at n.6 of his Memorandum and Order that; "..the MCCCDA explicitly provides for rescission claims as against assignees of the mortgage where "the violation for which such action or proceeding is brought is apparent upon the face of the disclosure statement." (ADD-021)

[18] This statute is currently tempered by regulation that mandates that an understatement of more than $100 is per se material. See 209 Code Mass Regs 32.18(4)(a)(1).

conclusion that any understatement of a finance charge beyond the de minimus range is a material non-disclosure". See *Mayo v. Key* at 865.

Thus, the fee of $224.48 charged to Plaintiff for a "credit report", which was deducted from the "amount financed", was <u>*not*</u> bona fide <u>*nor*</u> reasonable in amount.

At Count V of Mr. Serra's Second Amended complaint, specifically at line 35, Mr. Serra succinctly alleges, in a materially relevant fashion;

> "At the time of closing the Equifirst loan plaintiff was charged, and paid, the sum of $224.48 as a "credit report fee". A substantial portion of said fee was not reasonable, as <u>the prevailing market rate for obtaining a credit report was no more than $50.00</u>".

The upshot of such under-disclosure to Serra, had the effect of creating the appearance of a materially false lower Annual Percentage Interest Rate ("APR") on Serra loan, as this $224.48 was improperly deducted from the amount financed, thereby deceptively reducing the stated APR of the Plaintiff's mortgage loan. Such charge of $224.48, clearly exceeds the tolerance level of being more than a *de minimus violation*, and indeed $224.48 for such fee appears to be well in excess of the $35.00 maximum tolerance, as the loan was <u>*clearly in foreclosure*</u>, and additionally the said fee would appear to be clearly in excess of any "*prevailing*

.

*market rate*" at the time, or in the alternative creates a genuine issue in dispute related to this issue.

### 1.  Determination If a Fee is Bona Fide and Reasonable

To be excluded from the finance charge, the fees must not only be the right types, but they must also be "*bona fide and reasonable in amount.*" They are bona fide even if the services for which the fees are imposed are performed by employees of the creditor rather than by a third party.... Charges must be *reasonable* in amount so as not to allow inflated costs to indirectly augment the creditor's yield (APR) . Reasonableness should be determined by comparing the charges imposed by a particular creditor with the *prevailing practices of the industry in the locality*.

The term "reasonable" has generally been defined as whether "the disputed charges are comparable to the prevailing rates of the industry in the locality at the time of the transaction." *In re Crisomia,* 2002 WL 31202722, at *7 (Bankr.E.D.Pa.2002) ( *citing Brannam v. Huntington Mortgage Co.,* 287 F.3d 601, 606 (6th Cir.), *cert. denied,* 537 U.S. 1048, 123 S.Ct. 635, 154 L.Ed.2d 522 (2002). *quoting Grigsby v. Thorp Consumer Discount Co. (In re Grigsby),* 119 B.R. 479, 487 (Bankr. E.D. Pa.1990), *vacated on other grounds,* 127 B.R. 759 (E.D.Pa.1991). "Thus, if the creditor picks an 'expensive' third party and is receiving a rebate, there is some risk a hidden finance charge may be determined to

exist." *In re Grigsby,* 119 B.R. at 488, *quoting R. Rohner,* The Law of Truth in Lending, ¶ 3.03[2][a], at 3-30 to 3-31 (1984).

Here, the Defendants' only basis to support the outrageous statement that a $224.48 credit report fee is "bona fide and reasonable", is a purported "Affidavit" submitted by Mr. Rod Correia. (A-1017). The amount of this fee is of such an exceedingly excessive amount that it may be determined to be *per se* unreasonable.

### a. Affidavit of Rod Correia

As the sole "support" that the credit reporting fee of $224.48, was *bona fide and reasonable under the prevailing market rate at the time*, the Defendants submitted only a purported "Affidavit" of one Rod Correia. In the purported "Affidavit", Mr. Correia states that he "has reviewed the records of Shamrock Financial Corporation and produced the invoice associated with the transaction" (A-1017). Notably, the Defendants *fail* to explain how such fee is bona fide and/or reasonable under any existing prevailing market rate, but rather only that such charge was purportedly "assessed" as a "hard cost".  Indeed, Mr. Correia does not include any proffer that Shamrock ever made *any* payment to CREDCO on this amount, as it only is a purported "invoice" (A-1019). Further, at page 1 of Exhibit A to the Affidavit, it shows a charge for *all three individual credit bureaus* in the amount of $8.86 (A-1019). However, the purported "invoice" thereafter also recites that Mr. Serra was charged an additional $60.00 for *each* individual credit

report from each individual agency, above and beyond the $8.86 charge for all three agency report(s). (A-1019). There is no discussion as to why there was such double billing, nor any precise foundational basis to support any such charge as "reasonable under any prevailing market rate", or indeed whether Shamrock was incentivized by way of kickback(s) to inflate such credit reporting fee(s).

Indeed, the District Court Judge further erred by "postulating" that "in the absence of contrary evidence, that such charge was reasonable." Throughout these proceedings the District Court Judge apparently continuously made such postulation(s) as the "reasonableness" of such fee in light of the prevailing market rate, and the District Court Judge's subjective viewpoint as to Mr. Serra's financial situation, and sua sponte determined based upon such purported "financial condition of Serra" such fee was "reasonable", where such issue clearly remains in dispute.

Further, Mr. Correia does not make any statement from any personal knowledge in his purported Affidavit, nor has does he supply any foundational basis, as to the veracity, and/or authenticity, of such purported Affidavit , in order to classify such statements under the business record exception to the hearsay rule.

The District Court Judge erred by making findings that the Affidavit of Mr. Correia established that the credit reporting fee was "reasonable" based solely upon a purported characterization of such as an "actual hard cost" of the

41

transaction (ADD-044). The District Court Judge further erred by contradicting the statement in related to assignee liability; stating that:

> "…In any event, the plaintiff's claim in this regard would be as against Equifirst, the lender, an entity not before this Court."
> (ADD-044)

Therefore, the District Court Judge clearly erred, by not acknowledging that Serra had plausibly pled that due to such non-reasonable fee "the finance charge was understated beyond the $35.00 tolerance permitted by the MCCCDA.." (A-427).  Based upon the preceding, Serra plausibly alleged at ¶36 of the Second Amended Complaint, that as a result of the Equifirst under-disclosure of the finance charge, plaintiff has a continuing right to rescind the transaction pursuant to Section 10(a) of G.L. c. 140D and 209 C.M.R. 32.23(1)(c). (A-427). Further at ¶37 of the Second Amended Complaint Serra alleges that he sent Notice to Quantum of the exercise of his continuing right to rescind, prior to the  completion of any purported foreclosure auction, by a letter dated October 25, 2010,  and at ¶38 that Quantum received such correspondence, but refused to take any of the required actions required. (A-427). Thus, Serra specifically cited to solely G.L. c. 140D, and its implementing regulation 209 C.M.R. 32.23(1)(c), and specifically *did not* cite to the Federal Truth In Lending Act, nor its implementing regulation, Regulation Z.

However, even though the case law decisions state that the MCCCDA is

"*modeled closely after TILA*", Massachusetts took the affirmative step to "opt out" of TILA with regards to the application of rescission, as evidenced by the dichotomy between TILA and the MCCCDA,

The only purported "response" made by Quantum's counsel to the Serra Notice of Rescission that was provided to Serra was an interrogatory requesting *whether Serra had the financial ability to tender*, and therefore never responded in any meaningful way.[19]

The Serra Notice of rescission was clearly mailed and received by Quantum *prior to any purported auction sale* conducted by Quantum and/or Wells Fargo Bank as Trustee for RMAC Pass-Through Trust Series 2010-A. Indeed, while the Defendants admit that Quantum is only a purported "mortgage servicer", On November 25, 2009, Quantum was in purported sole possession of a purported assignment of the title to the Serra real property at issue in this matter, which was clearly recorded upon the Norfolk County Registry of Deeds at Book 27275, Page 159.(A-538-539).[20]

---

[19] Thus, the Defendants attempted to engraft their own self-serving, and legally inaccurate, implementation of the rescission procedure under the MCCCDA, unilaterally determining that as a condition precedent, Serra must Tender first.

[20] Massachusetts is a title theory jurisdiction, and therefore any purported "assignment", is a purported transfer of an interest in the title to land, See *U.S. Bank Nat'l Ass'n v. Ibanez*, 459 Mass 637, 649, "Like a sale of land itself, the assignment of a mortgage is a conveyance of an interest in land that requires a writing signed by the grantor. See G. L. c. 183, § 3; Saint Patrick's Religious,

Despite this fact, it is the Defendants contention that Wells Fargo Bank, N.A., _not in its individual capacity_, (or with any of its own depository monies at stake), but merely purporting to act in the purported role as a "trustee", for the named Defendant New York common law trust, and/or Delaware Statutory Trust (RMAC Pass-Through Trust Series 2010-A), that was the purported "owner-assignee" of the purported Serra indebtedness, to which the right of rescission would run to.

Therefore, the purported "Assignment" from Quantum to Wells Fargo Bank, N.A., purports to be part of one continuous transaction.[21]    Indeed, due to the fact that the Defendants were not the Serra original "Lender", Defendants can only

Educ. & Charitable Ass'n v. Hale, 227 Mass. 175 , 177 (1917). In a "title theory state" like Massachusetts, a mortgage is a transfer of legal title in a property to secure a debt. See Faneuil Investors Group, Ltd. Partnership v. Selectmen of Dennis, 458 Mass. 1 , 6 (2010). Therefore, when a person borrows money to purchase a home and gives the lender a mortgage, the homeowner-mortgagor retains only equitable title in the home; the legal title is held by the mortgagee. See Vee Jay Realty Trust Co. v. DiCroce, 360 Mass. 751 , 753 (1972), quoting Dolliver v. St. Joseph Fire & Marine Ins. Co., 128 Mass. 315 , 316 (1880) (although "as to all the world except the mortgagee, a mortgagor is the owner of the mortgaged lands," mortgagee has legal title to property); Maglione v. BancBoston Mtge. Corp., 29 Mass. App. Ct. 88 , 90 (1990). Where, as here, mortgage loans are pooled together in a trust and converted into mortgage-backed securities, the underlying promissory notes serve as financial instruments generating a potential income stream for investors, but the mortgages securing these notes are still legal title to someone's home or farm and must be treated as such."

[21] Although Serra has clearly challenged that in fact, no party has/have provided any clear documentary evidentiary indicia, that it/they are a proper party with "jurisdiction and authority" under statute to enforce the power of sale in the Serra mortgage under the strict mandates of G.L. c. 244 §14.

solely rely upon purported "assignments" of mortgage recorded upon the Serra title at the Norfolk County Registry of Deeds, as it/their foundational basis for proper "jurisdiction and authority" to foreclose under statute.

The Massachusetts Supreme Judicial Court has clearly spoken to the fact that merely because a document is recorded upon the Registry of Deeds, in and of itself does not definitively establish the legal validity of the document, but rather it is the legal effectiveness of the document, in and of itself that controls. See *Bevilacqua v. Rodriguez*, 460 Mass. 762, 771 (2011) [22]

### 2.    Tender Requirement and the MCCCDA

In the District Court Judge's Memorandum and Order, he made a thorough examination as to the "tender requirement", and whether Serra would have to *first tender* as a *condition precedent* to effectuate a legally valid rescission. (ADD-021-

---

[22] "……there is nothing magical in the act of recording an instrument with the registry that invests an otherwise meaningless document with legal effect. See S & H Petroleum Corp. v. Register of Deeds for the County of Bristol, 46 Mass. App. Ct. 535 , 537 (1999) ("The function of a registry of deeds is to record documents. It is essentially a ministerial function . . ."). Recording may be necessary to place the world on notice of certain transactions. See, e.g., G. L. c. 183, § 4 (leases and deed); G. L. c. 203, §§ 2-3 (trust documents). Recording is not sufficient in and of itself, however, to render an invalid document legally significant. See Arnold v. Reed, 162 Mass. 438 , 440 (1894); Nickerson v. Loud, 115 Mass. 94 , 97-98 (1874) ("mere assertions . . . whether recorded or unrecorded, do not constitute a cloud upon title, against which equity will grant relief"). As a result, it is the effectiveness of a document that is controlling rather than its mere existence. See Bongaards v. Millen, 440 Mass. 10 , 15 (2003) (where grantor lacks title "a mutual intent to convey and receive title to the property is beside the point")

027) The District Court Judge further made findings that "Serra _need not_ have first returned the loan proceeds received to effect a recession" (p.23 of Order).[23] (ADD-023).[24]

However, the District Court Judge also clearly stated that "A more complicated issue is whether the Court can, or should, modify the ordinary statutory process to condition rescission on tender by the borrower". _Id._ The District Court Judge went on to note that "Courts within this district have split on the issue", and cited to only federal court holdings from the District of Massachusetts Bankruptcy Courts. (ADD-023). The District Court Judge also noted _this Court's_ holding in _Belini v. Washington Mutual Bank,_ FA, 412 F. 3d 17, 28 (1st Cir. 2005), that this court stated that "_TILA_" alters the common law rescission by forcing the creditor to tender before the debtor…" . (ADD-023). The

---

[23] Indeed, at oral argument for the Defendants Motion for Summary Judgment, the District Court Judge appears quite troubled with the Defendants' position that Serra was required to tender as a condition precedent, and further that Defendants never sent Serra any letter that Serra had to respond to. (A-1052-1064).

[24] Indeed the District Court Judge appears to have consistently erroneously _conflated_ his Order regarding Serra's Preliminary injunction to be based upon obtaining a bond in the amount of $150,000.00 to forestall the purported foreclosure auction, as applying to Serra meeting any "tender" obligation. Further the District Court Judge completely ignored his predecessor counsel's argument(s) related to the damage claims alleged by Serra effectuating a "set off" as to any amount owed to be supplied by Serra, however, the District Court Judge the effect of which incorrectly placed a legally incorrect burden upon Serra to tender the majority of the full amount as a condition precedent to tender, as the cost of any purported "bond" would require almost 100% of the face amount necessary.. (A-861-70).

District Court Judge further noted that; "it is not clear if the First Circuit would interpret the MCCCDA similarly because the Code of Massachusetts Regulations (C.M.R.) provides an arguable basis for holding that under the law applicable in the Commonwealth, a court cannot place conditions upon rescission", citing *In re Cromwell*, 461 B.R., at 131-36, and *In re Giza*, 428 B.R., at 273-76. (ADD-023).

While the District Court Judge apparently found that as to Serra, the Defendants placed a *legally incorrect condition precedent requirement upon Serra to first Tender*, ultimately the District Court Judge found that "the condition of tender is "*beside the point in this case at this stage", because "after Serra first advanced his claim seeking rescission, the property was sold at foreclosure auction, and therefore Serra's right of rescission expired due to the said purported "sale"*. (ADD-024).

### 3. Where a Borrower's  Validly Noticed Rescission Is Received By a Purported "Mortgagee" *Prior* To A Foreclosure Auction Sale, The Purported Foreclosure Auction Sale *Does Not* "Extinguish" the Borrower's Right of Rescission"

The Plaintiff's  examination of case law in this Circuit discussing the

The issue of whether a completed foreclosure auction sale would "extinguish" a borrower's Right of Rescission, appears to only have considered those Borrowers' Notice of such exercise of Rescission *after* the completed auction sale, or where the purported creditor recipient of such Notice of Rescission; had already made

affirmative statements to the borrower; _refusing_ to Rescind the loan transaction. [25]

In the instant matter, on <u>October 25, 2010</u>, Serra clearly sent his Notice of

---

[25] Respectfully stated Plaintiff's counsel has not discovered any opinions to date from the First Circuit discussing the precise fact pattern concerning this issue that is squarely presented to this court, which is; where a creditor is validly served with the Notice of Rescission prior to the foreclosure auction sale, whether a subsequent foreclosure auction would cut off the mortgagor's right to rescind. There appears to be a dearth of case law on this issue, however, in _Ofor v. Ocwen Loan Servicing, LLC_ et al; C.A. No. 09-1402 (D. Minnesota 2009), the Court was faced with a similar fact pattern that is currently before this court, regarding the mortgagor sending the foreclosing entity a Notice of Rescission prior to the foreclosure auction sale. Serra pointed these fact out to the District Court Judge, who apparently completely disregarded the same. In the _Ofor_ opinion, at page 5, it states that "neither party cited to any case law on point to this particular issue, <u>and the Court could find none</u> _sua sponte_." The _Ofor_ court further stated that "Court decisions stating unequivocally that the right to rescind expires with the sale <u>are in the main, cases in which the homeowner did not exercise the right to rescind until after the sale</u>" See _Jones v. Saxon Mortgage Inc_. 161 F.3d 2, 1998 WL 614159 AT *S3 (4th Cir 1998) (noting the homeowner "would have had to give proper notice of rescission prior to the foreclosure sale or his right of rescission would have expired on the date of the foreclosure sale). Ultimately the _Ofor_ court denied Ocwen's Motion to Dismiss, based upon the failure of the record to have developed a sufficient record as to whether _Ofor_ had a legally sufficient basis to actually rescind. Indeed, the cited case law in support of the District Court Judge's ruling that Serra's right to rescind was cut off upon the foreclosure sale, were matters in which the homeowner's in those actions, only submitted the Notice of rescission _**after**_ the auction, whereas here, the Plaintiff had sent his Notice of Rescission _**over one year prior**_ to the foreclosure auction to Quantum, who purported to act on behalf of Wells Fargo at the time of such Notice. Indeed, if such a procession of events were to become the "law of the land", one would be hard pressed to imagine a creditor ever responding to _**any**_ borrower's validly Notice of Rescission, whereby it would be quite simple to merely avoid any potential liability, and extinguish the borrower' valid rescission right by conducting the foreclosure sale and _**thereby evade any review**_. Respectfully stated, this would be an inequitable result that Congress clearly would not have intended, especially in the context of a consumer protection statute

Rescission _prior_ to any foreclosure auction sale to Quantum (who was purporting to act for the same undisclosed Wells Fargo Bank, N.A. as Trustee for the Defendant Trust that purportedly ultimately conducted the purported foreclosure auction sale of the Serra residence). (A-638-39). The letter from Serra to Defendants clearly states that Serra is exercising his extended right to rescind **_under G.L. c. 140D_**, (not TILA),  based upon the excessive $224.48 charge for the credit report fee. The said letter only requests supporting documents to determine Serra's obligation to tender at all, and leaves the Defendants obligations under G.L. c. 140D undisturbed.  (A-638-39).[26]

Defendants' letter in response, dated November 17, 2010, incorrectly indicates that the "note and mortgage" were transferred to Quantum, as Quantum admits that it is merely a mortgage servicer acting at the behest of the Wells Fargo Trust, not in its own capacity as any "owner".[27] More importantly, the Defendants

---

[26] Indeed, in Defendants' Memorandum in Opposition to the Plaintiff's Motion for Preliminary Injunction, describing the "procedural history of the litigation" at that time, the Defendants clearly **_omit_** any reference to responding to the Serra "Notice of Rescission", and attempt to characterize the Plaintiff's October 25, 2010 letter as solely a "QWR that Defendants responded to" ("on November 17, 2010, , Defendants' counsel acknowledged said QWR and provided a loan history to Plaintiff's counsel" A-132, at Section C, second sentence)

[27]  A more complicated issue upon Remand would be precisely how the purported sequence of events would comport with the trust requirements, especially where the said failure would leave the trust without legal claim to title to the Serra real property, as Serra had a statutory right to redeem providing him the legal standing

November 17, 2010 letter in Response incorrectly states that the Serra letter appears to be a "*Qualified Written Request*", and a Notice of Rescission. The only correspondence directed in Response to Serra's request for rescission is, "*Could you please advise if your client has the financial ability to tender the loan obligation*…." (A-640-41).

Again, on March 22, 2011, with regards to Serra's validly Noticed request for Rescission, the Defendants sent Serra a letter, failing to specifically deny Serra's valid request, but again *only* requesting Serra to advise *whether he had the financial ability to "tender"*. (A-643) Thus, Defendants *never stated that they refused to rescind*, only that Defendants indicated their intention to engraft their own self-interested legally incorrect condition precedent that Serra must "tender" first.

The instant matter appears to represent *a first impression issue* in this Circuit, which is where a borrower's validly Noticed Rescission is received by a purported "mortgagee" *prior* to a foreclosure auction sale, *specifically under the MCCCDA*, where such "mortgagee" is acting as a mortgage servicer for an undisclosed trust, and where subsequent to the mortgage servicer's receipt of such Notice of Rescission, *never responds, or never rejects*, the borrower's Notice of

---

to challenge the integrity of his title in order to redeem under G.L. c. 244 § 18, or as a condition of Rescission under G.L. c. 140D.

Rescission, and only requests that the borrower tender as a condition precedent, and in the face of existing valid Notice, thereafter purports to intentionally "assign" the borrower's mortgage back to the same undisclosed trust principal that ultimately foreclosed, with scienter that there was never any response to the borrower's Notice of Rescission, and that as a result of the preceding; then asserts that the foreclosure auction sale "extinguished the borrower's validly Noticed Right of Rescission", (which Serra's Notice is clearly premised upon a legally viable claim of being charged an excessive fee for a credit report.) *At a bare minimum*, this represents a remaining issue in dispute, and further, Serra would argue that Defendants own production, statements, and considering the statute(s) and regulation(s) at issue; appear to establish that *Summary Judgment should enter in Serra's favor on this issue*.

### 4. The Credit Report Fee Is *Conspicuously Apparent* on The Face of The Plaintiff's HUD-1 Statement Thus Liability for Attorney Fees Flows to The Present Defendant

In the District Court Judges August 15, 2012 Memorandum and Order he left the question open Regarding Serra's damages for the alleged failure to comply with G.L. c. 140D (separate from the rescission claim, as well as Quantum's claim for litigation fees and costs. (ADD-001-040). Also on August 15, 2012, the District Court Judge took the highly unusual step of issuing a "Procedural Order" directing further summary judgment practice, and directing

51

"Serra to submit a summary judgment motion, with supporting Affidavits, addressing (1) the facts that support his claim that the defendants failed to comply with G.L. c. 140D, and the amount of damages he contends that he is owed as a result, and (2) the viability of the defendants claim for unjust enrichment." (ADD-041)

On August 08, 2012, Serra submitted his Motion for Partial Summary Judgment (A-937-1001).[28] In Defendants' Opposition, at p. 6, it bases its argument that the Plaintiff has failed to establish Assignee liability on the basis of 209 CMR 32.04(3)(g) in which credit reporting fees are excluded from the finance charge, **_but neglects to reiterate that such a fee(s) are excluded only if they are "bona fide and reasonable"_**.[29]   (A-1007-08) The Defendant cites to _McDermott v. Mortgage Elec. Registration Systems_, 2010 WL 3895460. Like its citation to _Mckenna v. Wells Fargo Bank, N.A._ 2012 WL 3553475 at *8, (involving a fee charged for title insurance) McDermott did not involve a fee charged for a credit report, rather _McDermott_ involved a dispute as to the fee charged for a title examination. Thus, in both _McDermott_ and _McKenna_, there was **_no discussion_** as

---

[28] Indeed at n. 1 of his Motion for Partial Summary Judgment, Serra candidly states that he respectfully disagreed with the District Court Judge's ruling(s) in this matter, and was only submitting the instant Motion for Summary Judgment to comply with the District Court Judge's Order, and additionally to supplement the entirety of any appeal. (A-937)

[29] Clearly a $224.48 charge for a credit report on its face, would not appear to be "reasonable", which at a bare minimum would leave this as an existing issue in dispute,  requiring more than a self-serving "Affidavit" from one Rod Correia, which fails to indicate precisely how such fee would be reasonable under any current existing market rate at that time.

to prevailing market rates at all, nor indeed **_any_** consideration at all, of an examination of prevailing market rates. Unlike fees charged for *title insurance* and *title examinations*, a credit reporting fee is readily apparent to be excessive when viewed in light that a mortgage broker such as Shamrock is afforded volume discounts on obtaining credit reports, and even if it was a consumer, for the Defendant to state that an entity determines that a $244.48 charge for a credit report fee is a bona fide "hard cost", *completely ignores* the per se unreasonableness of such charge.

Additionally, there has been no foundation established whether such fee was ever actually paid, or merely retained by Shamrock, and if paid to CREDCO whether Shamrock Financial Corporation received any financial remuneration ("kickback incentive") for the charging of such unreasonable fee. And therefore the District Court Judge erred by not recognizing that where such charge was apparent on the face of the HUD-1 statement, the current Defendant(s) are liable for the Plaintiff's attorney's fees and costs for the defense of the entirety of the action between the parties.

### 5. Plaintiff Need Not Establish Damages

At page 8 of the Defendants' Opposition, they allege that Serra has failed to establish damages attributable to any alleged violation related to credit reporting fees. (A-1008-09). In *Mayo v. Key Financial Services, Inc.*, 424 Mass. 862, 865

(1997), the Supreme Judicial Court determined that there is *no flexibility* in deciding whether an understatement of a finance charge is material. This statute is currently tempered by regulation that mandates that an understatement of more than $100 is per se material, However, *once foreclosure has been initiated*, under G.L. c.. 140D, § 10(i)(2), the finance charge and other disclosures affected by the finance charge are considered accurate ***only*** if the disclosed finance charge does not vary from the actual finance charge *by more than thirty-five dollars ($35)*. Thus, the Plaintiff does not need to prove damages, as strict liability is imposed for a material understatement of the finance charge that is greater than $35.00, as the Plaintiff has plausibly pled, and established here in the instant action. Therefore the District Court Judge erred by accepting the Defendants position in this regard.

### 6.  Serra is clearly Entitled to His Attorneys' Fees Under G.L. c. 140D §33(a).

The Massachusetts Supreme Judicial Court has opined that in order to find that a homeowners attorney fees are recoverable, from an assignee of the originator of a mortgage loan transaction at issue, the homeowner seeking to enforce the right of rescission, based upon the under-disclosure violation at issue, would need to show that such under disclosure "*be apparent on the face of the disclosure statement*" See *Mayo* at 865. See also G.L. c. 140D §33(a). Here, the District Court Judge erred by not recognizing the fact that the "credit report" fee was clearly and

conspicuously noted upon the **_face_** of the HUD-1 Settlement _Disclosure Statement_ at line 804. (A-302). Thus the District Court Judge clearly erred by not making a finding that the Plaintiff plausibly pled allegations met the requirements of G.L. c. 140D §33(a), and therefore should have been allowed to recover his costs and attorney fees associated with the entirety of his actions seeking to rescind the mortgage loan at issue (Please see the Affidavit of John P. Serra, for an itemized breakdown of his actual incurred damages, and attorneys fees). (A-953-55).

In Response to Serra's Statement of Material Facts at #5 and #6, Defendants admit that the credit reporting fee was readily apparent upon the face of the HUD-1 Settlement Statement . The Defendants Responded with the following:

> "It is acknowledged that the Credit Report Fee was on the HUD, but it is disputed that it is inaccurate or "unreasonable on its face" The Credit Report Fee was the actual hard cost of the credit reports, was not a finance charge, and was reasonable and bona fide, citing to the purported "Affidavit" of Rod Correia." (A-1012-13)

Again, the Defendants equate the purported fact that this was a "hard cost", with "reasonableness", yet neglect to explain how such "hard cost" was "bona fide" and/or "reasonable", and further state that this issue is "disputed". Therefore, the Plaintiff respectfully states it is clear beyond peradventure that District Court Judge committed clear error, in that; 1) the Plaintiff provided a valid Notice of Rescission to the Defendants prior to the purported auction sale, on October 25, 2010, 2) that the Defendants never answered the Plaintiff's valid claim related to

his succinctly articulated basis for rescission, only making the legally incorrect demand that Serra tender first; 3) that as G.L. c. 140D §4(e)(6) defines a "credit report fee" as a "finance charge", the $224.48 fee is clearly one covered under statute; 4) that the Plaintiff's basis for exercising his extended right to rescind was based upon an under-disclosure of this finance charge, and 5) that this under disclosure was clearly apparent upon the face of the disclosure statement. Thus, based upon the entirety of the foregoing the District Court Judge committed grave error in finding for Defendants on this issue, as the Defendants theory was merely adopted in its entirety, in that the Defendants characterization of the said unreasonable $224.48 credit report fee as a "hard cost" and the District Court Judge failed to ever undertake any serious consideration as to the purported "reasonableness" of such charge. (A-1047-48). Thus, at a bare minimum there remain numerous issues in dispute related to the instant matter.

### D.    The District Court Judge Erred By Not Recognizing That _Any_ Finding For Serra Under <u>Count V</u> of His Complaint Related To G.L. c. 140D Above Required A Finding of An Automatic Violation of G.L. c. 93A

Based upon the foregoing discussion above Supra, related to Serra's Rescission claim under <u>Count III</u> of his Second Amended Complaint, Defendants violated G.L. c. 140D. Under G.L. c. 140 D § 34, any violation of _**any section**_ of G.L. c. 140 D, is _**an automatic violation of G.L. c. 93A**_.

"Section 34. A violation of this chapter, or any rule or regulation issued hereunder, shall constitute a violation of chapter ninety-three A."

At n. 5 of the District Court Judge's Memorandum and Order, he committed clear error by making the erroneous determination that

"the Amended complaint only alleges that Quantum violated G.L. c. 93A through "wrongful foreclosure" and by "commencing and pursuing a foreclosure proceeding against plaintiff without standing or proper authority to do so, <u>Count III does not relate to any alleged violation of G.L. c. 140D</u>." (ADD-018)

The District Court Judge was clearly confused, as discussed immediately above Supra, that Serra clearly alleged violations of G,L. c. 140D, at <u>Count IV</u>, "Rescission" (A-440), the violation of which, is an "*automatic*" violation of G.L. c. 93A. Therefore, at a minimum, there remains issue(s) in material dispute as to Counts II, III and IV of the Serra Second Amended Complaint..

1. **The District Court Judge Further Erred By Relying Upon A Citation from a 1989 Case That Made Findings That Assignees Could Not Be Held Liable For Any Alleged Unfair or Deceptive Act of The Originating "Lender"**

A recent decision of the Massachusetts Supreme Judicial Court has held that when a high-cost mortgage loan is assigned, the assignee bank is liable for "all affirmative claims and defenses." *Drakopoulos v. U.S. Bank Nat'l Ass'n*, ___ N.E.2d ___, ___ (Mass. 2013) (2013 WL 3470485, at *3 & n.11) (citing Mass.

57

Gen. Laws ch. 183C, § 15(a)). "[A]ll affirmative claims," the SJC determined,

***includes not only those brought under the Predatory Home Loan Practices Act***

***but also other consumer protection statutes, including G.L. c. 93A***.[30]

> "To the extent that the bank may thus have liability as an assignee by virtue of the act, it would extend to "all affirmative claims and defenses with respect to the loan" that the plaintiffs could assert against the lender, including the statutory claims asserted under the Consumer Protection Act, G. L. c. 93A; and the Borrower's Interest Act, G. L. c. 183, § 28C, as well as the affirmative defense of unconscionability. Given this, allowing summary judgment in the bank's favor on those three claims, to the extent that it is based on the bank's status as assignee, is premature" *Drakopoulos* at 782.

Therefore, the District Court Judge committed clear error, relying upon;

*Ford Motor Credit v. Morgan*, 536 N.E. 2d 587 (Mass. 1989) in making a finding

that G.L. c. 93A liability would not extend to Defendants Quantum and Wells

Fargo:[31]

> "Quantum and Wells Fargo contend that they are not liable for the alleged G.L. c. 93A violation because each is merely an assignee, and not the originator, of the mortgage and loan. The case law supports the argument made by Quantum and Wells Fargo" [32] (ADD-018)

Therefore, as Serra made plausible allegations at ¶¶17-,21(i)-(iv), related to

---

[30] See also *DeMelo v, U.S. Bank Nat'l Ass'n,* Ca. No. 12-2485, at p. 12 (1st Cir. August 16, 2013)

[31] Indeed, see " *Drakopoulos* at 782

[32] But see; Drakopoulos at n. 16, "Moreover, as a matter of common law, assignees are not shielded from liability under G. L. c. 93A by virtue of their assignee status.".

Count III of his Second Amended Complaint (A-437-39),, which the District Court Judge clearly applied an *incorrect legal standard*, it would be clear beyond peradventure that the said dismissal of Count II and III under a Summary Judgment Motion, cannot stand, "*allowing summary judgment in the bank's favor on those three claims, to the extent that it is based on the bank's status as assignee, is premature*" *Drakopoluos,* at 781.

## II. THE DISTRICT COURT JUDGE ERRED IN ALLOWING THE DEFENDANTS COUNTERCLAIMS RELATED TO BREACH OF CONTRACT AND POSSESSION[33]

### A. Breach of Contract

Premised upon the District Court Judges erroneous application of the law described above Supra, necessarily leaves the issue(s) involved with the Defendants claim of "breach of contract" in dispute, including, but not limited to, the fact that Serra has clearly advanced a viable claim of Rescission as against Defendants.

### B. Possession

In finding for the Defendants in their Counterclaim for "Possession", the District Court Judge rightly notes that:

"There is no question that Wells Fargo must show strict adherence to the Massachusetts statutory foreclosure requirements in order to

---

[33] The Defendants abandoned their third Counterclaim for Unjust Enrichment.

demonstrate its right to possession, citing *Bank of N.Y. v. Bailey*, 951 N.E. 2d 331, 334 (Mass. 2011)" (ADD-031)

However, the District Court Judge's error is that; he failed to discern that *Bailey* involved an appeal of an action that was specifically brought under the specific Massachusetts state statute(s) related to "Summary Process". In the instant matter, there were no "Eviction proceedings" brought under the Massachusetts State Statute related to any Summary Process action against Serra under, G.L. c. 239 that were "Removed" to this Court. Thus, the Plaintiff Serra makes the affirmative challenge to the District Court Judge's jurisdiction to have sua sponte heard the Defendants' claim for possession as 1) the federal court lacks the subject matter jurisdiction as an inferior Court to hear even this state law issue, 2) the Defendants intentionally seek to circumvent the specific Massachusetts Legislative directive under G.L. c. 239, to carry out any Eviction proceeding by "Summary Process", 3) under Massachusetts state law, any finding for a purported foreclosing entity under G.L. c. 244 § 14, does not "automatically" entitle that entity to "Possession", as it must resort to G.L. c. 239 to carry out "Summary Process". Therefore the Plaintiff Serra respectfully requests that this Court Reverse the District Court Judge's ruling for "Possession" for the Defendants.

## III.  CONCLUSION

Respectfully stated, the District Court Judge clearly abused his discretion, committed numerous errors in legal analysis, committed further numerous errors in application of the law, committed further numerous errors of citation to off point case law, while fundamentally ignoring the first impression argumentation of the Plaintiff. Further respectfully stated, the District Court Judge clearly erred, by not recognizing that there clearly are remaining issues in dispute, and therefore the Granting of Summary Judgment for the Defendants on all counts, was at a bare minimum *premature*. Thus for all of the foregoing reasons and stated *ratio decidendi* contained herein, the Plaintiff respectfully requests that this Court reverse the District Court Judge's Memorandum and Order, vacate the Judgment, and remand this matter back to the District Court consistent with this Court's findings.

Respectfully Submitted by
Plaintiff, John P. Serra, II
By his attorney,

/s/ Glenn F. Russell, Jr.
Glenn F. Russell, Jr.
BBO#656914
Glenn F. Russell, Jr. & Associates, P.C.
38 Rock Street, Suite 12
Fall River, MA 02720
P.     (508) 324-4545
F.     (508) 938-0244
Dated:  October 28, 2013     Email:    russ45esq@gmail.com

61

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P.
   32(a)(7)(B) because:

2. This brief contains approximately  [13,983 words], excluding parts of the
   brief exempted by Fed.R.App. P. 32(a)(7)(B)(iii)

3. This brief complies with the typeface requirements of Fed. R. App. P.
   32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   a.  this brief has been prepared in a proportionally spaced typeface using
       Word version in 14 times new roman style.


   /s/Glenn F. Russell, Jr.
   Glenn F. Russell, Jr.

Dated:  October 28, 2013

## CERTIFICATE OF SERVICE

I, Glenn F. Russell, Jr. hereby certify that on October 28, 2013, this document was filed through the US Court of appeals for the first circuit CM/ECF, and will be sent electronically to its registered participants as identified in the Notice of Electronic Filing (NES) .

Dated:  October 28, 2013

/s/Glenn F. Russell, Jr.
Glenn F. Russell, Jr.

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

| **Document** | **Page** |
|---|---|
| District Court Decision of  August 15, 2012……...................................ADD-001 | |
| District Court Procedural Order of  August 15, 2012……......................ADD-041 | |
| District Court Decision of  March 29, 2013……...…….......................ADD-043 | |
| District Court Entry of Judgment April 23, 2013……….............................ADD-045 | |
| Plaintiff's Notice of Appeal April 29, 2013……….....................................ADD-046 | |
| G.L. c. 93A§§1-11 …...………………………………………...ADD-048 | |
| G.L. c. 140D……………………………………………………...ADD-064 | |
| 209 Mass. C.M.R. 32.00……………………………………………..ADD-072 | |
| G.L. c. 183 § 28C…...………………………………………..ADD-091 | |
| G.L. c. 183 § 54B…...………………………………………..ADD-102 | |
| G.L. c. 244 § 14……………………………………………….ADD-103 | |
| G.L. c. 244 § 18……………………………………………….ADD-108 | |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN P. SERRA, II,                    )
                                      )
              Plaintiff,              )    CIVIL ACTION NO.
                                      )    11-11843-DPW
v.                                    )
                                      )
QUANTUM SERVICING CORP.;              )
EQUIFIRST CORPORATION;                )
WELLS FARGO BANK, N.A.,               )
TRUSTEE FOR RMAC PASS-THROUGH )
TRUST SERIES 2010-A,                  )
                                      )
              Defendants.             )

MEMORANDUM AND ORDER
August 15, 2012

Plaintiff John P. Serra, II, filed this suit against
Defendants Quantum Servicing Corporation; Equifirst Corporation;
and Wells Fargo Bank, N.A., Trustee for RMAC Pass-Through Trust
Series 2010-A, alleging misconduct relating to a mortgage secured
by real property in Bellingham, Massachusetts. Wells Fargo
responded with counterclaims alleging breach of contract, unjust
enrichment, and a valid foreclosure; it requested a deficiency
judgment as well as possession of the property. Quantum and
Wells Fargo have moved for summary judgment on all claims and
counterclaims. While I will grant the defendant's motion for the
most part, there are several loose threads to be attended to
before judgment disposing of this case may be entered.

# I.   BACKGROUND

## A.   *Factual Background*

On May 2, 2007, John P. Serra, II, executed a promissory note in the amount of two hundred and seventy six thousand, two hundred and fifty dollars ($276,250.00) to EquiFirst Corporation. The note was secured by a mortgage on the property at 61 Scott Hill Boulevard, Bellingham, Massachusetts ("the Property").  The mortgage identified the "Lender" as Equifirst Corporation.  It stated that Mortgage Electronic Registration Systems, Inc. ("MERS"), "a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns" was "the mortgagee under this Security Instrument."

The Norfolk County Registry of Deeds reflects a series of assignments of the mortgage.  The first two assignments are dated April 7, 2009.  One assigned the mortgage from MERS, as nominee for Equifirst Corporation, to Barclays Bank PLC.  The second assigned the mortgage from Barclays Bank PLC to Sutton Funding, LLC.

A Complaint to Foreclose Mortgage was filed in the Land Court on March 31, 2009, on behalf of Sutton Funding, LLC, requesting a judgment that Serra was not entitled to the benefits of the Servicemembers Civil Relief Act.  On May 26, 2009, the Order of Notice was published, served, and recorded.  Judgment issued on October 15, 2009.

2

A third assignment dated November 25, 2009, transferred the mortgage from Sutton Funding, LLC, to Quantum Servicing Corp ("Quantum"). On December 9, 2009, Quantum sent a Notice of Intent to Foreclose Mortgage and Pursue Deficiency After Foreclosure of Mortgage to Serra at the Property. Quantum then caused the Notice of Mortgagee's Sale of Real Estate to be published in the Milford Daily News on December 10, 2009; December 17, 2009; and December 24, 2009, announcing a foreclosure auction of the Property on January 6, 2010.

On January 4, 2010, Serra filed for bankruptcy under Chapter 13 of the United States Bankruptcy Code; the cases were docketed as Case No. 10-10033 and Case No. 10-40060. The foreclosure sale scheduled for January 6, 2010, was canceled. The bankruptcy cases were thereafter closed. Case No. 10-10033 was closed on January 7, 2010, because Serra had a prior bankruptcy case. Case No. 10-40060 was dismissed on May 10, 2010, because Serra failed to submit an amended Chapter 13 Plan.

On June 1, 2010, Quantum sent a Notice of Intent to Foreclose Mortgage and Pursue Deficiency After Foreclosure of Mortgage to Serra at the Property. Quantum then caused the Notice of Mortgagee's Sale of Real Estate to be published in the Milford Daily News on June 3, 2010; June 10, 2010; and June 17, 2010, announcing a foreclosure auction of the Property on June 28, 2010.

On June 28, 2010, Serra again filed for bankruptcy under
Chapter 13 of the United States Bankruptcy Code; the cases were
docketed as Case No. 10-16986 and Case No. 10-43313.  The
foreclosure sale scheduled for June 28, 2010, was canceled.  The
bankruptcy cases were thereafter closed.  Case No. 10-16986 was
closed on June 30, 2010, because Serra had a prior bankruptcy
case.  Case No. 10-43313 was dismissed on August 17, 2010,
because Serra failed to submit required documents in a timely
manner.

On September 8, 2010, Quantum sent a Notice of Intent to
Foreclose Mortgage and Pursue Deficiency After Foreclosure of
Mortgage to Serra at the Property.  Quantum then caused the
Notice of Mortgagee's Sale of Real Estate to be published in the
Milford Daily News on September 8, 2010; September 15, 2010; and
September 22, 2010, announcing a foreclosure auction of the
Property on October 4, 2010.

On October 1, 2010, Serra again filed for bankruptcy under
Chapter 13 of the United States Bankruptcy Code; this case was
docketed as Case No. 10-20856.  The foreclosure sale scheduled
for October 4, 2010, was canceled.  The bankruptcy case was
thereafter closed on November 8, 2010, because Serra failed to
comply with a court order to file missing documents.

Serra's counsel sent Quantum's counsel a letter dated
October 25, 2010.  The letter informed Quantum that Serra was:

4

exercising his extended right to rescind pursuant to MCCCDA . . . . because the disclosed finance charge was understated beyond any tolerance permitted by law, as certain closing costs--including but not necessarily limited to a "credit report fee"--were not bona fide or reasonable and thus should have been, but were not, included in the disclosed finance charge.

In a letter dated November 17, 2010, Quantum's counsel acknowledged receipt of the October 25, 2010, letter and requested that Serra's counsel "provide the documentation on which [he] relied to request Quantum to rescind the loan obligation."

A fourth assignment dated June 1, 2011, transferred the mortgage from Quantum to Wells Fargo Bank, N.A., not in its individual capacity but solely as Trustee for RMAC Pass-Through Trust, Series 2010-A ("Wells Fargo"). On August 15, 2011, Wells Fargo sent a Notice of Intent to Foreclose Mortgage and Pursue Deficiency After Foreclosure of Mortgage to Serra at the Property. Wells Fargo then caused the Notice of Mortgagee's Sale of Real Estate to be published in the Milford Daily News on August 16, 2011; August 23, 2011; and August 30, 2011, announcing a foreclosure auction of the Property on September 13, 2011.

On September 12, 2011, Serra again filed for bankruptcy under Chapter 13 of the United States Bankruptcy Code; the case was docketed as Case No. 11-18688. The foreclosure sale scheduled for September 13, 2011, was postponed to October 28, 2011. The foreclosure sale was subsequently postponed a second

time to November 11, 2011, and a third time to December 7, 2011.

On December 7, 2011, a foreclosure auction was conducted. Wells Fargo purchased the property for $191,000.00. As of that date, Serra's total debt was $260,632.10. Wells Fargo additionally states that as of that date it had spent $14,914.37 on attorney fees and foreclosure costs as well as approximately $11,000.00 on litigation fees and costs.

On February 23, 2012, Wells Fargo caused a foreclosure deed to be filed at the Norfolk County Registry of Deeds. The foreclosure deed was executed on January 26, 2012, and transferred the property to Wells Fargo for $191,000.00. On March 12, 2012, Wells Fargo sent Serra a three-day notice to quit.

**B.  *Procedural Background***

On March 4, 2011, Serra filed this case at the Norfolk County Superior Court. Quantum, Equifirst, and John Does 1-5 were named as the Defendants. Equifirst and John Does 1-5 were subsequently dismissed from the case without prejudice for lack of timely service.

On October 14, 2011, Serra filed an Amended Complaint against Quantum, Equifirst,[1] and Wells Fargo. Serra brought

---

[1]  Although Equifirst is named in the Amended Complaint, none of the counts requested relief with respect to Equifirst, and it does not appear from the docket that Equifirst has been served with the Amended Complaint.

6

wrongful foreclosure and G.L. c. 93A claims against both Quantum and Wells Fargo.  Serra additionally requested declaratory and equitable relief with respect to both Quantum and Wells Fargo, alleging that the loan was structurally unfair in violation of G.L. c. 93A and that the lender failed to comply with the provisions of 209 CMR 32.02 *et seq*.  Finally, Serra requested judgment rescinding the mortgage transaction pursuant to G.L. c. 140D.

Quantum and Wells Fargo removed the case to this Court on October 19, 2011.  On October 26, 2011, Serra filed a motion for a preliminary injunction.  After considering the briefing and hearing argument, I granted the motion on the condition that a bond or alternative form of security in the amount of $150,000.00 be secured no later than December 1, 2011.  No security was obtained and the preliminary injunction order was not entered.

On February 13, 2012, Quantum and Wells Fargo filed their answer and affirmative defenses.  Wells Fargo additionally brought three counterclaims against Serra.  First, Wells Fargo also alleged that Serra breached the mortgage contract and requested a deficiency judgment, fees, and costs.  Second, Wells Fargo alleged that Serra was unjustly enriched and requested damages.  Finally, Wells Fargo alleged that Serra's right to possess the Property terminated at the foreclosure sale and

7

requested a judgment for possession and the issuance of an execution.

Quantum and Wells Fargo have moved for summary judgment on all claims and counterclaims, which Serra has opposed. Upon request of this Court, both parties submitted additional briefing on the effect of the recently decided *Eaton v. Federal National Mortgage Association*, 969 N.E. 1118 (Mass. 2012), on the pending motion.[2] I have considered all of the parties' submissions as well as the oral arguments presented at the motion hearing.

## II. STANDARD OF REVIEW

A movant is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is 'material' if it has the potential of determining the outcome of the litigation." *Baker v. St. Paul Travelers Ins. Co.*, 670 F.3d 119, 125 (1st Cir. 2012) (quoting *Scottsdale Ins. Co. v. Torres*, 561 F.3d 74, 77 (1st Cir. 2009)).

---

[2]  While Quantum's and Wells Fargo's initial motion requested summary judgment on all claims and counterclaims, the supporting memorandum did not include argument relating to Count VI of the Complaint ("Wrongful Foreclosure v. Wells Fargo"). However, in their supplemental briefing regarding *Eaton v. Federal National Mortgage Association*, 969 N.E. 1118 (Mass. 2012), the defendants addressed Count VI in the context of *Eaton*.

8

Serra "may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." *Rockwood v. SKF USA Inc.*, No. 11-1105, 2012 WL 2437685, at *7, -- F.3d --, (1st Cir. June 28, 2012) (quoting *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006)). He "must be able to point to specific, competent evidence to support his claim." *Id.* (quoting *Soto-Ocasio v. Fed. Express Corp.*, 150 F.3d 14, 18 (1st Cir. 1998)). In evaluating this evidence, I "must construe the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's favor while safely ignoring conclusory allegations, improbable inferences, and unsupported speculation." *Collins v. Univ. of N.H.*, 664 F.3d 8, 14 (1st Cir. 2011) (alteration in original) (internal quotation marks omitted).

### III.   ANALYSIS

*A.    The Counts of the Amended Complaint*

#### 1.    Wrongful Foreclosure (Quantum)

In Count I of the Amended Complaint, Serra alleges that Quantum wrongfully foreclosed on his mortgage. Quantum contends it is entitled to judgment on this count because (1) Serra has produced no evidence to show that Quantum did not have standing to foreclose at the times that it commenced foreclosure proceedings and (2) the only foreclosure that was completed was conducted by Wells Fargo, not Quantum.

9

Serra speculates that the assignment from Quantum to Wells Fargo might have been invalid and states that "it remains a genuine issue of dispute as to whether in fact Quantum played a role in the wrongful foreclosure of the Serra residence." Serra provides no evidence in support of the proposition that the assignment was invalid. He fails to explain why an invalid assignment would result in liability for wrongful foreclosure on the part of Quantum where the foreclosure was conducted by Wells Fargo. Serra offers neither case law in support of the proposition that the assignor of a mortgage is generally liable for a wrongful foreclosure conducted by the mortgage's assignee nor evidence in support of the proposition that something specific about this transaction would call for such liability in the instant case.

Serra states that he cannot determine whether Quantum's counsel's statement that "at no time was Quantum's conduct unlawful" is true without the benefit of discovery. At oral argument he conceded, however, that he has chosen not to take any discovery and that nothing has prevented him from doing so. He also conceded that he has not sought to invoke Federal Rule of Civil Procedure 56(d) to obtain discovery regarding the summary judgment contentions.

As a general matter, "trial courts should refrain from entertaining summary judgment motions until after the parties

10

ADD-010

have had a sufficient opportunity to conduct necessary discovery." *Velez v. Awning Windows, Inc.*, 375 F.3d 35, 39 (1st Cir. 2004).[3]  However, the mere fact that the Serra would ordinarily have more time to conduct discovery is insufficient reason to deny a motion for summary judgment. *See Mowbray v. Waste Mgmt. Holdings, Inc.*, 45 F. Supp. 2d 132, 142 (D. Mass. 1999) ("[T]imeliness alone does not guarantee the success of a Rule 56([d]) motion" for discovery on a topic prior to summary judgment proceedings.).  Instead, "[a] party who legitimately requires more time to oppose a motion for summary judgment has a . . . responsibility to make the court aware of its plight. Typically, this is accomplished by way of either a 56([d]) motion or its functional equivalent." *Velez*, 375 F.3d at 39-40. Federal Rule of Civil Procedure 56(d) allows a district court to deny or defer consideration of a motion for summary judgment, allow time to conduct discovery, or issue other appropriate orders where "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to

---

[3]  Serra repeatedly states that he has been "estopped" from conducting discovery.  Nothing in the record supports such a statement.  No orders have issued preventing discovery from proceeding either before or after Quantum and Wells Fargo filed their motion for summary judgment.  This case was filed in March, 2011, and the Amended Complaint was filed in October, 2011. Serra had the opportunity to conduct discovery in the months that have passed since those pleadings were filed.  Serra's claim of estoppel appears to be without basis, as his concession at oral argument makes clear.

11

ADD-011

justify its opposition . . . ."  Fed. R. Civ. P. 56(d).

Here, Serra has neither filed a motion pursuant to Federal Rule of Civil Procedure 56(d) nor submitted affidavits or declarations in support of his claim that he requires more time for discovery.  While "[a]n opponent of a summary judgment motion need not follow the exact letter of Rule 56([d]) in order to obtain its benefits . . . the alternative proffer must simulate the rule in important ways."  *Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 988 (1st Cir. 1988).  The First Circuit has held that the alternative proffer should (1) be written and timely, (2) "articulate some plausible basis for the party's belief that specified 'discoverable' material facts likely exist," (3) show "some realistic prospect that the facts can be obtained within a reasonable (additional) time, and will, if obtained, suffice to engender an issue both genuine and material," and (4) "demonstrate good cause for failure to have conducted the discovery earlier."  *Id.*  Merely asking for more time in an opposition to a motion for summary judgment, without making the other required showings, is insufficient.  *See Hebert v. Wicklund*, 744 F.2d 218, 221-22 (1st Cir. 1984).

Serra does not satisfy these requirements.  He does not specify any material facts or articulate a plausible basis for a belief that such facts exist.  He hypothesizes that discovery might show that Quantum played some role in the Wells Fargo

12

foreclosure that would render Quantum liable if the foreclosure was wrongful, but provides no specifics regarding what that role might have been and no plausible basis for the conjecture.[4]

Serra's "motion papers disclose no plausible basis for a belief that [further discovery] would lead to material facts that might defeat summary judgment." *Rivera-Torres v. Rey-Hernandez*, 502 F.3d 7, 12 (1st Cir. 2007). "Speculative conclusions, unanchored in facts, are not sufficient to ground a Rule 56([d]) motion." *Id.* Because Serra neither points to evidence showing the existence of a disputed material fact nor demonstrates that I should deny or defer consideration of the motion for summary judgment under Rule 56(d), I will grant Quantum's motion with regard to Count I.

### 2.    G.L. c. 93A (Quantum)

In Count II of the Amended Complaint, Serra alleges that Quantum's conduct in commencing and pursuing foreclosure proceedings without standing to do so was unfair and deceptive in violation of G.L. c. 93A. He alleges that these proceedings compelled him to file bankruptcy and caused him to suffer monetary loss, damage to his credit, inconvenience, and emotional

---

[4]  Notably, Serra not only fails to point to such facts in support of his opposition and fails to articulate a plausible belief that such facts exist, but also has failed to assert such facts in his Amended Complaint.  Had Quantum challenged the wrongful foreclosure claim in motion to dismiss practice, it would have been successful at that stage as well.

distress.  To the extent that Court II relates to the December 7,
2011, foreclosure, Quantum contends that summary judgment is
warranted with respect to Count II because Count II is titled
"G.L. c. 93A v. Quantum--Wrongful Foreclosure" but Quantum did
not foreclose on the mortgage.  To the extent that Count II
relates to Quantum's acts in commencing foreclosures against
Serra, Quantum contends that it is not wrongful for a servicer to
take the necessary legal actions to foreclose the mortgage where
it is the mortgagee.

With respect to Quantum's role in the foreclosure conducted
by Wells Fargo in December, 2011, Count II is dismissed for the
reasons I discussed with respect to Count I.  *See supra* Part
III.A.1.  Serra has demonstrated no plausible basis for a belief
that Quantum is liable for any wrongful foreclosure conducted by
Wells Fargo.

With respect to the unfairness or deceit of the foreclosures
commenced (but not completed) by Quantum, Serra fails to
articulate a basis for a violation pursuant to G.L. c. 93A.
Serra makes no argument in his opposition to Quantum's motion for
summary judgment in support of the proposition that commencing
these foreclosures was unfair or deceitful.  In the Amended
Complaint, Serra states that there are five bases for his belief
that Quantum had no authority to foreclose, but each of these
bases is unsupported in law or in fact.

14

First, Serra states that "Quantum holds itself out as a loan
servicer only, its website proclaiming: 'Quantum Servicing
Corporation is a special servicer, dedicated to residential loan
management, loss mitigation services, foreclosure and bankruptcy
administration and management,['] and in its most recent annual
report filed with the Massachusetts Secretary of the
Commonwealth, Quantum describes its business as 'loss mitigation
and workout services for mtg loans.'"  Serra fails to explain why
Quantum's status as a loan servicer precludes it from having the
authority to foreclose.  He identifies no case law in support of
the proposition that a loan servicer cannot also be a mortgagee.

Second, Serra states that "in or about January, 2010,
plaintiff received a notice indicating that the loan was acquired
by an entity known as Roosevelt Mortgage Acquisition Company, and
identifying Quantum as the servicer."  Serra has not provided a
copy of this notice, an affidavit describing its receipt, or any
other verified documentation about its existence in support of
his opposition to Quantum's motion for summary judgment.  He does
not explain whether Roosevelt Mortgage Acquisition Company
purported to be the mortgagee or the noteholder or both.  He has
failed to establish a genuine issue of material fact.

Third, Serra states that during bankruptcy proceedings,
Quantum filed a proof of claim dated March 9, 2010, indicating
that Wells Fargo Bank was the holder of the mortgage.  Serra has

not provided a copy of this proof of claim or otherwise raised
this argument in support of his opposition to Quantum's motion
for summary judgment.  He does not explain whether Wells Fargo
Bank was represented to be the mortgagee or the noteholder or
both as of March 9, 2010.  He has failed to establish a genuine
issue of material fact.

Fourth, Serra states that "at no time has Quantum been the
holder of the promissory note or a transferee of the note with
the rights of a holder."  The Massachusetts Supreme Judicial
Court recently decided in *Eaton v. Federal National Mortgage
Association*, 969 N.E.2d 1118 (Mass. 2012), that to foreclose
pursuant to G.L. c. 244, § 14, a mortgagee must hold the mortgage
note or be acting on behalf of the noteholder.  *Eaton*, 969 N.E.2d
at 1121.  However, the Supreme Judicial Court held that this
requirement would only be imposed on foreclosure sales regarding
which the notice of sale was sent after June 22, 2012.  *Id.* at
1133.  All of the foreclosure proceedings commenced by Quantum
were noticed prior to June 22, 2012; consequently, whether
Quantum held the note is immaterial.

Fifth, Serra states that "the purported assignment from MERS
to Barclays Bank was invalid because, inter alia, it was executed
without authorization by Equifirst and the individual who signed
the assignment lacked proper authority to do so."  Serra fails to
provide any evidence supporting the asserted lack of authority in

16

ADD-016

his opposition to Quantum's motion for summary judgment. Moreover, Massachusetts law does not require a signatory for an assignor of a mortgage to do more to establish her authority than (1) execute the assignment "before a notary public, justice of the peace or other officer entitled by law to acknowledge instruments" and (2) "purport[] to hold the position of president, vice president, treasurer, clerk, secretary, cashier, loan representative, principal, investment, mortgage or other officer, agent, asset manager, or other similar office or position, including assistant to any such office or position, of the entity holding such mortgage, or otherwise purporting to be an authorized signatory for such entity, or acting under such power of attorney on behalf of such entity, acting in its own capacity or as a general partner or co-venturer of the entity holding such mortgage . . . ."  G.L. c. 183, § 54B.   The signatory appears to have met those requirements.  Serra has failed to establish a genuine issue of material fact.

Serra does not establish any genuine issue of fact material to whether Quantum violated G.L. c. 93A through conduct related to either the December, 2011, foreclosure conducted by Wells Fargo or the earlier foreclosure proceedings commenced by

17

Quantum.[5]  Consequently, I will grant Quantum's motion with regard to Count II.

### 3.    Structurally Unfair Loan in Violation of G.L. c. 93A

In Count III of the Amended Complaint, Serra alleges that the loan was a sub-prime adjustable rate product that was structurally unfair in violation of G.L. c. 93A, § 2, because it was reasonably likely that the loan was doomed to foreclosure. The Amended Complaint states that the loan had the following characteristics: (1) an introductory period of three years or less; (2) an introductory interest rate that was substantially below the fully-indexed rate; (3) mortgage, tax, and insurance payments that, at the fully indexed rate, would be at least 50% of the mortgagor's monthly gross income; (4) a loan-to-value ratio of 100% or nearly 100%; and (5) a substantial balloon payment at the loan's maturity date.  Quantum and Wells Fargo contend that they are not liable for the alleged G.L. c. 93A violation because each is merely an assignee, and not the originator, of the mortgage and loan.

The case law supports the argument made by Quantum and Wells

---

[5]  In his opposition, Serra notes that "should this Court find that the Plaintiff is entitled to rescind his mortgage, under G.L. c. 140D § 34, this would be an automatic violation of G.L. c. 93A."  However, the Amended Complaint only alleges that Quantum violated G.L. c. 93A through "Wrongful Foreclosure" and by "commencing and pursuing a foreclosure proceeding against plaintiff without standing or proper authority to do so . . . ."  Count II does not relate to any alleged violation of G.L. c. 140D.

ADD-018

Fargo.  The Massachusetts Supreme Judicial Court has held that "[w]hile [a debtor] may well have a valid c. 93A claim against [a loan originator], [the Court] rejects the claim that such liability should be extended to the [originator's] assignee . . . ." *Ford Motor Credit Co. v. Morgan*, 536 N.E.2d 587, 591 (Mass. 1989).  Other courts have applied this holding to G.L. c. 93A claims made against mortgage assignees in particular. *See McBride v. Am. Home. Mortg. Servicing Inc.*, CIV.A 11-10998-RWZ, 2012 WL 931247, at *3-4 (D. Mass. Mar. 19, 2012) (dismissing G.L. c. 93A claim brought against mortgage assignee); *In re Mae*, 460 B.R. 1, 4 (Bankr. D. Mass. 2011) (same); *In re Riga*, Bankr. No. 10-11415-FJB, 2011 WL 1115084, at *1 (Bankr. D. Mass. Mar. 25, 2011) (same); *McKensi v. Bank of Am., N.A.*, CIV.A 09-11940-JGD, 2010 WL 3781841, at *3 (D. Mass. Sept. 22, 2010) (same).

Serra does not argue to the contrary.  Instead, he states in his opposition that he "relies on his pleadings regarding this Count, as he has not been given the benefit of discovery on this or any other claim in this matter."  Serra's statements regarding discovery do not warrant deferral or denial of the defendants' motion for summary judgment because Serra has not satisfied the requirements of Rule 56(d) in either form or substance.  He has neither "articulate[d] some plausible basis for [his] belief that specified 'discoverable' material facts likely exist" nor shown "some realistic prospect that the facts can be obtained within a

19

reasonable (additional) time, and will, if obtained, suffice to engender an issue both genuine and material." *Paterson-Leitch Co.*, 840 F.2d at 988.  Consequently, I will grant Quantum's and Wells Fargo's motion with regard to Count III.

### 4. Failure to Determine That the Loan was in Serra's Interest

In Count IV of the Amended Complaint, Serra alleges that Equifirst knowingly made the loan despite the fact that it was a refinance loan and was not in Serra's interest.  Serra contends that such conduct violates 209 CMR 53.02 *et seq.*  The regulations cited by Serra are authorized by and more fully describe the prohibition on such transactions contained in G.L. c. 183, § 28C.

Quantum and Wells Fargo argue that assignees are not liable for any violation under G.L. c. 183, § 28C.  The statute does not explicitly provide for assignee liability but instead states that "[a] *lender* shall not knowingly make a home loan if the home loan pays off all or part of an existing home loan that was consummated within the prior 60 months or other debt of the borrower, unless the refinancing is in the borrower's interest." G.L. c. 183, § 28C (emphasis added).  To the extent that Serra might argue that common law contract liability would extend such liability to an assignee, *Ford Motor Credit Co.* holds otherwise. *See Ford Motor Credit Co.*, 536 N.E.2d at 591.  Serra identifies no cases, and this Court is unaware of any, that apply G.L. c. 183, § 28C, liability to assignees.

20

Serra makes no argument in opposition.  Instead, he merely
reiterates that he "relies on his pleadings regarding this Count,
as he has not been given the benefit of discovery on this or any
other claim in this matter."  He does not specify what facts
could create a genuine dispute material to the viability of the
claim and he states no plausible basis for believing that such
facts exist.  Consequently, I will grant the defendants' motion
with regard to Count IV.

### 5.   G.L. c. 140D

In Count V of the Amended Complaint, Serra alleges that
Equifirst understated the finance charge in the disclosures it
made at the loan's origination.  Serra alleges that he provided
written notice to Quantum in October, 2010, that he was
exercising his right of rescission on the basis of that
understatement and that Quantum did not respond.  Serra contends
that he has a right to rescind and to damages, costs, and
attorney fees pursuant to the Massachusetts Credit Cost
Disclosure Act, G.L. c. 140D ("the MCCCDA") and 209 CMR
32.23(1)(c).[6]  Quantum and Wells Fargo contend that Serra's claim

---

[6]   Unlike G.L. c. 183, § 28C, the MCCCDA explicitly provides for
rescission claims against assignees of the mortgage where "the
violation for which such action or proceeding is brought is
apparent on the face of the disclosure statement . . . ."  G.L.
c. 140D, § 33(a).  *See Belini v. Washington Mutual Bank, FA*, 412
F.3d 17, 28 (1st Cir. 2005) ("[A] debtor can seek rescission
against an assignee as though that assignee were the original
creditor.").

of rescission must fail because he has produced no evidence indicating his ability to tender the loan proceeds.

The MCCCDA is to be construed in accordance with the federal Truth in Lending Act ("TILA"). *McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418, 422 (1st Cir. 2007);[7] *Mayo v. Key Fin. Servs., Inc.*, 678 N.E.2d 1311, 1313 (Mass. 1997). The First Circuit has stated in the context of the TILA that "in contrast

---

[7]  Serra objects to Wells Fargo's citation of *McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418 (1st Cir. 2007) in support of the proposition that the MCCCDA should be construed in accordance with the federal Truth in Lending Act because (1) *McKenna* is a federal case and (2) *McKenna* considered rescission rights in the context of class actions in particular. These objections are baseless for a number of reasons.

First, while a district court sitting in diversity makes its "best guess" as to state law "[a]bsent a decision by the state's highest court," *Liberty Mut. Ins. Co. v. Metro. Life Ins. Co.*, 260 F.3d 54, 65 (1st Cir. 2001), the district court must defer to the court of appeals in its circuit as to what that "best guess" should be because the courts of appeal provide binding precedent for the district courts.

Second, nothing in *McKenna* limited the holding that "the MCCCDA should be construed in accordance with the TILA," *McKenna*, 475 F.3d at 422, to the class action context. Indeed, only after declaring this principle of construction did the First Circuit "turn . . . to the operation of these statutes in the class-action context." *Id.*

Third, the Supreme Judicial Court has itself held that, in the context of the MCCCDA and the TILA, "[f]ederal court decisions are instructive in construing parallel State statutes and State regulations," *Mayo v. Key Financial Servs., Inc.*, 678 N.E.2d 1311, 1313 (Mass. 1997). In fact, the First Circuit in *McKenna* cited the Supreme Judicial Court's decision in *Mayo*. *See McKenna*, 475 F.3d at 422.

Fourth, Serra cites no case law in support of the proposition that the MCCCDA should be interpreted differently than the TILA (with the exception of the four-year limitations period that the MCCCDA imposes on rescission as compared to the three-year limitations period imposed by the TILA, a matter which is not at issue here).

to common law rescission, the borrower need not first return the
loan proceeds received under the agreement to effect a
rescission." *Large v. Conseco Fin. Servicing Corp.* 292 F.3d 49,
55 (1st Cir. 2002).  The same rule applies in the context of the
MCCCDA: Serra need not have first returned the loan proceeds
received to effect a rescission.  *See Wells Fargo Bank, N.A. v.
Jaaskelainen*, 407 B.R. 449, 455 (D. Mass. 2009) ("[U]nder
the . . . MCCDA, the creditor must perform first and terminate
any security interest it has as a result of the transaction
before the borrower is required to return any loan proceeds.").
To the extent that Quantum and Wells Fargo contend that the
statute requires tender prior to or concurrent with rescission,
the statute and the case law foreclose this argument.

A more complicated issue is whether this Court can, or
should, modify the ordinary statutory process to condition
rescission on tender by the borrower.  Courts within this
district have split on the issue.  *Compare Jaaskelainen*, 407 B.R.
at 459-62, *with In re Cromwell*, 461 B.R. 99, 131-36 (Bankr. D.
Mass. 2011), *and In re Giza*, 428 B.R. 266, 273-76 (Bankr. D.
Mass. 2010).  Although none of those courts have cited the
decision, the First Circuit has also addressed the issue in the
context of the TILA, albeit in dicta.  In *Belini v. Washington
Mutual Bank, FA*, 412 F.3d 17, 28 (1st Cir. 2005), the First
Circuit stated:

23

> After the creditor has carried out these obligations, the
> debtor has her own obligations. "Upon performance of the
> creditor's obligations under this section, the [debtor]
> shall tender the property to the creditor . . . ." 15
> U.S.C. § 1635. As we noted in *Large v. Conseco Fin.*
> *Servicing Corp.*, 292 F.3d 49, 55-56 (1st Cir. 2002), TILA
> alters common law rescission by forcing the creditor to
> tender before the debtor, although *the court has the power*
> *under section 1635(b) to change these procedures where*
> *appropriate.*

*Belini*, 412 F.3d at 25 n.3 (emphasis added). It is not clear if

the First Circuit would interpret the MCCCDA similarly because

the Code of Massachusetts Regulations provides an arguable basis

for holding that, under the law applicable in the Commonwealth, a

court cannot place conditions upon rescission. *See In re*

*Cromwell*, 461 B.R. at 131-36; *In re Giza*, 428 B.R. at 273-76.

The defendants would have me modify the process to impose a

contingency of tender here.[8] I find the condition of tender is

beside the point in this case at this stage. Rescission, whether

conditioned by tender or not, is no longer available. After

Serra first advanced his claim seeking rescission, the Property

---

[8] I note Quantum and Wells Fargo have effectively established as
a matter of law that Serra cannot tender the loan proceeds. In
support of the proposition that Serra cannot do so, Quantum and
Wells Fargo cite a letter from counsel for Quantum to counsel for
Serra inquiring if he could "please advise if [his] client has
the financial ability to tender the loan obligation . . . ."
Apparently no reply was sent by Serra's counsel. This is
effectively an admission by Serra that he could not tender the
loan obligation. It was corroborated by Serra's failure to post
a bond as a condition of obtaining a preliminary injunction.
In the absence of countervailing evidence, this record is
sufficient to establish as a matter of law that Serra could not
tender the loan proceeds.

24

was sold at foreclosure auction.[9]  Serra's right of rescission

expired due to this sale of the Property.  *See* G.L. c. 140D,

§ 10(f) ("An obligor's right of rescission shall expire . . .

upon the sale of the property . . . .").

A foreclosure sale extinguishes the right of rescission

under G.L. c. 140D.  *In re Hall*, 188 B.R. 476, 484 (Bankr. D.

Mass 1995); *Snowden v. Chase Manhattan Mortg. Corp.*, No. 030001,

2004 WL 1194656, at *3 n.5 (Mass. Super. Apr. 27, 2004); *Khan v.*

*Dime Sav. Bank of New York, FSB*, No. 931345E, 1993 WL 818711, at

*4 (Mass. Super. Ct. Nov. 15, 1993).  This holding is in

accordance with the case law on the subject with regard to the

expiration of the right to rescind pursuant to the TILA.  *See*

*Takushi v. BAC Home Loans Servicing, LP*, 814 F. Supp. 2d 1073,

1079-84 (D. Haw. 2011); *Benemie v. Countrywide Home Loans, Inc.*,

No. CV 09-7870-GHK, 2010 WL 4228339, at *1 (C.D. Cal. Oct. 26,

2010).  It is also in accordance with the Official Staff

Commentary to Regulation Z.  *See* Official Staff Commentary to

Reg. Z, § 226.23(a)(3) ("A sale or transfer of the property need

not be voluntary to terminate the right to rescind.  For example,

a foreclosure sale would terminate an unexpired right to

rescind.").

Although Serra had issued a rescission notice to Quantum

---

[9]  Serra contends that the foreclosure was wrongful and is void.
However, Serra provides no compelling argument in support of that
contention.  *See infra* Part III.A.6.

25

prior to the foreclosure sale, that step did not effect a rescission that might render the foreclosure sale void. The First Circuit has held that rescission pursuant to the TILA is not automatic on dispatch of a rescission notice. *See Large*, 292 F.3d at 55-56; *Belini*, 412 F.3d at 25 n.3. Courts within this district have applied this interpretation to rescission pursuant to the MCCCDA. *See, e.g., In re Giza*, 428 B.R. at 274; *Jaaskelainen*, 407 B.R. at 455. Instead of automatic rescission, "[i]f a lender disputes a borrower's purported right to rescind, the designated decision maker . . . must decide whether the conditions for rescission have been met. Until such decision is made, the [borrower has] only advanced a claim seeking rescission" and the loan "agreement remains in force . . . ." *Large*, 292 F.3d at 55. Here, the designated decision maker (in this case, this Court) had not determined whether the conditions for rescission were met. Consequently, rescission had not been effected prior to the foreclosure sale and the mortgage agreement remained in force until Wells Fargo foreclosed.

Serra's right to rescind pursuant to G.L. c. 140D has been extinguished. However, I do not grant Quantum and Wells Fargo summary judgment with respect to Count V in its entirety. Count V requests relief not only in the form of rescission but also in the form of damages, costs, and attorney fees.

The First Circuit has held that a failure to respond

26

appropriately to a notice of rescission pursuant to the TILA
violates a requirement of the TILA and renders the lender liable
for damages. *See Belini*, 412 F.3d at 24-27. G.L. c. 140D
contains statutory provisions parallel to the TILA provisions at
issue in *Belini*. These provisions state that "[i]n any action in
which it is determined that a creditor has violated" the
borrower's rescission rights, "the court may award relief . . .
not relating to the right to rescind," G.L. c. 140D, § 10(g), and
that "any creditor who fails to comply with any requirement
imposed under this chapter or any rule or regulation issued
thereunder including any requirement [related to rescission]
under section ten with respect to any person is liable" for
actual damages, twice the amount of any finance charge in
connection with the transaction, costs, and attorney fees, G.L.
c. 140D, § 32(a).

Quantum and Wells Fargo offer no argument supporting the
contention that Serra's request for damages, costs, and fees
should be subject to summary judgment. Consequently, I will deny
Quantum's and Wells Fargo's motion with regard to Serra's
requests in Count V for that form of relief and require further
briefing from the parties on that issue.

### 6. Wrongful Foreclosure (Wells Fargo)

In Count VI of the Amended Complaint, Serra alleges that
Wells Fargo is not the holder of the note secured by the mortgage

27

ADD-027

on the Property.  Serra contends that consequently Wells Fargo
lacks authority to foreclose.  After the initial briefing was
submitted regarding Wells Fargo's motion for summary judgment,
the Massachusetts Supreme Judicial Court decided *Eaton v. Federal
National Mortgage Association*, 969 N.E.2d 1118 (Mass. 2012), in
which it addressed precisely this issue.

In *Eaton*, the Supreme Judicial Court "construe[d] the term
'mortgagee' in G.L. c. 244, § 14 [the statute governing
foreclosure under the power of sale], to mean a mortgagee who
also holds the underlying mortgage note."  *Eaton*, 969 N.E.2d at
1129.  The Supreme Judicial Court held that the foreclosure sale
must therefore be conducted by the note holder or by one who acts
as an authorized agent of the note holder.  *Id.* at 1130.
However, the Supreme Judicial Court exercised its discretion to
apply the *Eaton* rule prospectively only, "to mortgage foreclosure
sales for which the mandatory notice of sale [is] given after the
date of [the *Eaton*] opinion" of June 22, 2012.  *Id.* at 1333.

The foreclosure at issue was noticed prior to June 22, 2012.
Consequently, whether Wells Fargo held the note does not affect
the validity of the foreclosure sale.  *See Woods v. Wells Fargo
Bank, N.A.*, C.A. No. 11-cv-30216-MAP, 2012 WL 2577580, at *2 (D.
Mass. July 3, 2012) ("[A]s a pre-*Eaton* mortgagee, [the bank]
would be entitled to foreclose even without proof that it was
also the note holder or its agent.").  Serra cannot point to a

28

ADD-028

fact material to any genuine dispute. For this reason, I will
grant summary judgment with regard to Count VI.

I note that in the course of his submissions, Serra argues
that the foreclosure sale conducted by Wells Fargo was invalid
for a host of other reasons. The Amended Complaint itself does
not identify any of these reasons as grounds for the wrongful
foreclosure claim. Nevertheless, for the sake of completeness, I
will briefly address each of these additional issues as developed
in the submissions in the case apart from the operative pleading.

First, Serra contends that the sale was invalid because
assignments from MERS are invalid and consequently Wells Fargo
did not have authority to foreclose pursuant to G.L. c. 244,
§ 14. This contention is incorrect as a matter of law for the
reasons described in the decision I issued yesterday in *Butler v.*
*Deutsche Bank Trust Company Americas as Trustee for RALI 2007*
*QS3*, Civil Action No. 12-10337-DPW, also litigated before me by
Serra's counsel.[10] In short, many decisions in this district
have held that MERS may validly assign a mortgage. *See, e.g.,*
*Culhane v. Aurora Loan Servs. of Neb.*, 826 F. Supp. 2d 352, 367–
78 (D. Mass. 2011); *Rosa v. Mortg. Elec. Sys., Inc.*, 821 F. Supp.
2d 423, 429-30 (D. Mass. 2011); *In re Marron*, 455 B.R. 1, 5-8
(Bankr. D. Mass 2011); *Aliberti v. GMAC Mortg., LLC*, 779 F. Supp.

---

[10] In *Butler v. Deutsche Bank Trust Company Americas as Trustee*
*for RALI 2007 QS3*, Civil Action No. 12-10337-DPW, counsel for
Serra more completely briefed the issue.

2d 242, 249 (D. Mass. 2011); *In re Lopez*, 446 B.R. 12, 18-19 (Bankr. D. Mass. 2011).  I find these decisions persuasive and reject the contention that Wells Fargo wrongfully foreclosed due to the role of MERS as assignor of the mortgage.

Second, Serra contends that the sale was invalid because "it has yet to be determined" whether the assignment to Wells Fargo was "in compliance with the controlling terms of the foreclosing Trust's Governing Documents."  Even if Serra were permitted discovery regarding the trust's governing documents, which he describes as the Pooling and Servicing Agreement and the Prospectus Supplement, he has not shown "some realistic prospect that" the facts therein "will, if obtained, suffice to engender an issue both genuine and material."  *Paterson-Leitch Co.,* 840 F.2d at 988.  Serra has presented no argument in support of the contention that if the assignment did violate the trust's governing documents, this would render the assignment invalid.

More fundamentally, a number of decisions in this district have held that a mortgagor does not have standing to challenge a foreclosure on the basis of the non-compliance of an assignment with the provisions of the Pooling and Servicing Agreement governing the foreclosing trust.  *See Juarez v. U.S. Bank Nat. Ass'n,* Civil Action No. 11-10318-DJC, 2011 WL 5330465, at *4 (D. Mass. Nov. 4, 2011); *In re Correia*, 452 B.R. 319, 324 (1st Cir. BAP 2011) (per curiam); *In re Almeida*, 417 B.R. 140, 149 (Bankr.

30

D. Mass. 2009); *In re Samuels*, 415 B.R. 8, 22 (Bankr. D. Mass. 2009). *Cf. In re Lacey*, Bankr. No. 10-19903-JNF, 2012 WL 2872050, at *17 (Bankr. D. Mass. 2012) (distinguishing between a challenge to a foreclosure based on an invalid assignment as a general proposition and a challenge to a foreclosure based on an assignment's violation of the PSA governing the trust); *In re Bailey*, 468 B.R. 464, 474 (Bankr. D. Mass. 2012) (same). I agree with these decisions for the reasons described in *Butler*. Serra has not shown that additional discovery on the issue is warranted on this topic pursuant to Federal Rule of Civil Procedure 56(d).

Third, Serra points to the statement in Wells Fargo's and Quantum's Memorandum of Law in Support of their Motion for Summary Judgment that "[a]t Wells Fargo's expense, the Plaintiff has been unjustly enriched since 2008." He contends that this statement is sufficient to create a genuine dispute of material fact "with regards to who precisely was the 'holder' of the Serra mortgage at various points in time." I disagree.

Serra fails to distinguish between the mortgage and the note. Wells Fargo's contention regarding unjust enrichment relates to, inter alia, "the delinquent amount due under the loan obligation." Wells Fargo might well have been the note holder, suffering a delinquency at the hands of Serra, since 2008; this does not establish who was the mortgagee at that time. *See U.S. Bank. Nat. Ass'n v. Ibanez*, 941 N.E.2d 40, 53-54 (Mass. 2011)

31

("In Massachusetts, where a note has been assigned but there is
no written assignment of the mortgage underlying the note, the
assignment of the note does not carry with it the assignment of
the mortgage."). Consequently, any admission made with regard to
the timing of Wells Fargo's ownership of the note does not impact
the validity of the foreclosure sale. *See Eaton*, 969 N.E.2d at
1333 (holding that the requirement that the mortgagee possess the
note in order to validly foreclose applies prospectively only).

Fourth, Serra contends that Sutton Funding, LLC, (and not
Wells Fargo) filed the complaint pursuant to the Servicemembers
Civil Relief Act at the Land Court and that consequently Wells
Fargo did not foreclose in "good faith" and with "reasonable
diligence." Serra acknowledges that "Massachusetts foreclosure
statutes do not require a Judgment from the Servicemembers
action," but alleges that REBA Title Standard 7 "states that in
order to convey marketable title the foreclosing party must
obtain a Judgment in [a] Servicemembers[] action." Serra argues
that Wells Fargo's failure to convey marketable title at the
foreclosure sale would constitute a failure to foreclose in good
faith and with reasonable diligence. He suggests that he has
raised a material dispute of genuine fact. I disagree.

As a preliminary matter, Serra fails to provide a copy of
REBA Title Standard 7 although it is the evidentiary basis for
his argument. A party must "cit[e] to particular parts of

32

materials in the record, including depositions, documents,
electronically stored information, affidavits or declarations,
stipulations (including those made for purposes of the motion
only), admissions, interrogatory answers, or other materials" to
support a factual assertion.  Fed. R. Civ. P. 56(c)(1)(a).  Serra
fails to do so, and his factual assertion is unsupported.  Given
the failure to provide a copy of the REBA Title Standard it is
impossible to evaluate Serra's claim that the Standard states or
implies that the same party must file the Servicemembers Civil
Relief Act Complaint and exercise the power of sale.

     In any event, to the extent that the REBA Title Standard
does state or imply that the same entity must file the
Servicemembers Civil Relief Act Complaint and exercise the power
of sale, it is in clear conflict with the law in Massachusetts.
The Supreme Judicial Court has stated that the Servicemembers
Civil Relief Act:

> simply establishes procedures whereby mortgagees, in
> addition to taking all steps necessary to foreclose, can
> make certain that there will be no cloud on the title
> following the foreclosure as a result of an interested party
> having been in, or just released from, military
> service . . . .

*Beaton v. Land Court*, 326 N.E.2d 302, 305 (Mass. 1975).  The
Court held:

> If a foreclosure were otherwise properly made, failure to
> comply with the [Servicemembers' Civil Relief] Act would not
> render the foreclosure invalid as to anyone not entitled to
> the protection of that act.

*Id.*  So long as the mortgagor is not entitled to the protection

33

of the Act--a fact determined by the Servicemembers action regardless of the identity of the filing party--the foreclosure will not be invalid under Massachusetts law on the basis of the Act and there will be no cloud on the title. *See Akar v. Fed. Nat. Mortg. Ass'n*, 845 F. Supp. 2d 381, 395-97 (D. Mass. Feb. 8, 2012) (holding that where foreclosing entity files the Servicemembers action before it is assigned the mortgage, such action does not render the foreclosure sale unlawful).

Serra's contentions might have some weight if there had been *no* Servicemembers action whatsoever. While failure to bring a Servicemembers action does not automatically invalidate a sale, it might affect the marketability of title due to concern that the mortgagor could have been entitled to the protections of the Act. This, in turn, might affect prospective buyers' confidence in the property and the price for which the property is sold. Here, however, there was a Servicemembers action, and a judgment issued that Serra was not entitled to the protections of the Act. I fail to see how the identity of the filing party could affect marketable title. In light of Serra's failure to provide a copy of REBA Title Standard 7, and in light of the case law, I find that Serra has failed to establish a genuine dispute of material fact regarding the validity of the foreclosure sale based on Wells Fargo's failure to file a Servicemembers Complaint in its own name.

34

Finally, Serra's opposition papers suggest that these proceedings must be unfair because "the record is *littered* with a multitude of threatened foreclosure auctions as against the Plaintiff." (emphasis in original). The record does not demonstrate any deceit or unfairness in Quantum's serial commencement of foreclosure proceedings; instead, it shows that Quantum was required to cancel multiple foreclosure sales and start anew because of Serra's repeated recourse to the Bankruptcy Court followed by his failure to prosecute those actions. On this record, I cannot hold that a reasonable jury could find serial foreclosure proceedings necessitated by Serra's repeated and unsuccessful recourse to bankruptcy process somehow reflects a failure of Wells Fargo to foreclose in good faith.

Serra fails to raise a genuine issue of material fact either in relation to the claim as pleaded (which addresses only the validity of the foreclosure auction in the context of Wells Fargo's questionable status as note holder) or in consideration of the additional arguments spread across Serra's memorandum and his response to Quantum's and Wells Fargo's statements of undisputed fact. Consequently, I will grant summary judgment with regard to Count VI of the Amended Complaint.

**B.  *Counterclaims***

### 1.    Breach of Contract

In Count I of its Counterclaims, Wells Fargo alleges that Serra defaulted on the loan, that Wells Fargo published notice of

the foreclosure sale once in each of three successive weeks, and
that notice of the sale and intention to collect a deficiency was
sent to the mortgagor at least twenty one days prior to the date
of sale.  Wells Fargo contends that it is due the deficiency and
asks for summary judgment.  Serra contends that there are two
issues of material fact in genuine dispute.

First, Serra argues that "[i]t remains an issue of material
dispute whether the Defendant Trust is the possessor of the
contractual right of the power of sale that Mr. Serra only
Granted to Equifirst."  Serra complains that he has not been able
to conduct discovery on this matter.  However, Serra fails to
articulate a "plausible basis for a belief that [further
discovery] would lead to material facts that might defeat summary
judgment."  *Rivera-Torres*, 502 F.3d at 12.  He does not
articulate the specific facts that he seeks to discover, nor why
they would be material.  He does not explain the theory that he
wishes to pursue by means of additional discovery.  To the extent
that he relies on the theories that the assignment was invalid
due to (1) the role of MERS as assignor, (2) the assignment's
non-compliance with the PSA, or (3) Wells Fargo's request for
damages due to unjust enrichment dating from 2008, I have
rejected those theories for the reasons explained above regarding
the Amended Complaint.  *See supra* Part III.A.6.

Second, Serra argues that Wells Fargo did not obtain a
Judgment under the Servicemembers Civil Relief Act in

36

contravention of REBA Title Standard 7, potentially creating
unmarketable title.  Serra contends that this is evidence that
Wells Fargo did not act in good faith during the foreclosure sale
in a manner that might render the sale void.  I have also
rejected this argument for the reasons explained above in
connection with the Amended Complaint.  *See supra* Part III.A.6.

Serra additionally challenges the accuracy of the costs and
fees requested, as well as the litigation fees and costs alleged.
The affidavits submitted by Wells Fargo include only
"approximate" litigation fees and expenses.  At the hearing on
the summary judgment matter, I directed further submissions
regarding such costs, fees, and litigation expenses.
Consequently, I will deny summary judgment with respect to
Counterclaim I pending resolution of this discrete matter.

### 2.    Unjust Enrichment

In Count II of the Counterclaims, Wells Fargo alleges that
Serra was unjustly enriched by receiving the benefit of the
bargain of the loan at the expense of Wells Fargo.  It asks for
summary judgment on this Count.

Serra contends that Wells Fargo's statement that "[a]t Wells
Fargo's expense, the Plaintiff has been unjustly enriched since
2008" somehow "creates more issues in dispute than it purportedly
answers" because it conflicts with the mortgage assignment date.
As I discussed above, *see supra* Part III.A.6, Serra fails to

37

distinguish between the mortgage and the note.  The statement
creates no inconsistency in the record.

Serra also challenges the accuracy of the fees and expenses
asserted by Wells Fargo.  For the reasons described above, *see*
*supra* Part III.B.1, I have denied summary judgment and required
further submissions on this matter.

Although neither party raises the issue, I must additionally
express my reservations about the appropriateness of the use of
an unjust enrichment claim to collect a deficiency after a
foreclosure sale.  In Massachusetts, "[u]njust enrichment
provides an equitable stopgap for occasional inadequacies in
contractual remedies at law by mandating that a person who has
been unjustly enriched at the expense of another is required to
make restitution to the other."  *Mass. Eye and Ear Infirmary v.*
*QLT Phototherapeutics, Inc.*, 412 F.3d 215, 234 (1st Cir. 2005).
Here, no "equitable stopgap" is necessary where Wells Fargo has a
remedy at law and has brought, in Counterclaim I, an action for a
deficiency to attain that remedy.  Because Serra has not moved
for summary judgment on Counterclaim II, I have directed further
submissions regarding this issue pursuant to Federal Rule of
Civil Procedure 56(f)(1).

### 3.  Possession

Wells Fargo alleges that it has complied with the
requirements of G.L. c. 244, § 14; conducted a foreclosure sale;
and sent a three day notice to quit on March 12, 2012.  In Count

38

III of the Counterclaims, Wells Fargo requests possession and an
execution to issue forthwith.  Serra contends that as a condition
precedent to "possession" Wells Fargo would have to establish its
strict adherence with Massachusetts non-judicial foreclosure
statutes as well as with the terms of the trust's governing
documents.

There is no question that Wells Fargo must show strict
adherence to the Massachusetts statutory foreclosure requirements
in order demonstrate its right to possession.  *Bank of N.Y. v.
Bailey*, 951 N.E.2d 331, 334 (Mass. 2011) ("In a[n] . . . action
for possession after foreclosure by sale, the plaintiff is
required to make a prima facie showing that it obtained a deed to
the property at issue and that the deed and affidavit of sale,
showing compliance with statutory foreclosure requirements, were
recorded."); *Sheehan Constr. Co. v. Dudley*, 12 N.E.2d 182, 183
(Mass. 1937) (holding that in a summary process action brought by
a purchaser at a foreclosure sale "it is incumbent upon such
purchaser to establish his right of possession.  The legal title
in those circumstances plainly may be put in issue.").  It has
done so on this record.

Wells Fargo has established, via production of the
assignments, that it was the record mortgagee at the time of
foreclosure.  It has established, via affidavits, that it
conducted the foreclosure sale in accordance with G.L. c. 244,
§ 14.  I have rejected Serra's contention that an assignment in

39

violation of the trust's governing documents is void and have addressed the contentions that Serra makes elsewhere with regard to the validity of the foreclosure sale.  *See supra* Part III.A.6. Serra does not raise any other specific challenges regarding Wells Fargo's compliance with the Massachusetts foreclosure statutes in the context of Counterclaim III.  Consequently, I will grant summary judgment with regard to Count III of the Counterclaims.

## IV.  CONCLUSION

For the reasons set forth above, I GRANT the Defendant's Motion for Summary Judgment (Dkt. No. 21), except to the extent that the parties have been directed to provide further submissions with respect to (A) Count V, regarding Serra's purported damages for the alleged failure to comply with G.L. c. 140D, *see supra* Part III.A.5.; (B) Counterclaim I, regarding Wells Fargo's litigation fees and costs arising from the foreclosure sale, *see supra* Part III.B.1; and C) Counterclaim II, regarding Wells Fargo's unjust enrichment cause of action, *see supra* Part III.B.2.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

ADD-040

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN P. SERRA, II,                      )
                                        )
            Plaintiff,                  )    CIVIL ACTION NO.
                                        )    11-11843-DPW
v.                                      )
                                        )
QUANTUM SERVICING CORP.;                )
EQUIFIRST CORPORATION;                  )
WELLS FARGO BANK, N.A.,                 )
TRUSTEE FOR RMAC PASS-THROUGH           )
TRUST SERIES 2010-A,                    )
                                        )
            Defendants.                 )

PROCEDURAL ORDER
August 15, 2012

Summary judgment practice in this case has raised additional issues for briefing.  In addition to the schedule established during the summary judgment hearing in this matter on August 8, 2012, for identifying what, if any, compensable fees and costs as a result of the foreclosure are proven,[1] this procedural order establishes a schedule for further summary judgment practice as reflected in the Memorandum and Order ("8/15/12 Memo and Order") issued this day.  Accordingly, on or before August 24, 2012, the Plaintiff shall submit a summary judgment motion, with supporting affidavits, addressing (1) the facts in support of his claim that the defendants failed to comply with G.L. c. 140D and the amount of damages he contends are owed to him as a result, *see* 8/15/12 Memo and Order at Part III.A.5, p. 27, and (2) the viability of the Defendant's claim for unjust enrichment, *see* 8/15/12 Memo and

_____

[1] *See* 8/15/12 Memorandum and Order at Part III.B.1, p. 37.

ADD-041

Order at Part III.B.2, pp. 38-39.  On or before September 4,
2012, the Defendant shall submit responsive briefing thereto.


                              */s/ Douglas P. Woodlock*
                              DOUGLAS P. WOODLOCK
                              UNITED STATES DISTRICT JUDGE

2

ADD-042

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN P. SERRA., II                  )
                                    )
                Plaintiff,          )    CIVIL ACTION NO.
                                    )    11-11843-DPW
v.                                  )
                                    )
QUANTUM SERVICING CORP.             )
EQUIFIRST CORPORATION,              )
WELLS FARGO BANK, N.A.,             )
TRUSTEE FOR RMAC PASS-              )
THROUGH TRUST, SERIES 2010-A        )
                                    )
                Defendants.         )

MEMORANDUM AND ORDER
March 29, 2013

In connection with my Memorandum and Order of August 15,
2012, in which I granted summary judgment to the defendants
outright on most claims but found myself unable on the basis of
the record before me to resolve: (1) Count V regarding the
Massachusetts Credit Cost Disclosure Act c. 140D and 209 CMR
32.23.(1)(c), (2) so much of Counterclaim I as concerned
litigation fees and costs arising from the foreclosure sale, and
(3) Counterclaim II for unjust enrichment, I directed the parties
to make further submissions to frame the issues.

Upon review of those submissions, I now grant summary
judgment to the defendant and deny it to plaintiff on Count V,
find the litigation fees and costs from the foreclosure sale have
been adequately supported and have not been challenged by

plaintiff with respect to that support and find that Counterclaim
II for unjust enrichment has been withdrawn.

Only the availability of summary judgment to the defendant
on Count V now requires any further discussion. And that
discussion need only be brief. As established through the
affidavit of Rod Correia (Doc. 52), the credit fee activity
charge of $224.48 is fully supported by the underlying invoices
which show "actual hard cost charges", *id.* at para 5, that I
find, in the absence of contrary evidence, reasonable for the
fee. In any event, the plaintiff's claim in this regard would be
against Equifirst, the lender, an entity which is not before the
court. It is unlikely, however, given plaintiff's financial
circumstances that an intensive inquiry into his credit history
resulting in charges in this amount would be found unreasonable.

Accordingly, I direct the clerk to enter judgment for the
defendants with an award to defendant Wells Fargo of a deficiency
judgment (including litigation fees and costs) of $212,470.37.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

-2-

ADD-044

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN P. SERRA., II          )
                            )
            Plaintiff,      )    CIVIL ACTION NO.
                            )    11-11843-DPW
v.                          )
                            )
QUANTUM SERVICING CORP.     )
EQUIFIRST CORPORATION,      )
WELLS FARGO BANK, N.A.,     )
TRUSTEE FOR RMAC PASS-      )
THROUGH TRUST, SERIES 2010-A )
                            )
            Defendants.     )

**JUDGMENT**

WOODLOCK, District Judge

In accordance with this Court's Memoranda and Orders dated August 15, 2012, granting summary judgment to the defendants except with respect to Count V and Counterclaims I and II, and March 29, 2013, granting summary judgment to the defendant on Count V and Counterclaim I (Counterclaim II having been withdrawn), and for the reasons stated therein, it is hereby ORDERED, ADJUDGED AND DECREED:

**Judgment for the Defendants with an award to defendant Wells Fargo of a deficiency judgment (including litigation fees and costs) of $212,470.37.**

BY THE COURT,

/s/ Jarrett Lovett
Deputy Clerk

DATED: April 23, 2013

ADD-045

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

CV Action No. 1:11-cv-11843-DPW

|  |  |
|---|---|
| JOHN F. SERRA, II | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| QUANTUM SERVICING CORP. | ) |
| EQUIFIRST CORPORATION | ) |
| WELLS FARGO  BANK, N.A. | ) |
| TRUSTEE FOR RMAC PASS | ) |
| THROUGH | ) |
| TRUST SERIES 2010-A | ) |
| Defendants. | ) |

## NOTICE OF APPEAL

Notice is hereby given that John F. Serra, II, the  Plaintiff in the above-captioned

matter, hereby appeals to the United States Court of Appeals For the First Circuit, from the

April 01, 2013 Judgment entered (Doc. 60); regarding the District Court's August 15, 2012

Order granting the Defendants' Summary Judgment (Doc. 40) and regarding the Court's

March 29, 2013 Order granting  Motion  for  Partial  Summary  Judgment, (Doc. 57).

Respectfully submitted,
Plaintiffs,
By their Attorney,

/s/Glenn F. Russell, Jr
Glenn F. Russell, Jr.
BBO# 656914
38 Rock Street, Suite #12
Fall River, MA 02720
(508) 324-4545
russ45esq@gmail.com

Dated: April 29, 2013

1

ADD-046

## CERTIFICATE OF SERVICE

I, Glenn F. Russell, Jr., do hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) on this is, the 29th day of April, 2013:

/s/Glenn F. Russell, Jr
Glenn F. Russell, Jr.

Reneau Longoria
Doonan Graves and Longoria
100 Cummings Center
Suite 225D
Beverly MA  01915

ADD-047

Case: 13-1557    Document: 00116603663    Page: 114    Date Filed: 10/29/2013    Entry ID: 5775769



THE 188TH GENERAL COURT OF
# THE COMMONWEALTH OF MASSACHUSETTS

| Massachusetts Laws | Bills | State Budget | People | Committees | Educate & Engage | Events |

Massachusetts Laws

## General Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT (Chapters 1 through 182) |
| | PREV   NEXT |
| TITLE XV | REGULATION OF TRADE |
| | PREV   NEXT |
| CHAPTER 93A | REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION |
| | PREV   NEXT |
| Section 1 | Definitions |
| | PREV   NEXT |

Section 1. The following words, as used in this chapter unless the text otherwise requires or a different meaning is specifically required, shall mean—

(a) "Person" shall include, where applicable, natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity.

(b) "Trade" and "commerce" shall include the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security as defined in subparagraph (k) of section four hundred and one of chapter one hundred and ten A and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth.

(c) "Documentary material" shall include the original or a copy of any book, record, report, memorandum, paper, communication, tabulation, map, chart, photograph, mechanical transcription, or other tangible document or recording, wherever situate.

(d) "Examination of documentary material", the inspection, study, or copying of any such material, and the taking of testimony under oath or acknowledgment in respect of any such documentary material.

Copyright © 2013 The General Court, All Rights Reserved



THE 188TH GENERAL COURT OF
# THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs
site search
Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events

Massachusetts Laws        General Laws

Print Page

Massachusetts Constitution

General Laws

Session Laws

Rules

| PART I | ADMINISTRATION OF THE GOVERNMENT (Chapters 1 through 182) |
| | PREV  NEXT |
| TITLE XV | REGULATION OF TRADE |
| | PREV  NEXT |
| CHAPTER 93A | REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION |
| | PREV  NEXT |
| Section 2 | Unfair practices; legislative intent; rules and regulations |
| | PREV  NEXT |

Section 2. (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(b) It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

(c) The attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter. Such rules and regulations shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1) (The Federal Trade Commission Act), as from time to time amended.

Show / Hide Site Map

Copyright © 2013 The General Court, All Rights Reserved

Case: 13-1557    Document: 00116603663    Page: 116    Date Filed: 10/29/2013    Entry ID: 5775769



THE 188TH GENERAL COURT OF
# THE COMMONWEALTH OF MASSACHUSETTS

Home   Glossary   FAQs
site search
Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events

Massachusetts Laws

## General Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT (Chapters 1 through 182) | PREV NEXT |
|---|---|---|
| TITLE XV | REGULATION OF TRADE | PREV NEXT |
| CHAPTER 93A | REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION | PREV NEXT |
| Section 3 | Exempted transactions | PREV NEXT |

Section 3. Nothing in this chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States.

For the purpose of this section, the burden of proving exemptions from the provisions of this chapter shall be upon the person claiming the exemptions.

Copyright © 2013 The General Court, All Rights Reserved

ADD-050

Case: 13-1557     Document: 00116603663     Page: 117     Date Filed: 10/29/2013     Entry ID: 5775769



THE 188TH GENERAL COURT OF
# THE COMMONWEALTH OF MASSACHUSETTS

home  Glossary  FAQs
site search
Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events

Massachusetts Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

## General Laws

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT (Chapters 1 through 182) | |
|---|---|---|
| | | PREV  NEXT |
| TITLE XV | REGULATION OF TRADE | |
| | | PREV  NEXT |
| CHAPTER 93A | REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION | |
| | | PREV  NEXT |
| Section 4 | Actions by attorney general; notice; venue; injunctions | |
| | | PREV  NEXT |

Section 4. Whenever the attorney general has reason to believe that any person is using or is about to use any method, act, or practice declared by section two to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the commonwealth against such person to restrain by temporary restraining order or preliminary or permanent injunction the use of such method, act or practice. The action may be brought in the superior court of the county in which such person resides or has his principal place of business, or the action may be brought in the superior court of Suffolk county with the consent of the parties or if the person has no place of business within the commonwealth. If more than one person is joined as a defendant, such action may be brought in the superior court of the county where any one defendant resides or has his principal place of business, or in Suffolk county. Said court may issue temporary restraining orders or preliminary or permanent injunctions and make such other orders or judgments as may be necessary to restore to any person who has suffered any ascertainable loss by reason of the use or employment of such unlawful method, act or practice any moneys or property, real or personal, which may have been acquired by means of such method, act, or practice. If the court finds that a person has employed any method, act or practice which he knew or should have known to be in violation of said section two, the court may require such person to pay to the commonwealth a civil penalty of not more than five thousand dollars for each such violation and also may require the said person to pay the reasonable costs of investigation and litigation of such violation, including reasonable attorneys' fees. If the court finds any method, act, or practice unlawful with regard to any security or any contract of sale of a commodity for future delivery as defined in section two, the court may issue such orders or judgments as may be necessary to restore any person who has suffered any ascertainable loss of any moneys or property, real or personal, or up to three but not less than two times that amount if the court finds that the use of the act or practice was a willful violation of said section two, a civil penalty to be paid to the commonwealth of not more than five thousand dollars for each such violation, and also may require said person to pay the reasonable costs of investigation and litigation of such violation,

4/4/2013 12:16 PM

ADD-051

Case: 13-1557   Document: 00116603663   Page: 118   Date Filed: 10/29/2013   Entry ID: 5775769

including reasonable attorneys fees.

At least five days prior to the commencement of any action brought under this section, except when a temporary restraining order is sought, the attorney general shall notify the person of his intended action, and give the person an opportunity to confer with the attorney general in person or by counsel or other representative as to the proposed action. Such notice shall be given the person by mail, postage prepaid, to his usual place of business, or if he has no usual place of business, to his last known address.

Any district attorney or law enforcement officer receiving notice of any alleged violation of this chapter or of any violation of an injunction or order issued in an action brought under this section shall immediately forward written notice of the same together with any information that he may have to the office of the attorney general.

Any person who violates the terms of an injunction or other order issued under this section shall forfeit and pay to the commonwealth a civil penalty of not more than ten thousand dollars for each violation. For the purposes of this section, the court issuing such an injunction or order shall retain jurisdiction, and the cause shall be continued, and in such case the attorney general acting in the name of the commonwealth may petition for recovery of such civil penalty.

Copyright © 2013 The General Court, All Rights Reserved

ADD-052                    11/4/2013 12:16 PM

Case: 13-1557    Document: 00116603663    Page: 119    Date Filed: 10/29/2013    Entry ID: 5775769



THE 188TH GENERAL COURT OF
# THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs
site search
Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events

Massachusetts Laws

## General Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT (Chapters 1 through 182) | |
|---|---|---|
| | | PREV  NEXT |
| TITLE XV | REGULATION OF TRADE | |
| | | PREV  NEXT |
| CHAPTER 93A | REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION | |
| | | PREV  NEXT |
| Section 5 | Assurance of discontinuance of unlawful method or practice | |
| | | PREV  NEXT |

Section 5. In any case where the attorney general has authority to institute an action or proceeding under section four, in lieu thereof he may accept an assurance of discontinuance of any method, act or practice in violation of this chapter from any person alleged to be engaged or to have been engaged in such method, act or practice. Such assurance may, among other terms, include a stipulation for the voluntary payment by such person of the costs of investigation, or of an amount to be held in escrow pending the outcome of an action or as restitution to aggrieved buyers, or both. Any such assurance of discontinuance shall be in writing and be filed with the superior court of Suffolk county. Matters thus closed may at any time be reopened by the attorney general for further proceedings in the public interest. Evidence of a violation of such assurance shall be prima facie evidence of a violation of section two in any subsequent proceeding brought by the attorney general.

Show / Hide Site Map

Copyright © 2013 The General Court, All Rights Reserved

Case: 13-1557   Document: 00116603663   Page: 120   Date Filed: 10/29/2013   Entry ID: 5775769



THE 188TH GENERAL COURT OF

# THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs

site search

Options

| Massachusetts Laws | Bills | State Budget | People | Committees | Educate & Engage | Events |

Massachusetts Laws

## General Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT (Chapters 1 through 182) |
| | PREV  NEXT |
| TITLE XV | REGULATION OF TRADE |
| | PREV  NEXT |
| CHAPTER 93A | REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION |
| | PREV  NEXT |
| Section 6 | Examination of books and records; attendance of persons; notice |
| | PREV  NEXT |

Section 6. (1) The attorney general, whenever he believes a person has engaged in or is engaging in any method, act or practice declared to be unlawful by this chapter, may conduct an investigation to ascertain whether in fact such person has engaged in or is engaging in such method, act or practice. In conducting such investigation he may (a) take testimony under oath concerning such alleged unlawful method, act or practice; (b) examine or cause to be examined any documentary material of whatever nature relevant to such alleged unlawful method, act or practice; and (c) require attendance during such examination of documentary material of any person having knowledge of the documentary material and take testimony under oath or acknowledgment in respect of any such documentary material. Such testimony and examination shall take place in the county where such person resides or has a place of business or, if the parties consent or such person is a nonresident or has no place of business within the commonwealth, in Suffolk county.

(2) Notice of the time, place and cause of such taking of testimony, examination or attendance shall be given by the attorney general at least ten days prior to the date of such taking of testimony or examination.

(3) Service of any such notice may be made by (a) delivering a duly executed copy thereof to the person to be served or to a partner or to any officer or agent authorized by appointment or by law to receive service of process on behalf of such person; (b) delivering a duly executed copy thereof to the principal place of business in the commonwealth of the person to be served; or (c) mailing by registered or certified mail a duly executed copy thereof addressed to the person to be served at the principal place of business in the commonwealth or, if said person has no place of business in the commonwealth, to his principal office or place of business.

(4) Each such notice shall (a) state the time and place for the taking of testimony or the examination and the name and address of each person to be examined, if known, and, if the

name is not known, a general description sufficient to identify him or the particular class or group to which he belongs; (b) state the statute and section thereof, the alleged violation of which is under investigation and the general subject matter of the investigation; (c) describe the class or classes of documentary material to be produced thereunder with reasonable specificity, so as fairly to indicate the material demanded; (d) prescribe a return date within which the documentary material is to be produced; and (e) identify the members of the attorney general's staff to whom such documentary material is to be made available for inspection and copying.

(5) No such notice shall contain any requirement which would be unreasonable or improper if contained in a subpoena duces tecum issued by a court of the commonwealth; or require the disclosure of any documentary material which would be privileged, or which for any other reason would not be required by a subpoena duces tecum issued by a court of the commonwealth.

(6) Any documentary material or other information produced by any person pursuant to this section shall not, unless otherwise ordered by a court of the commonwealth for good cause shown, be disclosed to any person other than the authorized agent or representative of the attorney general, unless with the consent of the person producing the same; provided, however, that such material or information may be disclosed by the attorney general in court pleadings or other papers filed in court.

(7) At any time prior to the date specified in the notice, or within twenty-one days after the notice has been served, whichever period is shorter, the court may, upon motion for good cause shown, extend such reporting date or modify or set aside such demand or grant a protective order in accordance with the standards set forth in Rule 26(c) of the Massachusetts Rules of Civil Procedure. The motion may be filed in the superior court of the county in which the person served resides or has his usual place of business, or in Suffolk county. This section shall not be applicable to any criminal proceeding nor shall information obtained under the authority of this section be admissible in evidence in any criminal prosecution for substantially identical transactions.

Show / Hide Site Map

Copyright © 2013 The General Court. All Rights Reserved

ADD-055            10/29/2013 12:16 PM

Case: 13-1557    Document: 00116603663    Page: 122    Date Filed: 10/29/2013    Entry ID: 5775769



THE 188TH GENERAL COURT OF

## THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs

site search

Options

Massachusetts Laws | Bills | State Budget | People | Committees | Educate & Engage | Events

Massachusetts Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

## General Laws

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT (Chapters 1 through 182) | PREV  NEXT |
| TITLE XV | REGULATION OF TRADE | PREV  NEXT |
| CHAPTER 93A | REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION | PREV  NEXT |
| Section 7 | Failure to appear or to comply with notice | PREV  NEXT |

Section 7. A person upon whom a notice is served pursuant to the provisions of section six shall comply with the terms thereof unless otherwise provided by the order of a court of the commonwealth. Any person who fails to appear, or with intent to avoid, evade, or prevent compliance, in whole or in part, with any civil investigation under this chapter, removes from any place, conceals, withholds, or destroys, mutilates, alters, or by any other means falsifies any documentary material in the possession, custody or control of any person subject to any such notice, or knowingly conceals any relevant information, shall be assessed a civil penalty of not more than five thousand dollars.

The attorney general may file in the superior court of the county in which such person resides or has his principal place of business, or of Suffolk county if such person is a nonresident or has no principal place of business in the commonwealth, and serve upon such person, in the same manner as provided in section six, a petition for an order of such court for the enforcement of this section and section six. Any disobedience of any final order entered under this section by any court shall be punished as a contempt thereof.

Show / Hide Site Map

Mass.gov | Site Map | Terms of Use | Privacy Policy | Accessibility Statement | Contact Us

Copyright © 2013 The General Court. All Rights Reserved

ADD-056

4/4/2013 12:16 PM



THE 188TH GENERAL COURT OF
# THE COMMONWEALTH OF MASSACHUSETTS

Home   Glossary   FAQs
*site search*
Options

| Massachusetts Laws | Bills | State Budget | People | Committees | Educate & Engage | Events |

**Massachusetts Laws**

## General Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

Print Page

**PART I**      **ADMINISTRATION OF THE GOVERNMENT**
(Chapters 1 through 182)

PREV   NEXT

**TITLE XV**      **REGULATION OF TRADE**

PREV   NEXT

**CHAPTER 93A**      **REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION**

PREV   NEXT

**Section 8**      **Habitual violation of injunctions**

PREV   NEXT

Section 8. Upon petition by the attorney general, the court may for habitual violation of injunctions issued pursuant to section four order the dissolution, or suspension or forfeiture of franchise of any corporation or the right of any individual or foreign corporation to do business in the commonwealth.

Show Help Site Map

Copyright © 2013 The General Court, All Rights Reserved

Case: 13-1557     Document: 00116603663     Page: 124     Date Filed: 10/29/2013     Entry ID: 5775769



THE 188TH GENERAL COURT OF
# THE COMMONWEALTH OF MASSACHUSETTS

Massachusetts Laws     Bills     State Budget     People     Committees     Educate & Engage     Events

Massachusetts Laws          General Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

Print Page

PART I          ADMINISTRATION OF THE GOVERNMENT
                (Chapters 1 through 182)
                                                    PREV   NEXT

TITLE XV        REGULATION OF TRADE
                                                    PREV   NEXT

CHAPTER 93A     REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION
                                                    PREV   NEXT

Section 9       Civil actions and remedies; class action; demand for relief; damages;
                costs; exhausting administrative remedies
                                                    PREV   NEXT

Section 9. (1) Any person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder or any person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D may bring an action in the superior court, or in the housing court as provided in section three of chapter one hundred and eighty-five C whether by way of original complaint, counterclaim, cross-claim or third party action, for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

(2) Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons; the court shall require that notice of such action be given to unnamed petitioners in the most effective practicable manner. Such action shall not be dismissed, settled or compromised without the approval of the court, and notice of any proposed dismissal, settlement or compromise shall be given to all members of the class of petitioners in such manner as the court directs.

(3) At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent. Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered

ADD-058

Case: 13-1557    Document: 00116603663    Page: 125    Date Filed: 10/29/2013    Entry ID: 5773769

was reasonable in relation to the injury actually suffered by the petitioner. In all other cases, if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper. The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim or cross-claim, or if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth, but such respondent may otherwise employ the provisions of this section by making a written offer of relief and paying the rejected tender into court as soon as practicable after receiving notice of an action commenced under this section. Notwithstanding any other provision to the contrary, if the court finds any method, act or practice unlawful with regard to any security or any contract of sale of a commodity for future delivery as defined in section two, and if the court finds for the petitioner, recovery shall be in the amount of actual damages.

(3A) A person may assert a claim under this section in a district court, whether by way of original complaint, counterclaim, cross-claim or third-party action, for money damages only. Said damages may include double or treble damages, attorneys' fees and costs, as herein provided. The demand requirements and provision for tender of offer of settlement provided in paragraph (3) shall also be applicable under this paragraph, except that no rights to equitable relief shall be created under this paragraph, nor shall a person asserting a claim hereunder be able to assert any claim on behalf of other similarly injured and situated persons as provided in paragraph (2).

(4) If the court finds in any action commenced hereunder that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorney's fees and costs incurred in connection with said action; provided, however, the court shall deny recovery of attorney's fees and costs which are incurred after the rejection of a reasonable written offer of settlement made within thirty days of the mailing or delivery of the written demand for relief required by this section.

*[There is no paragraph (5).]*

(6) Any person entitled to bring an action under this section shall not be required to initiate, pursue or exhaust any remedy established by any regulation, administrative procedure, local, state or federal law or statute or the common law in order to bring an action under this section or to obtain injunctive relief or recover damages or attorney's fees or costs or other relief as provided in this section. Failure to exhaust administrative remedies shall not be a defense to any proceeding under this section, except as provided in paragraph seven.

(7) The court may upon motion by the respondent before the time for answering and after a

Case: 13-1557   Document: 00116603663   Page: 126   Date Filed: 10/29/2013   Entry ID: 5775769

hearing suspend proceedings brought under this section to permit the respondent to initiate action in which the petitioner shall be named a party before any appropriate regulatory board or officer providing adjudicatory hearings to complainants if the respondent's evidence indicates that:

(a) there is a substantial likelihood that final action by the court favorable to the petitioner would require of the respondent conduct or practices that would disrupt or be inconsistent with a regulatory scheme that regulates or covers the actions or transactions complained of by the petitioner established and administered under law by any state or federal regulatory board or officer acting under statutory authority of the commonwealth or of the United States; or

(b) that said regulatory board or officer has a substantial interest in reviewing said transactions or actions prior to judicial action under this chapter and that the said regulatory board or officer has the power to provide substantially the relief sought by the petitioner and the class, if any, which the petitioner represents, under this section.

Upon suspending proceedings under this section the court may enter any interlocutory or temporary orders it deems necessary and proper pending final action by the regulatory board or officer and trial, if any, in the court, including issuance of injunctions, certification of a class, and orders concerning the presentation of the matter to the regulatory board or officer. The court shall issue appropriate interlocutory orders, decrees and injunctions to preserve the status quo between the parties pending final action by the regulatory board or officer and trial and shall stay all proceedings in any court or before any regulatory board or officer in which petitioner and respondent are necessarily involved. The court may issue further orders, injunctions or other relief while the matter is before the regulatory board or officer and shall terminate the suspension and bring the matter forward for trial if it finds (a) that proceedings before the regulatory board or officer are unreasonably delayed or otherwise unreasonably prejudicial to the interests of a party before the court, or (b) that the regulatory board or officer has not taken final action within six months of the beginning of the order suspending proceedings under this chapter.

(8) Except as provided in section ten, recovering or failing to recover an award of damages or other relief in any administrative or judicial proceeding, except proceedings authorized by this section, by any person entitled to bring an action under this section, shall not constitute a bar to, or limitation upon relief authorized by this section.

Copyright © 2013 The General Court, All Rights Reserved

ADD-060                    10/4/2013 12:17 PM



THE 188TH GENERAL COURT OF
# THE COMMONWEALTH OF MASSACHUSETTS

Home Glossary FAQs
site search
Options

**Massachusetts Laws**    **Bills**    **State Budget**    **People**    **Committees**    **Educate & Engage**    **Events**

Massachusetts Laws

## General Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT (Chapters 1 through 182) | PREV NEXT |
|--------|----------------------------------------------------------|-----------|
| TITLE XV | REGULATION OF TRADE | PREV NEXT |
| CHAPTER 93A | REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION | PREV NEXT |
| Section 10 | Notice to attorney general; injunction, prima facie evidence | PREV NEXT |

Section 10. Upon commencement of any action brought under section nine or section eleven, the clerk of the court shall mail a copy of the bill in equity to the attorney general and, upon entry of any judgment or decree in the action, the clerk of the court shall mail a copy of such judgment or decree to the attorney general.

Any permanent injunction or order of the court made under section four shall be prima facie evidence in an action brought under section nine or section eleven that the respondent used or employed an unfair or deceptive act or practice declared unlawful by section two.

Site map / Help: Site Map

Copyright © 2013 The General Court, All Rights Reserved

Case: 13-1557   Document: 00116603663   Page: 128   Date Filed: 10/29/2013   Entry ID: 5775769



THE 188TH GENERAL COURT OF
# THE COMMONWEALTH OF MASSACHUSETTS

Massachusetts Laws   Bills   State Budget   People   Committees   Educate & Engage   Events

Massachusetts Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

## General Laws

Print Page

| | | |
|---|---|---|
| PART I | ADMINISTRATION OF THE GOVERNMENT (Chapters 1 through 182) | PREV NEXT |
| TITLE XV | REGULATION OF TRADE | PREV NEXT |
| CHAPTER 93A | REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION | PREV NEXT |
| Section 11 | Persons engaged in business; actions for unfair trade practices; class actions; damages; injunction; costs | PREV NEXT |

Section 11. Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court, or in the housing court as provided in section three of chapter one hundred and eighty-five C, whether by way of original complaint, counterclaim, cross-claim or third-party action for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

Such person, if he has not suffered any loss of money or property, may obtain such an injunction if it can be shown that the aforementioned unfair method of competition, act or practice may have the effect of causing such loss of money or property.

Any persons entitled to bring such action may, if the use or employment of the unfair method of competition or the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons; the court shall require that notice of such action be given to unnamed petitioners in the most effective, practicable manner. Such action shall not be dismissed, settled or compromised without the approval of the court, and notice of any proposed dismissal, settlement or compromise shall be given to all members of the class of petitioners in such a manner as the court directs.

A person may assert a claim under this section in a district court, whether by way of original complaint, counterclaim, cross-claim or third-party action, for money damages only. Said damages may include double or treble damages, attorneys' fees and costs, as hereinafter provided, with provision for tendering by the person against whom the claim is asserted of a

Case: 13-1557   Document: 00116603663   Page: 129   Date Filed: 10/29/2013   Entry ID: 5775769

written offer of settlement for single damages, also as hereinafter provided. No rights to equitable relief shall be created under this paragraph, nor shall a person asserting such claim be able to assert any claim on behalf of other similarly injured and situated persons as provided in the preceding paragraph. The provisions of sections ninety-five to one hundred and ten, inclusive, of chapter two hundred and thirty-one, where applicable, shall apply to a claim under this section, except that the provisions for remand, removal and transfer shall be controlled by the amount of single damages claimed hereunder.

If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper. The respondent may tender with his answer in any such action a written offer of settlement for single damages. If such tender or settlement is rejected by the petitioner, and if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner, then the court shall not award more than single damages.

If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action.

In any action brought under this section, in addition to the provisions of paragraph (b) of section two, the court shall also be guided in its interpretation of unfair methods of competition by those provisions of chapter ninety-three known as the Massachusetts Antitrust Act.

No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

Copyright © 2013 The General Court, All Rights Reserved

4/4/2013 12:17 PM

ADD-063



THE 188TH GENERAL COURT OF
THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs
*site search*
Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events    MyLegislature

Home    Bills & Laws    Laws    General Laws    PART I    TITLE XX    CHAPTER 140D

Massachusetts Laws

Massachusetts Constitution

General Laws

Rules

Session Laws

## General Laws

Print Page

| | | |
|---|---|---|
| **PART I** | **ADMINISTRATION OF THE GOVERNMENT** (Chapters 1 through 182) | PREV  NEXT |
| **TITLE XX** | **PUBLIC SAFETY AND GOOD ORDER** | PREV  NEXT |
| **CHAPTER 140D** | **CONSUMER CREDIT COST DISCLOSURE** | PREV  NEXT |

| | |
|---|---|
| Section 1 | Definitions |
| Section 2 | Exempt transactions |
| Section 3 | Rules and regulations |
| Section 4 | Finance charge; determination |
| Section 5 | Annual percentage rate; determination |
| Section 6 | Inaccurate disclosure of finance charge or annual percentage rate; adjustment |
| Section 7 | Disclosure of information; multiple creditors or obligors; estimates |
| Section 8 | Disclosure of information; clear and conspicuous statements |
| Section 9 | Information rendered inaccurate |
| Section 10 | Security interest in property used as dwelling; rescission; liability; application |
| Section 11 | Disclosure; open end credit plans; statement; contents |
| Section 12 | Disclosure; other than open-end credit plans; statement; contents |
| Section 13 | Repealed, 2002, 496, Sec. 2 |
| Section 14 | Multiple-page advertisements; contents; open-end-credit plan |
| Section 15 | Advertisements; other than open-credit plans; contents |
| Section 15A | Application form or pre-approved written solicitation for open-end credit plan; contents |
| Section 16 | Liability of owner or personnel of advertising medium |
| Section 17 | Oral response to cost of credit inquiry |
| Section 18 | Model disclosure forms and clauses |
| Section 19 | Time for sending statement; noncompliance; finance charge |
| Section 20 | Sale of goods or services at retail; finance charge under open-end-credit plan; computation |
| Section 21 | Application of credit cardholder's funds held by issuer; authorization; agreement statement |
| Section 22 | Credit balance exceeding one dollar; periodic statement disclosure; contents |
| Section 23 | Transfer of funds following default of debt; written notice; applicability |
| Section 24 | Guaranty of obligations of other persons; notice of additional obligations |
| Section 25 | Issuance of credit cards |
| Section 26 | Cardholder liability for unauthorized use |
| Section 27 | Unauthorized use of credit cards |
| Section 28 | Liability of business for unauthorized use of credit cards |
| Section 28A | Cardholder discounts; surcharges; finance charge |
| Section 28B | Participation in credit plans; conditions |

ADD-064

| Section 29 | Rules and regulations; consistency with Federal Fair Credit Billing Act |
| Section 30 | Inspection of records |
| Section 31 | Prohibited acts; penalty |
| Section 32 | Creditor's failure to comply with law; damages |
| Section 33 | Civil actions against subsequent assignees of creditor; written acknowledgement; rescission |
| Section 34 | Unfair trade practices; violations |
| Section 35 | Limitations on creditors' liability and consumer rescission rights |

Show / Hide Site Map

Copyright © 2013 The General Court, All Rights Reserved



THE 188TH GENERAL COURT OF
THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs
*site search*
Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events    MyLegislature

Massachusetts Laws

Massachusetts Constitution

General Laws

Rules

Session Laws

## General Laws

Print Page

PART I          ADMINISTRATION OF THE GOVERNMENT
                (Chapters 1 through 182)
                                                        PREV   NEXT

TITLE XX        PUBLIC SAFETY AND GOOD ORDER
                                                        PREV   NEXT

CHAPTER         CONSUMER CREDIT COST DISCLOSURE
140D
                                                        PREV   NEXT

Section 10      Security interest in property used as dwelling; rescission; liability;
                application
                                                        PREV   NEXT

Section 10. (a) Except as otherwise provided in this section, in the case of any consumer credit transaction, including opening or increasing the credit limit for an open-end-credit plan, in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required by this chapter, whichever is later, by notifying the creditor, in accordance with regulations of the commissioner, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the commissioner, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the commissioner, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section. No finance or other charge shall begin to accrue on any such transaction until the termination of the rescission period provided for in this section.

(b) When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within twenty days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impractical or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within twenty days after tender by the obligor, ownership of the property rests in the obligor without obligation on his

ADD-066

Case: 13-1557     Document: 00116603663     Page: 133     Date Filed: 10/29/2013     Entry ID: 5775769

part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

(c) Written acknowledgment of receipt of any disclosures required under this chapter, or any rule or regulation issued thereunder, by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof.

(d) The commissioner may, if he finds that such action is necessary in order to permit homeowners to meet bona fide personal financial emergencies, prescribe regulations authorizing the modification or waiver of any rights created under this section to the extent and under the circumstances set forth in those regulations.

(e)(1) This section shall not apply to:

(A) a residential mortgage transaction as defined in section one;

(B) a transaction which constitutes a refinancing or consolidation, with no new advances, of the principal balance then due and any accrued and unpaid finance charges of an existing extension of credit by the same creditor secured by an interest in the same property;

(C) a transaction in which an agency of the commonwealth or any subdivision thereof, is the creditor;

(D) advances under a preexisting open-end-credit plan if a security interest has already been retained or acquired and such advances are in accordance with a previously established credit limit for such plan.

(f) An obligor's right of rescission shall expire four years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding that the information and forms required under this section or any other disclosures required under this chapter have not been delivered to the obligor, except that if (1) the commissioner institutes a proceeding to enforce the provisions of this section within four years after the date of consummation of the transaction, (2) the commissioner finds a violation of this section, and (3) the obligor's right to rescind is based in whole or in part on any matter involved in such proceeding, then the obligor's right of rescission shall expire four years after the date of consummation of the transaction or upon the earlier sale of the property, or upon the expiration of one year following the conclusion of the proceeding, or any judicial review or period for judicial review thereof, whichever is later.

(g) In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section thirty-two not relating to the right to rescind.

(h) An obligor shall have no rescission rights arising solely from the form of written notice used by the creditor to inform the obligor of the rights of the obligor under this section, if the creditor provided the obligor the appropriate form of written notice published and adopted by the commissioner, or a comparable written notice of the rights of the obligor, that was properly completed by the creditor, and otherwise complied with all other requirements of this section regarding notice.

ADD-067

Case: 13-1557     Document: 00116603663     Page: 134     Date Filed: 10/29/2013     Entry ID: 5775769

(i)(1) Notwithstanding the provisions of section thirty-five, and subject to the time period provided in subsection (f), in addition to any other right of rescission available under this section for a transaction, after the initiation of any judicial or nonjudicial foreclosure process on the primary dwelling of an obligor securing an extension of credit, the obligor shall have a right to rescind the transaction equivalent to other rescission rights provided by this section, if:

(a) a mortgage broker fee is not included in the finance charge in accordance with the laws and regulations in effect at the time the consumer credit transaction was consummated;

(b) the form of notice of rescission for the transaction is not the appropriate form of written notice published and adopted by the commissioner or a comparable written notice, and otherwise complied with all the requirements of this section regarding notice.

(2) Notwithstanding the provisions of subsection (f) of section four, and subject to the time period provided in subsection (f) of this section, for the purposes of exercising any rescission rights after the initiation of any judicial or nonjudicial foreclosure process on the principal dwelling of the obligor securing an extension of credit, the disclosure of the finance charge and other disclosures affected by any finance charge shall be treated as being accurate for the purposes of this section if the amount disclosed as the finance charge does not vary from the actual finance charge by more than thirty-five dollars or is greater than the amount required to be disclosed under this chapter.

(3) Nothing in this section shall be construed so as to affect a consumer's right of recoupment under the laws of the commonwealth.

(4) The provisions of this subsection shall apply to all consumer credit transactions in existence or consummated on or after September thirtieth, nineteen hundred and ninety-five.

Copyright © 2013 The General Court, All Rights Reserved

ADD-068   10/29/2013 2:03 PM

Case: 13-1557    Document: 00116603663    Page: 135    Date Filed: 10/29/2013    Entry ID: 5775769



THE 188TH GENERAL COURT OF
## THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs
site search
Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events    MyLegislature

Massachusetts Laws

## General Laws

Massachusetts Constitution

General Laws

Rules

Session Laws

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT (Chapters 1 through 182) |
|---|---|

PREV   NEXT

| TITLE XX | PUBLIC SAFETY AND GOOD ORDER |
|---|---|

PREV   NEXT

| CHAPTER 140D | CONSUMER CREDIT COST DISCLOSURE |
|---|---|

PREV   NEXT

| Section 33 | Civil actions against subsequent assignees of creditor; written acknowledgement; rescission |
|---|---|

PREV   NEXT

Section 33. (a) Except as otherwise specifically provided in this chapter, or any rule or regulation issued thereunder, any civil action for a violation of this chapter, or any rule or regulation issued thereunder, or proceeding under section six which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement, except where the assignment was involuntary. For the purpose of this section, a violation apparent on the face of the disclosure statement includes, but is not limited to (i) a disclosure which can be determined to be incomplete or inaccurate from the face of the disclosure statement or other documents assigned, or (ii) a disclosure which does not use the terms required to be used by this chapter, or any rule or regulation issued thereunder.

(b) Except as provided in subsection (c) of section ten, in any action or proceeding by or against any subsequent assignee of the original creditor without knowledge to the contrary by the assignee when he acquires the obligation, written acknowledgement of the receipt by a person to whom a statement is required to be given pursuant to this chapter, or any rule or regulation issued thereunder, shall be conclusive proof of the delivery thereof and, except as provided in section (a), of compliance with this chapter, or any rule or regulation issued thereunder. This section does not affect the rights of an obligor in any action against the original creditor.

(c) Any consumer who has the right to rescind a transaction under section ten may rescind the transaction as against any assignee of the obligation.

(d)(1) Except as otherwise specifically provided in this chapter, or any rule or regulation issued thereunder, any civil action against a creditor with respect to a consumer credit transaction secured by real property for a violation of this chapter and any proceeding under section six may be maintained against any assignee of such creditor only if—

(i) the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement provided in connection with such transaction pursuant to this chapter;

ADD-069
10/28/2013 2:03 PM

and

(ii) the assignment to the assignee was voluntary.

For the purposes of this section, a violation is apparent on the face of the disclosure statement if:

(i) the disclosure can be determined to be incomplete or inaccurate by a comparison among the disclosure statement, any itemization of the amount financed, the note, or any other disclosure of disbursement; or

(ii) the disclosure statement does not use the terms or format required to be used by this chapter.

*[There is no paragraph (d)(2).]*

(e)(1) A servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as an assignee of such obligation for the purposes of this section unless the servicer is or was the owner of the obligation.

(2) A servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as the owner of such obligation for the purposes of this section on the basis of an assignment of said obligation from the creditor or another assignee to the servicer solely for the administrative convenience of the servicer in servicing the obligation. Upon written request by the obligor, the servicer shall provide the obligor, to the best knowledge of the servicer, with the name, address and telephone number of the owner of the obligation or the master servicer thereof.

(3) For the purposes of this section, the word "servicer" shall have the same meaning as in section 6(I)(2) of the Federal Real Estate Settlement Procedures Act of 1974.

(4) This paragraph shall apply to all consumer credit transactions in existence or consummated on or after September thirtieth, nineteen hundred and ninety-five.

Show / Hide Site Map

Copyright © 2013 The General Court, All Rights Reserved

ADD-070

Case: 13-1557     Document: 00116603663     Page: 137     Date Filed: 10/29/2013     Entry ID: 5775769



THE 188TH GENERAL COURT OF
THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs
site search
Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events    MyLegislature

Massachusetts Laws

General Laws

Massachusetts Constitution
General Laws
Rules
Session Laws

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT (Chapters 1 through 182) | PREV  NEXT |
| TITLE XX | PUBLIC SAFETY AND GOOD ORDER | PREV  NEXT |
| CHAPTER 140D | CONSUMER CREDIT COST DISCLOSURE | PREV  NEXT |
| Section 34 | Unfair trade practices; violations | PREV  NEXT |

Section 34. A violation of this chapter, or any rule or regulation issued hereunder, shall constitute a violation of chapter ninety-three A.

Show / Hide Site Map

Mass.gov | Site Map | Site Policy | Webmaster

Copyright © 2013 The General Court, All Rights Reserved

209 CMR:   DIVISION OF BANKS AND LOAN AGENCIES

209 CMR 32.00:    DISCLOSURE OF CONSUMER CREDIT COSTS AND TERMS

Section

32.01 through 32.04:  GENERAL
32.01:  Purpose and Scope
32.02:  Definitions and Rules of Construction
32.03:  Exempt Transactions
32.04:  Finance Charges

32.05 through 32.16:  OPEN-END CREDIT
32.05:  General Disclosure Requirements -- OPEN END CREDIT
32.05A:  Credit and Charge Card Applications and Solicitations
32.05B:  Requirements for Home Equity Plans
32.06:  Account-opening Disclosures
32.06A:  Computation of Finance Charge
32.07:  Periodic Statement
32.08:  Identifying Transactions on Periodic Statements
32.09:  Subsequent Disclosure Requirements
32.10:  Payments
32.11:  Treatment of Credit Balances; Account Termination
32.12:  Special Credit Card Provisions
32.13:  Billing Error Resolution
32.14:  Determination of Annual Percentage Rate
32.15:  Right of Rescission
32.16:  Advertising

32.17 through 32.24:  CLOSED-END CREDIT
32.17:  General Disclosure Requirements - CLOSED-END CREDIT
32.18:  Content of Disclosures
32.19:  Certain Mortgage and Variable-rate Transactions
32.20:  Subsequent Disclosure Requirements
32.21:  Treatment of Credit Balances
32.22:  Determination of Annual Percentage Rate
32.23:  Right of Rescission
32.24:  Advertising

32.25 through 32.30:  MISCELLANEOUS
32.25:  Record Retention
32.26:  Use of Annual Percentage Rate in Oral Disclosures
32.27:  Staff Interpretations
32.28:  Appendices
32.29:  Compliance
32.30:  Limitation on Rates

32.31 through 32.45:  SPECIAL RULES FOR CERTAIN HOME MORTGAGE TRANSACTIONS
32.31:  Special Rules for Certain Home Mortgage Transactions - General Rules
32.32:  Requirements for Certain Home Mortgages
32.33:  Requirements for Reverse Mortgages
32.34:  Prohibited Acts and Practices in Connection with Credit Subject to 209 CMR 32.32
32.35:  Prohibited Acts or Practices in Connection with Higher-priced Mortgage Loans
32.36:  Prohibited Acts or Practices in Connection with Credit Secured by a Consumer's Principal Dwelling
32.39:  Mortgage Transfer Disclosures

32.46 through 32.48:  SPECIAL RULES FOR PRIVATE EDUCATION LOANS
32.46:  Special Disclosure Requirements for Private Education Loans
32.47:  Content of Disclosures
32.48:  Limitations on Private Education Loans

32.51 through 32.58:  SPECIAL RULES APPLICABLE TO CREDIT CARD ACCOUNTS AND OPEN-END CREDIT OFFERED TO COLLEGE STUDENTS
32.51:  Ability to Pay

ADD-072

209 CMR:  DIVISION OF BANKS AND LOAN AGENCIES

32.16:  continued

(b) Definitions.  "Deferred interest" means finance charges, accrued on balances or transactions, that a consumer is not obligated to pay or that will be waived or refunded to a consumer if those balances or transactions are paid in full by a specified date. The maximum period from the date the consumer becomes obligated for the balance or transaction until the specified date by which the consumer must pay the balance or transaction in full in order to avoid finance charges, or receive a waiver or refund of finance charges, is the "deferred interest period." "Deferred interest" does not include any finance charges the consumer avoids paying in connection with any recurring grace period.

(c) Stating the Deferred Interest Period.  If a deferred interest offer is advertised, the deferred interest period must be stated in a clear and conspicuous manner in the advertisement. If the phrase "no interest" or similar term regarding the possible avoidance of interest obligations under the deferred interest program is stated, the term "if paid in full" must also be stated in a clear and conspicuous manner preceding the disclosure of the deferred interest period in the advertisement.  If the deferred interest offer is included in a written or electronic advertisement, the deferred interest period and, if applicable, the term "if paid in full" must also be stated in immediate proximity to each statement of "no interest," "no payments," "deferred interest," "same as cash," or similar term regarding interest or payments during the deferred interest period.

(d)  Stating the Terms of the Deferred Interest or Similar Offer.  If any deferred interest offer is advertised, the information in 209 CMR 32.16(8)(d)1. and 2. must be stated in the advertisement, in language similar to Sample G-24 in Appendix G to Regulation Z. If the deferred interest offer is included in a written or electronic advertisement, the information in 209 CMR 32.16(8)(d)1. and 2. must also be stated in a prominent location closely proximate to the first statement of "no interest," "no payments," "deferred interest," "same as cash," or similar term regarding interest or payments during the deferred interest period.

1.  A statement that interest will be charged from the date the consumer becomes obligated for the balance or transaction subject to the deferred interest offer if the balance or transaction is not paid in full within the deferred interest period; and

2.  A statement, if applicable, that interest will be charged from the date the consumer incurs the balance or transaction subject to the deferred interest offer if the account is in default before the end of the deferred interest period.

(e)  Envelope Excluded.  The requirements in 209 CMR 32.16(8)(d) do not apply to an envelope or other enclosure in which an application or solicitation is mailed, or to a banner advertisement or pop-up advertisement linked to an application or solicitation provided electronically.

32.17:  General Disclosure Requirements - CLOSED-END CREDIT

(1)  Form of Disclosures.

(a)  The creditor shall make the disclosures required by 209 CMR 32.17 through 32.23 clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures required by 209 CMR 32.17 through 32.23 may be provided to the consumer in electronic form, subject to compliance with the consumer consent and other applicable provisions of the Electronic Signatures in Global and National Commerce Act (E-Sign Act) (15 U.S.C. 7001 *et seq.*). The disclosures required by 209 CMR 32.17(7), 32.19(2) and 32.24 may be provided to the consumer in electronic form without regard to the consumer consent or other provisions of the E-Sign Act in the circumstances set forth in 209 CMR 32.17(7), 32.19(2) and 32.24.  The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related[37] to the disclosures required under 209 CMR 32.18 or 32.47).[38] The itemization of the amount financed under 209 CMR 32.18(3)(a) must be separate from the other disclosures under 209 CMR 32.18, except for private education loan disclosures made in compliance with 209 CMR 32.47.

[37]  The disclosures may include an acknowledgment of receipt, the date of the transaction, and the consumer's name, address and account number.

[38]  The following disclosures may be made together or separately from other required disclosures: the creditor's identity under 209 CMR 32.18(1), the variable rate example under 209 CMR 32.18(6)(a)4., insurance under 209 CMR 32.18(14), and certain security interest charges under 209 CMR 32.18(15).

ADD-073

32.17:   continued

(b)  Except for private education loan disclosures made in compliance with 209 CMR 32.47 the terms "finance charge" and "annual percentage rate," when required to be disclosed under 209 CMR 32.18(4) and (5) together with a corresponding amount or percentage rate, shall be more conspicuous than any other disclosure, except the creditor's identity under 209 CMR 32.18(1).  For private education loan disclosures made in compliance with 209 CMR 32.47, the term "annual percentage rate," and the corresponding percentage rate must be less conspicuous than the term "finance charge" and corresponding amount under 209 CMR 32.18(4), the interest rate under 209 CMR 32.47(2)(a)1. and (3)(a), and the notice of the right to cancel under 209 CMR 32.47(3)(d).)

(2)  Time of Disclosures.  The creditor shall make disclosures before consummation of the transaction. In certain mortgage transactions, special timing requirements are set forth in 209 CMR 32.19(1).  In certain variable-rate transactions, special timing requirements for variable-rate disclosures are set forth in 209 CMR 32.19(2) and 32.20(3).  For private education loan disclosures made in compliance with 209 CMR 32.47, special timing requirements are set forth in 209 CMR 32.46(4).)  In certain transactions involving mail or telephone orders or a series of sales, the timing of disclosures may be delayed in accordance with 209 CMR 32.17(7) and (8).

(3)  Basis of Disclosures and Use of Estimates.
(a)  The disclosures shall reflect the terms of the legal obligation between the parties.
(b)  1.  If any information necessary for an accurate disclosure is unknown to the creditor, the creditor shall make the disclosure based on the best information reasonably available at the time the disclosure is provided to the consumer and shall state clearly that the disclosure is an estimate.
2.  For a transaction in which a portion of the interest is determined on a *per diem* basis and collected at consummation, any disclosure affected by the per diem interest shall be considered accurate if the disclosure is based on information known to the creditor at the time that the disclosure documents are prepared for consummation of the transaction
(c)  The creditor may disregard the effects of the following in making calculations and disclosures:
1.  That payments must be collected in whole cents.
2.  That dates of scheduled payments and advances may be changed because the scheduled date is not a business day.
3.  That months have different numbers of days.
4.  The occurrence of leap year.
(d)  In making calculations and disclosures, the creditor may disregard any irregularity in the first period that falls within the limits described below and any payment schedule irregularity that results from the irregular first period:
1.  For transactions in which the term is less than one year, a first period not more than six days shorter or 13 days longer than a regular period;
2.  For transactions in which the term is at least one year and less than ten years, a first period not more than 11 days shorter or 21 days longer than a regular period; and
3.  For transactions in which the term is at least ten years, a first period shorter than or not more than 32 days longer than a regular period.
(e)  If an obligation is payable on demand, the creditor shall make the disclosures based on an assumed maturity of one year. If an alternate maturity date is stated in the legal obligation between the parties, the disclosures shall be based on that date.
(f)  1.  A series of advances under an agreement to extend credit up to a certain amount may be considered as one transaction.
2.  When a multiple-advance loan to finance the construction of a dwelling may be permanently financed by the same creditor, the construction phase and the permanent phase may be treated as either one transaction or more than one transaction.

(4)  Multiple Creditors; Multiple Consumers.  If a transaction involves more than one creditor, only one set of disclosures shall be given and the creditors shall agree among themselves which creditor must comply with the requirements that 209 CMR 32.00 imposes on any or all of them. If there is more than one consumer, the disclosures may be made to any consumer who is primarily liable on the obligation. If the transaction is rescindable under 209 CMR 32.23, however, the disclosures shall be made to each consumer who has the right to rescind.

ADD-074

32.17:  continued

(5) Effect of Subsequent Events. If a disclosure becomes inaccurate because of an event that occurs after the creditor delivers the required disclosures, the inaccuracy is not a violation of 209 CMR 32.00, although new disclosures may be required under 209 CMR 32.17(6), 32.19, or 32.20 or 32.46(3)(d).

(6) Early Disclosures. Except for private education loan disclosures made in compliance with 209 CMR 32.47 if the disclosures required by 209 CMR 32.17 are given before the date of consummation of a transaction and a subsequent event makes them inaccurate, the creditor shall disclose before consummation (subject to the provisions of 209 CMR 32.19(1)(b) and 32.19(1)(e)3.):

   (a) any changed term unless the term was based on an estimate in accordance with 209 CMR 32.17(3)(b) and was labeled an estimate;
   (b) all changed terms, if the annual percentage rate at the time of consummation varies from the annual percentage rate disclosed earlier by more than 1/8 of 1% point in a regular transaction, or more than ¼ of 1% point in an irregular transaction, as defined in 209 CMR 32.22(1).

(7) Mail or Telephone Orders – Delay in Disclosures. Except for private education loan disclosures made in compliance with 209 CMR 32.47 if a creditor receives a purchase order or a request for an extension of credit by mail, telephone, or any other written or electronic communication without face-to-face or direct telephone solicitation, the creditor may delay the disclosures until the due date of the first payment, if the following information for representative amounts or ranges of credit is made available in written form or in electronic form to the consumer or to the public before the actual purchase order or request:

   (a) The cash price or the principal loan amount.
   (b) The total sale price.
   (c) The finance charge.
   (d) The annual percentage rate, and if the rate may increase after consummation, the following disclosures:
      1. The circumstances under which the rate may increase.
      2. Any limitations on the increase.
      3. The effect of an increase.
   (e) The terms of repayment.

(8) Series of Sales – Delay in Disclosures. If a credit sale is one of a series made under an agreement providing that subsequent sales may be added to an outstanding balance, the creditor may delay the required disclosures until the due date of the first payment for the current sale, if the following two conditions are met:

   (a) The consumer has approved in writing the annual percentage rate or rates, the range of balances to which they apply, and the method of treating any unearned finance charge on an existing balance.
   (b) The creditor retains no security interest in any property after the creditor has received payments equal to the cash price and any finance charge attributable to the sale of that property. For purposes of 209 CMR 32.17(8), in the case of items purchased on different dates, the first purchased is deemed the first item paid for; in the case of items purchased on the same date, the lowest priced is deemed the first item paid for.

(9) Interim Student Credit Extensions. For each transaction involving an interim credit extension under a student credit program for which an application is received prior to the mandatory compliance date of 209 CMR 32.46 through 32.48, the creditor need not make the following disclosures: the finance charge under 209 CMR 32.18(4), the payment schedule under 209 CMR 32.18(7), the total of payments under 209 CMR 32.18(8), or the total sale price under 209 CMR 32.18(10), at the time the credit is actually extended. The creditor must make complete disclosures at the time the creditor and consumer agree upon the repayment schedule for the total obligation. At that time, a new set of disclosures must be made of all applicable items under 209 CMR 32.18.

ADD-075

32.18:  Content of Disclosures

For each transaction, the creditor shall disclose the following information as applicable.

(1)  Creditor.  The identity of the creditor making the disclosures.

(2)  Amount Financed.  The "amount financed," using that term, and a brief description such as "the amount of credit provided to you or on your behalf." The amount financed is calculated by:

(a)  Determining the principal loan amount or the cash price (subtracting any downpayment);

(b)  Adding any other amounts that are financed by the creditor and are not part of the finance charge; and

(c)  Subtracting any prepaid finance charge.

(3)  Itemization of Amount Financed.

(a)  A separate written itemization of the amount financed, including:[40]

1.  The amount of any proceeds distributed directly to the consumer.

2.  The amount credited to the consumer's account with the creditor.

3.  Any amounts paid to other persons by the creditor on the consumer's behalf. The creditor shall identify those persons.[41]

4.  The prepaid finance charge.

(b)  The creditor need not comply with 209 CMR 32.18(3)(a) if the creditor provides a statement that the consumer has the right to receive a written itemization of the amount financed, together with a space for the consumer to indicate whether it is desired, and the consumer does not request it.

(4)  Finance Charge.  The "finance charge" using that term, and a brief description such as "the dollar amount the credit will cost you."

(a)  Mortgage Loans.  In a transaction secured by real property or a dwelling, the disclosed finance charge and other disclosures affected by the disclosed finance charge (including the amount financed and the annual percentage rate) shall be treated as accurate if the amount disclosed as the finance charge:

1.  is understated by no more than $100; or

2.  is greater than the amount required to be disclosed.

(b)  Other Credit.  In any other transaction, the amount disclosed as the finance charge shall be treated as accurate if, in a transaction involving an amount financed of $1,000 or less, it is not more than $5 above or below the amount required to be disclosed; or in a transaction involving an amount financed of more than $1,000, it is not more than $10 above or below the amount required to be disclosed.

(5)  Annual Percentage Rate.  The "annual percentage rate," using that term, and a brief description such as "the cost of your credit as a yearly rate." [42]

(6)  Variable-rate.

(a)  If the annual percentage rate may increase after consummation in a transaction not secured by the consumer's principal dwelling or in a transaction secured by the consumer's principal dwelling with a term of one year or less, the following disclosures: [43]

1.  The circumstances under which the rate may increase.

2.  Any limitations on the increase.

[40]  Good faith estimates of settlement costs provided for transactions subject to the Real Estate Settlement Procedures Act (12 USC 2601 et seq.) may be substituted for the disclosures required by 209 CMR 32.18(3).

[41]  The following payees may be described using generic or other general terms and need not be further identified: public officials or government agencies, credit reporting agencies, appraisers, and insurance companies.

[42]  For any transaction involving a finance charge, of $5 or less on an amount financed of $75 or less, or a finance charge of $7.50 or less on an amount financed of more than $75, the creditor need not disclose the annual percentage rate.

[43]  Information provided in accordance with 209 CMR 32.18(6)(b) and 32.19(2) may be substituted for the disclosures required by 209 CMR 32.18(6)(a).

ADD-076

32.18:   continued

3. The effect of an increase.
4. An example of the payment terms that would result from an increase.

(b) If the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year, the following disclosures:

1. The fact that the transaction contains a variable-rate feature.
2. A statement that variable-rate disclosures have been provided earlier.

(7) <u>Payment Schedule</u>. The number, amounts, and timing of payments scheduled to repay the obligation.

(a) In a demand obligation with no alternate maturity date, the creditor may comply with 209 CMR 32.18(7)(a) by disclosing the due dates or payment periods of any scheduled interest payments for the first year.

(b) In a transaction in which a series of payments varies because a finance charge is applied to the unpaid principal balance, the creditor may comply with 209 CMR 32.18(7)(b) by disclosing the following information:

1. The dollar amounts of the largest and smallest payments in the series.
2. A reference to the variations in the other payments in the series.

(8) <u>Total of Payments</u>. The "total of payments," using that term, and a descriptive explanation such as "the amount you will have paid when you have made all scheduled payments." [44]

(9) <u>Demand Feature</u>. If the obligation has a demand feature, that fact shall be disclosed. When the disclosures are based on an assumed maturity of one year as provided in 209 CMR 32.17(3)(e), that fact shall also be disclosed.

(10) <u>Total Sale Price</u>. In a credit sale, the "total sale price," using that term, and a descriptive explanation (including the amount of any downpayment) such as "the total price of your purchase on credit, including your downpayment of $ ." The total sale price is the sum of the cash price, the items described in 209 CMR 32.18(2)(b), and the finance charge disclosed under 209 CMR 32.18(4).

(11) <u>Prepayment</u>.

(a) When an obligation includes a finance charge computed from time to time by application of a rate to the unpaid principal balance, a statement indicating whether or not a penalty may be imposed if the obligation is prepaid in full.

(b) When an obligation includes a finance charge other than the finance charge described in 209 CMR 32.18(11)(a), a statement indicating whether or not the consumer is entitled to a rebate of any finance charge if the obligation is prepaid in full.

(12) <u>Late Payment</u>. Any dollar or percentage charge that may be imposed before maturity due to a late payment, other than a deferral or extension charge.

(13) <u>Security Interest</u>. The fact that the creditor has or will acquire a security interest in the property purchased as part of the transaction, or in other property identified by item or type.

(14) <u>Insurance and Debt Cancellation</u>. The items required by 209 CMR 32.04(4) in order to exclude certain insurance premiums and debt cancellation fees from the finance charge.

(15) <u>Certain Security Interest Charges</u>. The disclosures required by 209 CMR 32.04(5) in order to exclude from the finance charge certain fees prescribed by law or certain premiums for insurance in *lieu* of perfecting a security interest.

----

[44] In any transaction involving a single payment, the creditor need not disclose the total of payments.

ADD-077

32.18:  continued

(16) Contract Reference. A statement that the consumer should refer to the appropriate contract document for information about nonpayment, default, the right to accelerate the maturity of the obligation, and prepayment rebates and penalties. At the creditor's option, the statement may also include a reference to the contract for further information about security interests and, in a residential mortgage transaction, about the creditor's policy regarding assumption of the obligation.

(17) Assumption Policy. In a residential mortgage transaction, a statement whether or not a subsequent purchaser of the dwelling from the consumer may be permitted to assume the remaining obligation on its original terms.

(18) Required Deposit. If the creditor requires the consumer to maintain a deposit as a condition of the specific transaction, a statement that the annual percentage rate does not reflect the effect of the required deposit.[45]

32.19:  Certain Mortgage and Variable-rate Transactions

(1) Mortgage Transactions Subject to RESPA.
  (a) 1. Time of Disclosures. In a mortgage transaction subject to the Real Estate Settlement Procedures Act (12 U.S.C. 2601 et seq.) that is secured by the consumer's dwelling, other than a home equity line of credit subject to 209 CMR 32.05B or mortgage transaction subject to 209 CMR 32.19(1)(e), the creditor shall make good faith estimates of the disclosures required by 209 CMR 32.18 and shall deliver or place them in the mail not later than the third business day after the creditor receives the consumer's written application.
  2. Imposition of Fees. Except as provided in 209 CMR 32.19(1)(a)3., neither a creditor nor any other person may impose a fee on a consumer in connection with the consumer's application for a mortgage transaction subject to 209 CMR 32.19(1)(a)1. before the consumer has received the disclosures required by 209 CMR 32.19(1)(a)1. If the disclosures are mailed to the consumer, the consumer is considered to have received them three business days after they are mailed.
  3. Exception to Fee Restriction. A creditor or other person may impose a fee for obtaining the consumer's credit history before the consumer has received the disclosures required by 209 CMR 32.19(1)(a)1., provided the fee is bona fide and reasonable in amount.
  (b) Waiting Periods for Early Disclosures and Corrected Disclosures.
  1. The creditor shall deliver or place in the mail the good faith estimates required by 209 CMR 32.19(1)(a)1. not later than the seventh business day before consummation of the transaction.
  2. If the annual percentage rate disclosed under 209 CMR 32.19(1)(a)1. becomes inaccurate, as defined in 209 CMR 32.22, the creditor shall provide corrected disclosures with all changed terms. The consumer must receive the corrected disclosures no later than three business days before consummation. If the corrected disclosures are mailed to the consumer or delivered to the consumer by means other than delivery in person, the consumer is deemed to have received the corrected disclosures three business days after they are mailed or delivered.
  (c) Consumer's Waiver of Waiting Period Before Consummation. If the consumer determines that the extension of credit is needed to meet a bona fide personal financial emergency, the consumer may modify or waive the seven-business-day waiting period or the three-business-day waiting period required by 209 CMR 32.19(1)(b), after receiving the disclosures required by 209 CMR 32.18. To modify or waive a waiting period, the consumer shall give the creditor a dated written statement that describes the emergency, specifically modifies or waives the waiting period, and bears the signature of all the consumers who are primarily liable on the legal obligation. Printed forms for this purpose are prohibited.

[45] A required deposit need not include, for example: an escrow account for items such as taxes, insurance or repairs;

ADD-078

32.19:  continued

(d)  Notice.  Disclosures made pursuant to 209 CMR 32.19(1)(a) or (b) shall contain the following statement: "You are not required to complete this agreement merely because you have received these disclosures or signed a loan application." The disclosure required by 209 CMR 32.19(1)(d) shall be grouped together with the disclosures required by 209 CMR 32.19(1)(a) or (b).

(e)  Timeshare Plans.  In a mortgage transaction subject to the Real Estate Settlement Procedures Act (12 U.S.C. 2601 *et seq.*) that is secured by a consumer's interest in a timeshare plan described in 11 U.S.C. 101(53(D)):

1.  The requirements of 209 CMR 32.19(1)(a) through (d) do not apply;

2.  The creditor shall make good faith estimates of the disclosures required by 209 CMR 32.18 before consummation, or shall deliver or place them in the mail not later than three business days after the creditor receives the consumer's written application, whichever is earlier; and

3.  If the annual percentage rate at the time of consummation varies from the annual percentage rate disclosed under 209 CMR 32.19(1)(e)2. by more than _ of one percentage point in a regular transaction or more than ¼ of one percentage point in an irregular transaction, as defined in 209 CMR 32.22, the creditor shall disclose all the changed terms no later than consummation or settlement.

(2)  Certain Variable-rate Transactions.[45a]  If the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year, the following disclosures must be provided at the time an application form is provided or before the consumer pays a non-refundable fee, whichever is earlier:[45b]

(a)  The booklet titled Consumer Handbook on Adjustable Rate Mortgages published by the Board and the Federal Home Loan Bank Board, or a suitable substitute.

(b)  A loan program disclosure for each variable-rate program in which the consumer expresses an interest. The following disclosures, as applicable, shall be provided:

1.  The fact that the interest rate, payment, or term of the loan can change.

2.  The index or formula used in making adjustments, and a source of information about the index or formula.

3.  An explanation of how the interest rate and payment will be determined, including an explanation of how the index is adjusted, such as by the addition of a margin.

4.  A statement that the consumer should ask about the current margin value and current interest rate.

5.  The fact that the interest rate will be discounted, and a statement that the consumer should ask about the amount of the interest rate discount.

6.  The frequency of interest rate and payment changes.

7.  Any rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carry-over.

8.  At the option of the creditor, either of the following:

a.  An historical example, based on a $10,000 loan amount, illustrating how payments and the loan balance would have been affected by interest-rate changes implemented according to the terms of the loan-program disclosure. The example shall reflect the most recent 15 years of index values. The example shall reflect all significant loan-program terms, such as negative amortization, interest rate carryover, interest-rate discounts, and interest rate and payment limitations, that would have been affected by the index movement over the period.

[45a] Information provided in accordance with variable-rate regulations of other federal agencies may be substituted for the disclosures required by 209 CMR 32.19(2).

[45b] Disclosures may be delivered or placed in the mail not later than three business days following receipt of a consumer's application when the application reaches the creditor by telephone, or through an intermediary agent or broker.

ADD-079

32.19:  continued

    b.  The maximum interest rate and payment for a $10,000 loan originated at the initial interest rate (index value plus margin, adjusted by the amount of any discount or premium) in effect as of an identified month and year for the loan program disclosure assuming the maximum periodic increases in rates and payments under the program; and the initial interest rate and payment for that loan and a statement that the periodic payment may increase or decrease substantially depending on changes in the rate.

  9.  An explanation of how the consumer may calculate the payments for the loan amount to be borrowed based on either:

    a.  the most recent payment shown in the historical example in 209 CMR 32.19(2)(b)8.a.; or

    b.  the initial interest rate used to calculate the maximum interest rate and payment in 209 CMR 32.19(2)(b)8.b.

  10.  The fact that the loan program has a demand feature.

  11.  The type of information that will be provided in notices of adjustments and the timing of such notices.

  12.  A statement that disclosure forms are available for the creditor's other variable-rate loan programs.

  (3)  Electronic Disclosures.  For an application that is accessed by the consumer in electronic form, the disclosures required by 209 CMR 32.19(2) may be provided to the consumer in electronic form on or with the application.

32.20:  Subsequent Disclosure Requirements

  (1)  Refinancings.  A refinancing occurs when an existing obligation that was subject to 209 CMR 32.00 is satisfied and replaced by a new obligation undertaken by the same consumer. A refinancing is a new transaction requiring new disclosures to the consumer. The new finance charge shall include any unearned portion of the old finance charge that is not credited to the existing obligation. The following shall not be treated as a refinancing:

    (a)  A renewal of a single payment obligation with no change in the original terms.

    (b)  A reduction in the annual percentage rate with a corresponding change in the payment schedule.

    (c)  An agreement involving a court proceeding.

    (d)  A change in the payment schedule or a change in collateral requirements as a result of the consumer's default or delinquency, unless the rate is increased, or the new amount financed exceeds the unpaid balance plus earned finance charge and premiums for continuation of insurance of the types described in 209 CMR 32.04(4).

    (e)  The renewal of optional insurance purchased by the consumer and added to an existing transaction, if disclosures relating to the initial purchase were provided as required by 209 CMR 32.00

  (2)  Assumptions.  An assumption occurs when a creditor expressly agrees in writing with a subsequent consumer to accept that consumer as a primary obligor on an existing residential mortgage transaction.  Before the assumption occurs, the creditor shall make new disclosures to the subsequent consumer, based on the remaining obligation.  If the finance charge originally imposed on the existing obligation was an add-on or discount finance charge, the creditor need only disclose:

    (a)  The unpaid balance of the obligation assumed.

    (b)  The total charges imposed by the creditor in connection with the assumption.

    (c)  The information required to be disclosed under 209 CMR 32.18(11) through (14).

    (d)  The annual percentage rate originally imposed on the obligation.

    (e)  The payment schedule under 209 CMR 32.18(7) and the total of payments under 209 CMR 32.18(8), based on the remaining obligation.

ADD-080

32.20:  continued

(3)  Variable-rate Adjustments.[45c]  An adjustment to the interest rate with or without a corresponding adjustment to the payment in a variable-rate transaction subject to 209 CMR 32.19(2) is an event requiring new disclosures to the consumer. At least once each year during which an interest rate adjustment is implemented without an accompanying payment change, and at least 25, but no more than 120, calendar days before a payment at a new level is due, the following disclosures, as applicable, must be delivered or placed in the mail:

(a)  The current and prior interest rates.

(b)  The index values upon which the current and prior interest rates are based.

(c)  The extent to which the creditor has foregone any increase in the interest rate.

(d)  The contractual effects of the adjustment, including the payment due after the adjustment is made, and a statement of the loan balance.

(e)  The payment, if different from that referred to in 209 CMR 32.20(3)(d), that would be required to fully amortize the loan at the new interest rate over the remainder of the loan term.

32.21:  Treatment of Credit Balances

When a credit balance of $1 or more is created in connection with a transaction (through transmittal of funds to a creditor in excess of the total balance due on an account, through rebates of unearned finance charges or insurance premiums, or through amounts otherwise owed to or held for the benefit of a consumer), the creditor shall:

(1)  Credit the amount of the credit balance to the consumer's account;

(2)  Refund any part of the remaining credit balance, upon the written request of the consumer; and

(3)  Make a good faith effort to refund to the consumer by cash, check, or money order, or credit to a deposit account of the consumer, any part of the credit balance remaining in the account for more than six months (within 30 days after the end of the six-month period), except that no further action is required if the consumer's current location is not known to the creditor and cannot be traced through the consumer's last known address or telephone number. Any creditor who does not make the good faith effort as required by the regulation to refund the credit balance shall pay to the consumer interest on the balance at an annual percentage rate of 18%.

32.22:  Determination of Annual Percentage Rate

(1)  Accuracy of Annual Percentage Rate.

(a)  The annual percentage rate is a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made. The annual percentage rate shall be determined in accordance with either the actuarial method or the United States Rule method. Explanations, equations and instructions for determining the annual percentage rate in accordance with the actuarial method are set forth in appendix J to Regulation Z.[45d]

(b)  As a general rule, the annual percentage rate shall be considered accurate if it is not more than 1/8 of one percentage point above or below the annual percentage rate determined in accordance with 209 CMR 32.22(1)(a).

[45c]  Information provided in accordance with variable-rate subsequent disclosure regulations of other federal agencies may be substituted for the disclosure required by 209 CMR 32.20(3).

[45d]  An error in disclosure of the annual percentage rate or finance charge shall not, in itself, be considered a violation of 209 CMR 32.00 if (1) the error resulted from a corresponding error in a calculation tool used in good faith by the creditor; and (2) upon discovery of the error, the creditor promptly discontinues use of that calculation tool for disclosure purposes and notifies the Commissioner, in writing, of the error in the calculation tool.

32.21:  continued

    (c)  In an irregular transaction, the annual percentage rate shall be considered accurate if it is not more than ¼ of one percentage point above or below the annual percentage rate determined in accordance with 209 CMR 32.22(1)(a).[46]

    (d)  Mortgage Loans.  If the annual percentage rate disclosed in a transaction secured by real property or a dwelling varies from the actual rate determined in accordance with 209 CMR 32.22(1)(a), in addition to the tolerances applicable under 209 CMR 32.22(1)(b) and (c), the disclosed annual percentage rate shall also be considered accurate if:

        1.  The rate results from the disclosed finance charge; and

        2.  a.  The disclosed finance charge would be considered accurate under 209 CMR 32.18(4)(a); or

            b.  For purposes of rescission, if the disclosed finance charge would be considered accurate under 209 CMR 32.23(7) or (8), whichever applies.

    (e)  Additional Tolerance for Mortgage Loans.  In a transaction secured by real property or a dwelling, in addition to the tolerances applicable under 209 CMR 32.22(1)(b) and (c), if the disclosed finance charge is calculated incorrectly but considered accurate under 209 CMR 32.18(4)(a) or 32.23(7) or (8), the disclosed annual percentage rate shall be considered accurate:

        1.  If the disclosed finance charge is understated, and the disclosed annual percentage rate is also understated but it is closer to the actual annual percentage rate than the rate that would be considered accurate under 209 CMR 32.22(1)(d):

        2.  If the disclosed finance charge is overstated, and the disclosed annual percentage rate is also overstated but it is closer to the actual annual percentage rate than the rate that would be considered accurate under 209 CMR 32.22(1)(d).

(2)  Computation Tools.

    (a)  The Regulation Z Annual Percentage Rate Tables produced by the Board may be used to determine the annual percentage rate, and any rate determined from those tables in accordance with the accompanying instructions complies with the requirements of 209 CMR 32.22.  Volume I of the tables applies to single-advance transactions involving up to 480 monthly payments or 104 weekly payments.  It may be used for regular transactions and for transactions with any of the following irregularities; an irregular first period, an irregular first payment, and an irregular final payment.  Volume II of the tables applies to transactions involving multiple advances and any type of payment or period irregularity.

    (b)  Creditors may use any other computation tool in determining the annual percentage rate if the rate so determined equals the rate determined in accordance with appendix J, within the degree of accuracy set forth in 209 CMR 32.22(1).

(3)  Single Add-on Rate Transactions.  If a single add-on rate is applied to all transactions with maturities up to 60 months and if all payments are equal in amount and period, a single annual percentage rate may be disclosed for all those transactions, so long as it is the highest annual percentage rate for any such transaction.

(4)  Certain Transactions Involving Ranges of Balances.  For purposes of disclosing the annual percentage rate referred to in 209 CMR 32.17(7)(d): *Mail or Telephone Orders--Delay in Disclosures* and 32.17(8): *Series of Sales--Delay in Disclosures*, if the same finance charge is imposed on all balances within a specified range of balances, the annual percentage rate computed for the median balance may be disclosed for all the balances.  However, if the annual percentage rate computed for the median balance understates the annual percentage rate computed for the lowest balance by more than 8% of the latter rate, the annual percentage rate shall be computed on whatever lower balance will produce an annual percentage rate that does not result in an understatement of more than 8% of the rate determined on the lowest balance.

---

[46]  For purposes of 209 CMR 32.22(1)(c), an irregular transaction is one that includes one or more of the following features: multiple advances, irregular payment periods, or irregular payment amounts (other than an irregular first period or an irregular first or final payment).

ADD-082

32.23:  Right of Rescission

(1)  Consumer's Right to Rescind.
    (a)  In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in 209 CMR 32.23(6).[47]
    (b)  To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication.  Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.
    (c)  The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by 209 CMR 32.23(2), or delivery of all material disclosures[48], whichever occurs last.  If the required notice or material disclosures are not delivered, the right to rescind shall expire four years after consummation, upon transfer of all the consumer's interest in the property, or upon sale of the property, whichever occurs first.  In the case of certain administrative proceedings, the rescission period shall be extended in accordance with M.G.L. c. 140D, § 10(f).
    (d)  When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(2) (a)  Notice of Right to Rescind.  In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered in electronic form in accordance with the consumer consent and other applicable provisions of the E-Sign Act).  The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:
    1.  The retention or acquisition of a security interest in the consumer's principal dwelling.
    2.  The consumer's right to rescind the transaction.
    3.  How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.
    4.  The effects of rescission, as described in 209 CMR 32.23(4).
    5.  The date the rescission period expires.
    (b)  Proper Form of Notice.  To satisfy the disclosure requirements of 209 CMR 32.23(2)(a), the creditor shall provide a notice that conforms with the model forms in Appendix H of Regulation Z, as appropriate, or a substantially similar notice.

(3)  Delay of Creditor's Performance.  Unless a consumer waives the right of rescission under 209 CMR 32.23(5), no money shall be disbursed other than in escrow, no services shall be performed and no materials delivered until the rescission period has expired and the creditor is reasonably satisfied that the consumer has not rescinded.

(4)  Effects of Rescission.
    (a)  When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.
    (b)  Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

[47]  For purposes of 209 CMR 32.23, the addition to an existing obligation of a security interest in a consumer's principal dwelling is a transaction. The right of rescission applies only to the addition of the security interest and not the existing obligation. The creditor shall deliver the notice required by 209 CMR 32.23(2) but need not deliver new material disclosures. Delivery of the required notice shall begin the rescission period.
[48]  The term "material disclosures" means the required disclosures of the annual percentage rate, the finance charge, the amount financed, the total of payments, and the payment schedule, and the disclosures and limitations referred to in 209 CMR 32.32(3) and (4) and 32.35(2)(b).

ADD-083

32.23:  continued

(c) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under 209 CMR 32.23(4)(b). When the creditor has complied with 209 CMR 32.23(4)(b), the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

(d) The procedures outlined in 209 CMR 32.23(4)(b) and (c) may be modified by court order.

(5) Consumer's Waiver of Right to Rescind.

(a) The consumer may modify or waive the right to rescind if the consumer determines that the extension of credit is needed to meet a *bona fide* personal financial emergency. To modify or waive the right, the consumer shall give the creditor a dated written statement that describes the emergency, specifically modifies or waives the right to rescind, and bears the signature of all of the consumers entitled to rescind. Printed forms for this purpose are prohibited, except as provided in 209 CMR 32.23(5)(b).

(b) The need of the consumer to obtain funds immediately shall be regarded as a *bona fide* personal financial emergency provided that the dwelling securing the extension of credit is located in an area declared during September 1993, pursuant to 42 U.S.C. 5170, to be a major disaster area because of severe storms and flooding in the Midwest.[48a] In this instance, creditors may use printed forms for the consumer to waive the right to rescind. This exemption to 209 CMR 32.23(5)(a) shall expire one year from the date an area was declared a major disaster.

(c) The consumer's need to obtain funds immediately shall be regarded as a *bona fide* personal financial emergency provided that the dwelling securing the extension of credit is located in an area declared during June through September 1994 to be a major disaster area, pursuant to 42 U.S.C. 5170, because of severe storms and flooding in the South.[48b] In this instance, creditors may use printed forms for the consumer to waive the right to rescind. This exemption to 209 CMR 32.23(5)(a) shall expire one year from the date an area was declared a major disaster.

(d) The consumer's need to obtain funds immediately shall be regarded as a *bona fide* personal financial emergency provided that the dwelling securing the extension of credit is located in an area declared during October 1994 to be a major disaster area, pursuant to 42 U.S.C. 5170, because of severe storms and flooding in Texas.[48c] In this instance, creditors may use printed forms for the consumer to waive the right to rescind. This exemption to 209 CMR 32.23(5)(a) shall expire one year from the date an area was declared a major disaster.

(6) Exempt Transactions. The right to rescind does not apply to the following:

(a) A residential Mortgage Transaction.

(b) A refinancing or consolidation by the same creditor of an extension of credit already secured by the consumer's principal dwelling. The right of rescission shall apply, however, to the extent the new amount financed exceeds the unpaid principal balance, any earned unpaid finance charge on the existing debt, and amounts attributed solely to the costs of the refinancing or consolidation.

(c) A transaction in which a state agency is a creditor.

[48a] A list of the affected areas will be maintained by the Board.

[48b] A list of the affected areas will be maintained and published by the Board. Such areas now include parts of Alabama, Florida, and Georgia.

[48c] A list of the affected areas will be maintained and published by the Board. Such areas now include the following counties in Texas: Angelina, Austin, Bastrop, Brazos, Brazoria, Burleson, Chambers, Fayette, Fort Bend, Galveston, Grimes, Hardin, Harris, Houston, Jackson, Jasper, Jefferson, Lee, Liberty, Madison, Matagorda, Montgomery, Nacagdoches, Orange, Polk, San Augustine, San Jacinto, Shelby, Trinity, Victoria, Washington, Waller, Walker, and Wharton.

ADD-084

32.23:  continued

(d)  An advance, other than an initial advance, in a series of advances or in a series of single-payment obligations that is treated as a single transaction under 209 CMR 32.17(3)(f), if the notice required by 209 CMR 32.23(2) and all material disclosures have been given to the consumer.

(e)  A renewal of optional insurance premiums that is not considered a refinancing under 209 CMR 32.20(1)(e).

(7)  <u>Tolerances for Accuracy</u>.

(a)  <u>One-half of 1 Percent Tolerance</u>.  Except as provided in 209 CMR 32.23(7)(b) and (8)(b), the finance charge and other disclosures affected by the finance charge (such as the amount financed and the annual percentage rate) shall be considered accurate for purposes of 209 CMR 32.23(7) if the disclosed finance charge:

1.  is understated by no more than $\frac{1}{2}$ one percent of the face amount of the note or $100, whichever is greater; or

2.  is greater than the amount required to be disclosed.

(b)  <u>One Percent Tolerance</u>.  In a refinancing of a residential mortgage transaction with a new creditor (other than a transaction covered by 209 CMR 32.32) if there is no new money advanced and no consolidation of existing loans, the finance charge and other disclosures affected by the finance charge (such as the amount financed and the annual percentage rate) shall be considered accurate for purposes of 209 CMR 32.23(7) if the disclosed finance charge:

1.  is understated by no more than 1% of the face amount of the note or $100, whichever is greater; or

2.  is greater than the amount required to be disclosed.

(8)  <u>Special Rules for Foreclosures</u>.

(a)  <u>Right to Rescind</u>.  After the initiation of a foreclosure on the consumer's principal dwelling which secures the credit obligation, the consumer shall have the right to rescind the transaction if:

1.  A mortgage broker fee that should have been included in the finance charge was not included; or

2.  The creditor did not provide the properly completed appropriate model form in Appendix H of Regulation Z or a substantially similar notice of rescission.

(b)  Tolerance for disclosures. After the initiation of foreclosure on the consumer's principal dwelling that secures the credit obligation, the finance charge and other disclosures affected by the finance charge (such as the amount financed and the annual percentage rate) shall be considered accurate for purposes of 209 CMR 32.23 if the disclosed finance charge is:

1.  Is understated by no more than $35; or

2.  Is greater than the amount required to be disclosed.

32.24:  <u>Advertising</u>

(1)  <u>Actually Available Terms</u>.  If an advertisement for credit states specific credit terms, it shall state only those terms that actually are or will be arranged or offered by the creditor.

(2)  <u>Clear and Conspicuous Standard</u>.  Disclosures required by 209 CMR 32.24 shall be made clearly and conspicuously.

(3)  <u>Advertisement of Rate of Finance Charge</u>.  If an advertisement states a rate of finance charge, it shall state the rate as an "annual percentage rate," using that term. If the annual percentage rate may be increased after consummation, the advertisement shall state that fact.  If an advertisement is for credit not secured by a dwelling, the advertisement shall not state any other rate, except that a simple annual rate or periodic rate that is applied to an unpaid balance may be stated in conjunction with, but not more conspicuously than, the annual percentage rate. If an advertisement is for credit secured by a dwelling, the advertisement shall not state any other rate, except that a simple annual rate that is applied to an unpaid balance may be stated in conjunction with, but not more conspicuously than, the annual percentage rate.

ADD-085

32.24:  continued

(4) Advertisement of Terms that Require Additional Disclosures.
(a) Triggering Terms.  If any of the following terms is set forth in an advertisement, the advertisement shall meet the requirements of 209 CMR 32.24(4)(b):
1. The amount or percentage of any downpayment.
2. The number of payments or period of repayment.
3. The amount of any payment.
4. The amount of any finance charge.

(b) Additional Terms.  An advertisement stating any of the terms in 209 CMR 32.24(4)(a) shall state the following terms, as applicable (an example of one or more typical extensions of credit with a statement of all the terms applicable to each may be used):
1. The amount or percentage of the downpayment.
2. The terms of repayment, which reflect the repayment obligations over the full term of the loan, including any balloon payment.
3. The "annual percentage rate," using that term, and, if the rate may be increased after consummation, that fact.

(5) Catalogs or Other Multiple-page Advertisements; Electronic Advertisements.
(a) If a catalog or other multiple-page advertisement, or an electronic advertisement (such as an advertisement appearing on an Internet Web site) gives information in a table or schedule in sufficient detail to permit determination of the disclosures required by 209 CMR 32.24(4)(b), it shall be considered a single advertisement if:
1. The table or schedules is clearly set forth; and
2. Any statement of the credit terms in 209 CMR 32.24(4)(a) appearing anywhere else in the catalog or advertisement clearly refers to the page or location where the table or schedule begins.

(b) A catalog or multiple-page advertisement or an electronic advertisement (such as an advertisement appearing on an Internet Web site) complies with 209 CMR 32.24(4)(b) if the table or schedule of terms includes all appropriate disclosures for a representative scale of amounts up to the level of the more commonly sold higher-priced property or services offered.

(6) Disclosure of Rates and Payments in Advertisements for Credit Secured by a Dwelling.
(a) Scope.  The requirements of 209 CMR 32.24(6) apply to any advertisement for credit secured by a dwelling, other than television or radio advertisements, including promotional materials accompanying applications.
(b) Disclosure of Rates.
1. In general. If an advertisement for credit secured by a dwelling states a simple annual rate of interest and more than one simple annual rate of interest will apply over the term of the advertised loan, the advertisement shall disclose in a clear and conspicuous manner:
a. Each simple annual rate of interest that will apply. In variable-rate transactions, a rate determined by adding an index and margin shall be disclosed based on a reasonably current index and margin;
b. The period of time during which each simple annual rate of interest will apply; and
c. The annual percentage rate for the loan. If such rate is variable, the annual percentage rate shall comply with the accuracy standards in 209 CMR 32.17(3) and 32.22.
2. Clear and Conspicuous Requirement.  For purposes of 209 CMR 32.24(6)(b)1., clearly and conspicuously disclosed means that the required information in 209 CMR 32.24(6)(b)1.a. through c. shall be disclosed with equal prominence and in close proximity to any advertised rate that triggered the required disclosures. The required information in 209 CMR 32.24(6)(b)1.c. may be disclosed with greater prominence than the other information.
(c) Disclosure of Payments.
1. In General.  In addition to the requirements of 209 CMR 32.24(3), if an advertisement for credit secured by a dwelling states the amount of any payment, the advertisement shall disclose in a clear and conspicuous manner:

ADD-086

32.24:  continued

    a.  The amount of each payment that will apply over the term of the loan, including any balloon payment. In variable-rate transactions, payments that will be determined based on the application of the sum of an index and margin shall be disclosed based on a reasonably current index and margin;

    b.  The period of time during which each payment will apply; and

    c.  In an advertisement for credit secured by a first lien on a dwelling, the fact that the payments do not include amounts for taxes and insurance premiums, if applicable, and that the actual payment obligation will be greater.

    2.  Clear and Conspicuous Requirement.  For purposes of 209 CMR 32.24(6)(c)1., a clear and conspicuous disclosure means that the required information in 209 CMR 32.24(6)(c)1.a. and b. shall be disclosed with equal prominence and in close proximity to any advertised payment that triggered the required disclosures, and that the required information in 209 CMR 32.24(6)(c)1.c. shall be disclosed with prominence and in close proximity to the advertised payments.

(d)  Envelope Excluded.  The requirements in 209 CMR 32.24(6)(b) and (c) do not apply to an envelope in which an application or solicitation is mailed, or to a banner advertisement or pop-up advertisement linked to an application or solicitation provided electronically.

(7)  Alternative disclosures-television or radio advertisements. An advertisement made through television or radio stating any of the terms requiring additional disclosures under 209 CMR 32.24(4)(b) may comply with 209 CMR 32.24(4)(b) either by:

(a)  Stating clearly and conspicuously each of the additional disclosures required under 209 CMR 32.24(4)(b); or

(b)  Stating clearly and conspicuously the information required by 209 CMR 32.24(4)(b)3. and listing a toll-free telephone number, or any telephone number that allows a consumer to reverse the phone charges when calling for information, along with a reference that such number may be used by consumers to obtain additional cost information.

(8)  Tax Implications.  If an advertisement distributed in paper form or through the Internet (rather than by radio or television) is for a loan secured by the consumer's principal dwelling, and the advertisement states that the advertised extension of credit may exceed the fair market value of the dwelling, the advertisement shall clearly and conspicuously state that:

(a)  The interest on the portion of the credit extension that is greater than the fair market value of the dwelling is not tax deductible for Federal income tax purposes; and

(b)  The consumer should consult a tax adviser for further information regarding the deductibility of interest and charges.

(9)  Prohibited Acts or Practices in Advertisements for Credit Secured by a Dwelling.  The following acts or practices are prohibited in advertisements for credit secured by a dwelling:

(a)  Misleading Advertising of "Fixed" Rates and Payments.  Using the word "fixed" to refer to rates, payments, or the credit transaction in an advertisement for variable-rate transactions or other transactions where the payment will increase, unless:

    1.  In the case of an advertisement solely for one or more variable-rate transactions,

    a.  The phrase "Adjustable-Rate Mortgage," "Variable-Rate Mortgage," or "ARM" appears in the advertisement before the first use of the word "fixed" and is at least as conspicuous as any use of the word "fixed" in the advertisement; and

    b.  Each use of the word "fixed" to refer to a rate or payment is accompanied by an equally prominent and closely proximate statement of the time period for which the rate or payment is fixed, and the fact that the rate may vary or the payment may increase after that period;

    2.  In the case of an advertisement solely for non-variable-rate transactions where the payment will increase (e.g., a stepped-rate mortgage transaction with an initial lower payment), each use of the word "fixed" to refer to the payment is accompanied by an equally prominent and closely proximate statement of the time period for which the payment is fixed, and the fact that the payment will increase after that period; or

    3.  In the case of an advertisement for both variable-rate transactions and non-variable-rate transactions,

ADD-087

32.24:  continued

       a.  The phrase "Adjustable-Rate Mortgage," "Variable-Rate Mortgage," or "ARM" appears in the advertisement with equal prominence as any use of the term "fixed," "Fixed-Rate Mortgage," or similar terms; and

       b.  Each use of the word "fixed" to refer to a rate, payment, or the credit transaction either refers solely to the transactions for which rates are fixed and complies with 209 CMR 32.24(9)(a)2., if applicable, or, if it refers to the variable-rate transactions, is accompanied by an equally prominent and closely proximate statement of the time period for which the rate or payment is fixed, and the fact that the rate may vary or the payment may increase after that period.

(b)  Misleading Comparisons in Advertisements.  Making any comparison in an advertisement between actual or hypothetical credit payments or rates and any payment or simple annual rate that will be available under the advertised product for a period less than the full term of the loan, unless:

    1.  In General.  The advertisement includes a clear and conspicuous comparison to the information required to be disclosed under 209 CMR 32.24(6)(b) and (c); and

    2.  Application to Variable-rate Transactions.  If the advertisement is for a variable-rate transaction, and the advertised payment or simple annual rate is based on the index and margin that will be used to make subsequent rate or payment adjustments over the term of the loan, the advertisement includes an equally prominent statement in close proximity to the payment or rate that the payment or rate is subject to adjustment and the time period when the first adjustment will occur.

(c)  Misrepresentations about Government Endorsement.  Making any statement in an advertisement that the product offered is a "government loan program", "government-supported loan", or is otherwise endorsed or sponsored by any federal, state, or local government entity, unless the advertisement is for an FHA loan, VA loan, or similar loan program that is, in fact, endorsed or sponsored by a federal, state, or local government entity.

(d)  Misleading Use of the Current Lender's Name.  Using the name of the consumer's current lender in an advertisement that is not sent by or on behalf of the consumer's current lender, unless the advertisement:

    1.  Discloses with equal prominence the name of the person or creditor making the advertisement; and

    2.  Includes a clear and conspicuous statement that the person making the advertisement is not associated with, or acting on behalf of, the consumer's current lender.

(e)  Misleading Claims of Debt Elimination.  Making any misleading claim in an advertisement that the mortgage product offered will eliminate debt or result in a waiver or forgiveness of a consumer's existing loan terms with, or obligations to, another creditor.

(f)  Misleading Use of the Term "Counselor".  Using the term "counselor" in an advertisement to refer to a for-profit mortgage broker or mortgage creditor, its employees, or persons working for the broker or creditor that are involved in offering, originating or selling mortgages.

(g)  Misleading Foreign-language Advertisements.  Providing information about some trigger terms or required disclosures, such as an initial rate or payment, only in a foreign language in an advertisement, but providing information about other trigger terms or required disclosures, such as information about the fully-indexed rate or fully amortizing payment, only in English in the same advertisement.

32.25:  Record Retention

(1)  General Rule.  A creditor shall retain evidence of compliance with 209 CMR 32.00 (other than advertising requirements under 209 CMR 32.16 and 32.24) for two years after the date disclosures are required to be made or action is required to be taken. The Commissioner may require creditors to retain records for a longer period if necessary to carry out its enforcement responsibilities.

(2)  Inspection of Records.  A creditor shall permit the Commissioner or the Commissioner's duly authorized representative to inspect its relevant records for compliance.

ADD-088

### 32.26:  Use of Annual Percentage Rate in Oral Disclosures

(1)  Open-end Credit.  In an oral response to a consumer's inquiry about the cost of open-end credit, only the annual percentage rate or rates shall be stated, except that the periodic rate or rates also may be stated.  If the annual percentage rate cannot be determined in advance because there are finance charges other than a periodic rate, the corresponding annual percentage rate shall be stated, and other cost information may be given.

(2)  Closed-end Credit.  In an oral response to a consumer's inquiry about the cost of closed-end credit, only the annual percentage rate shall be stated, except that a simple annual rate or periodic rate also may be stated if it is applied to an unpaid balance.  If the annual percentage rate cannot be determined in advance, the annual percentage rate for a sample transaction shall be stated, and other cost information for the consumer's specific transaction may be given.

### 32.27:  Staff Interpretations

The office of the Commissioner will endeavor to maintain a current compilation of 209 CMR 32.00 and of official Board or staff interpretations. Compliance with any provisions of the Federal Truth in Lending Act, the Board's Regulation Z, and the Official Staff Commentary, which does not conflict with M.G.L. c. 140D, 209 CMR 32.00 or an advisory ruling of the Commissioner, shall be deemed to be in compliance with M.G.L. c. 140D.

### 32.28:  Appendices

Appendices of Regulation Z, are incorporated by reference as follows:

(1)  Appendix D

(2)  Rules for Card Issuers That Bill on a Transaction-by-Transaction Basis

(3)  Optional Annual Percentage Rate Computations for Creditors Offering Open-end Plans Subject to the Requirements of 209 CMR 32.05B

(4)  Appendix G

(5)  Appendix H

(6)  Appendix J

(7)  Appendix K

(8)  Appendix L

(9)  Appendix M1

(10)  Appendix M2

Sectional references are changed to coincide with sectional references of 209 CMR 32.00.

### 32.29:  Compliance

Any person who complies with the provisions of M.G.L. c. 140C and Regulations promulgated thereunder in effect prior to the effective date of M.G.L. c. 140D and 209 CMR 32.00 shall be deemed to be in compliance with M.G.L. c. 140D and Regulations promulgated thereunder until October 1, 1982.

### 32.30:  Limitations on Rates

A Creditor shall include in any consumer credit contract secured by a dwelling and subject to M.G.L. c. 140D and 209 CMR 32.00, the maximum interest rate that may be imposed during the term of the obligation 50 when:

ADD-089

32.30:  continued

(1)  in the case of closed-end credit, the annual percentage rate may increase after consummation; or

(2)  in the case of open-end credit, the annual percentage rate may increase during the plan.

32.31:  Special Rules for Certain Home Mortgage Transactions - General Rules

(1)  Relation to Other Sections of 209 CMR 32.00.  The requirements and limitations of 209 CMR 32.31 through 32.45 are in addition to and not in lieu of those contained in other sections of 209 CMR 32.00.

(2)  Form of Disclosures.  The creditor shall make the disclosures required by 209 CMR 32.31 through 32.45 clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures required by 209 CMR 32.31 through 32.45 may be provided to the consumer in electronic form, subject to compliance with the consumer consent and other applicable provisions of the Electronic Signatures in Global and National Commerce Act (E-Sign Act) (15 U.S.C. § 7001 *et seq.*).

(3)  Timing of Disclosure.
    (a)  Disclosures for Certain Closed-end Home Mortgages.  The creditor shall furnish the disclosures required by 209 CMR 32.32 at least three business days prior to consummation of a mortgage transaction covered by 209 CMR 32.32.
        1.  Change in Terms.  After complying with 209 CMR 32.31(3)(a) and prior to consummation, if the creditor changes any term that makes the disclosures inaccurate, new disclosures shall be provided in accordance with the requirements of 209 CMR 32.31(3)(a).
        2.  Telephone Disclosures.  A creditor may provide new disclosures by telephone if the consumer initiates the change and if, at consummation:
            a.  The creditor provides new written disclosures; and
            b.  The consumer and creditor sign a statement that the new disclosures were provided by telephone at least three days prior to consummation.
        3.  Consumer's Waiver of Waiting Period Before Consummation.  The consumer may, after receiving the disclosures required by 209 CMR 32.31(3)(a), modify or waive the three-day waiting period between delivery of those disclosures and consummation if the consumer determines that the extension of credit is needed to meet a *bona fide* personal financial emergency.  To modify or waive the right, the consumer shall give the creditor a dated written statement that describes the emergency, specifically modifies or waives the waiting period, and bears the signature of all the consumers entitled to the waiting period. Printed forms for this purpose are prohibited, except when creditors are permitted to use printed forms pursuant to 209 CMR 32.23(5)(b).
    (b)  Disclosures for Reverse Mortgages.  The creditor shall furnish the disclosures required by 209 CMR 32.33 at least three business days prior to:
        1.  Consummation of closed-end credit transaction; or
        2.  The first transaction under an open-end credit plan.

(4)  Basis of Disclosures and Use of Estimates.
    (a)  Legal Obligation.  Disclosures shall reflect the terms of the legal obligation between the parties.
    (b)  Estimates.  If any information necessary for accurate disclosure is unknown to the creditor, the creditor shall make the disclosure based on the best information reasonably available at the time the disclosure is provided and shall state clearly that the disclosure is an estimate.
    (c)  *Per Diem* interest.  For a transaction in which a portion of the interest is determined on a *per diem* basis and collected at consummation, any disclosure affected by the *per diem* interest shall be considered accurate if the disclosure is based on the information known to the creditor at the time that the disclosure documents are prepared.

ADD-090

Case: 13-1557    Document: 00116603663    Page: 157    Date Filed: 10/29/2013    Entry ID: 5775769

THE 188TH GENERAL COURT OF

# THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs

site search

Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events    MyLegislature

Massachusetts Laws

## General Laws

Massachusetts Constitution

General Laws

Rules

Session Laws

Print Page

| PART II | REAL AND PERSONAL PROPERTY AND DOMESTIC RELATIONS (Chapters 183 through 210) | PREV NEXT |
| TITLE I | TITLE TO REAL PROPERTY | PREV NEXT |
| CHAPTER 183 | ALIENATION OF LAND | PREV NEXT |
| Section 28C | Refinancing in the borrower's interest | PREV NEXT |

Section 28C. (a) A lender shall not knowingly make a home loan if the home loan pays off all or part of an existing home loan that was consummated within the prior 60 months or other debt of the borrower, unless the refinancing is in the borrower's interest. The "borrower's interest" standard shall be narrowly construed, and the burden is upon the lender to determine and to demonstrate that the refinancing is in the borrower's interest.

Factors to be considered in determining if the refinancing is in the borrower's interest include but are not limited to:—

(1) the borrower's new monthly payment is lower than the total of all monthly obligations being financed, taking into account the costs and fees;

(2) there is a change in the amortization period of the new loan;

(3) the borrower receives cash in excess of the costs and fees of refinancing;

(4) the borrower's note rate of interest is reduced;

(5) there is a change from an adjustable to a fixed rate loan, taking into account costs and fees; or

(6) the refinancing is necessary to respond to a bona fide personal need or an order of a court of competent jurisdiction.

(b) Notwithstanding any provision to the contrary contained in this chapter regarding costs and attorneys' fees, in any action instituted by a borrower who alleges that the defendant violated subsection (a), the borrower shall not be entitled to costs and attorneys' fees if the presiding judge, in the judge's discretion, finds that, before the institution of the action by the borrower, the lender made a reasonable offer to cure and that offer was rejected by the borrower.

ADD-091

(c) The commissioner of banks may prescribe from time to time such rules and regulations as may be necessary or proper in carrying out this section. Such rules and regulations may contain such factors, classifications, differentiations or other provisions, and may provide for such adjustments and exceptions for any class of transactions as, in the judgment of the commissioner, are necessary or proper to carry out this section, to prevent circumvention or evasion thereof or to facilitate compliance therewith.

Show / Hide Site Map

Mass.gov | Site Map | Site Policy | Webmaster

Copyright © 2013 The General Court, All Rights Reserved

ADD-092

Case: 13-1557    Document: 00116603663    Page: 159    Date Filed: 10/29/2013    Entry ID: 5775769



THE 188TH GENERAL COURT OF
THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs
site search
Options

Massachusetts Laws   Bills   State Budget   People   Committees   Educate & Engage   Events   MyLegislature

Home   Bills & Laws   Laws   General Laws   PART II   TITLE I   CHAPTER 183C

Massachusetts Laws

General Laws

Massachusetts Constitution
General Laws
Rules
Session Laws

Print Page

**PART II**       **REAL AND PERSONAL PROPERTY AND DOMESTIC RELATIONS** (Chapters 183 through 210)

PREV   NEXT

**TITLE I**      **TITLE TO REAL PROPERTY**

PREV   NEXT

**CHAPTER 183C**      **PREDATORY HOME LOAN PRACTICES**

PREV   NEXT

| Section 1 | Title |
| Section 2 | Definitions |
| Section 3 | Certification from counselor with third-party nonprofit organization |
| Section 4 | Obligor's ability to make payments; presumption |
| Section 5 | Prepayment fees and penalties |
| Section 6 | Limitation on financing of points and fees |
| Section 7 | Interest rate increases |
| Section 8 | Limitation on scheduled payments |
| Section 9 | Demand for repayment |
| Section 10 | Periodic payment schedule |
| Section 11 | No fee to modify or defer payment |
| Section 12 | Consolidation of payments |
| Section 13 | Forum for disputes |
| Section 14 | Lender's payment of contractor |
| Section 15 | Affirmative claims and defenses available; applicability |
| Section 16 | Default in connection with refinancing |
| Section 17 | Application of chapter; violations |
| Section 18 | Relief; remedies |
| Section 19 | Regulations |

Show / Hide Site Map

ADD-093

Case: 13-1557      Document: 00116603663      Page: 160      Date Filed: 10/29/2013      Entry ID: 5775769



THE 188TH GENERAL COURT OF
THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs
*site search*
Options

Massachusetts Laws     Bills     State Budget     People     Committees     Educate & Engage     Events     MyLegislature

| Massachusetts Laws | General Laws | | | |
|---|---|---|---|---|
| Massachusetts Constitution | | | | Print Page |
| General Laws | PART II | REAL AND PERSONAL PROPERTY AND DOMESTIC RELATIONS (Chapters 183 through 210) | | PREV    NEXT |
| Rules | TITLE I | TITLE TO REAL PROPERTY | | PREV    NEXT |
| Session Laws | CHAPTER 183C | PREDATORY HOME LOAN PRACTICES | | PREV    NEXT |
| | Section 2 | Definitions | | PREV    NEXT |

Section 2. As used in this chapter, the following words shall, unless the context requires otherwise, have the following meanings:—

"Annual percentage rate", the annual percentage rate for a loan calculated according to the Federal Truth In Lending Act (15 U.S.C. 1601 et seq.) and the regulations promulgated thereunder by the Federal Reserve Board or chapter 140D and the regulations promulgated thereunder by the commissioner of banks.

"Benchmark rate", the interest rate which the borrower can reduce by paying bona fide discount points; this rate shall not exceed the weekly average yield of United States Treasury securities having a maturity of 5 years, on the fifteenth day of the month immediately preceding the month in which the loan is made, plus 4 percentage points.

"Bona fide loan discount points", loan discount points which are: (1) knowingly paid by the borrower; (2) paid for the express purpose of lowering the benchmark rate; and (3) in fact reducing the interest rate or time-price differential applicable to the loan from an interest rate which does not exceed the benchmark rate.

"Broker", any person who for compensation directly or indirectly solicits, processes, places or negotiates home mortgage loans for others or who closes home mortgage loans which may be in the person's own name with funds provided by others and which loans are thereafter assigned to the person providing the funding of the loans; provided, that broker shall not include a person who is an attorney providing legal services in association with the closing of a home mortgage loan who is not also funding the home loan and is not an affiliate of the lender.

"Commissioner", the commissioner of banks.

"Conventional mortgage rate", the most recently published annual yield on conventional mortgages published by the Board of Governors of the Federal Reserve System, as published

ADD-094

in statistical release H.15 or any publication that may supersede it, as of the applicable time set forth in 12 C.F.R. 226.32(a)(1)(i).

"Conventional prepayment penalty", any prepayment penalty or fee that may be collected or charged in a home loan, and that is authorized by law other than this chapter, provided the home loan (1) does not have an annual percentage rate that exceeds the conventional mortgage rate by more than 2 percentage points; and (2) does not permit any prepayment fees or penalties that exceed 2 per cent of the amount prepaid.

"High cost home mortgage loan", a consumer credit transaction that is secured by the borrower's principal dwelling, other than a reverse mortgage transaction, a home mortgage loan that meets 1 of the following conditions:—

(i) the annual percentage rate at consummation will exceed by more than 8 percentage points for first-lien loans, or by more than 9 percentage points for subordinate-lien loans, the yield on United States Treasury securities having comparable periods of maturity to the loan maturity as of the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the lender; and when calculating the annual percentage rate for adjustable rate loans, the lender shall use the interest rate that would be effective once the introductory rate has expired.

(ii) Excluding either a conventional prepayment penalty or up to 2 bona fide discount points, the total points and fees exceed the greater of 5 per cent of the total loan amount or $400; the $400 figure shall be adjusted annually by the commissioner of banks on January 1 by the annual percentage change in the Consumer Price Index that was reported on the preceding June 1.

"Lender", an entity that originated 5 or more home mortgage loans within the past 12 month period or acted as an intermediary between originators and borrowers on 5 or more home mortgage loans within the past 12 month period, provided that lender shall not include a person who is an attorney providing legal services in association with the closing of a home loan who is not also funding the home loan and is not an affiliate of the lender. For the purposes of this chapter, lender shall also mean a broker.

"Obligor", a borrower, co-borrower, cosigner, or guarantor obligated to repay a home mortgage loan.

"Points and fees", (i) items required to be disclosed pursuant to sections 226.4 (a) and 226.4 (b) of Title 12 of the Code of Federal Regulations or 209 CMR 32.04(1) and 209 CMR 32.04(2) of the Code of Massachusetts Regulations, as amended from time to time, except interest or the time-price differential; (ii) charges for items listed under sections 226.4 (c) (7) of Title 12 of the Code of Federal Regulations or 209 CMR 32.04(3)(g) of the Code of Massachusetts Regulations, as amended from time to time, but only if the lender receives direct or indirect compensation in connection with the charge, otherwise, the charges are not included within the meaning of the term "points and fees"; (iii) the maximum prepayment fees and penalties that may be charged or collected under the terms of the loan documents; (iv) all prepayment fees of penalties that are incurred by the borrower if the loan refinances a previous loan made or currently held by the same lender; (v) all compensation paid directly or indirectly to a mortgage broker, including a broker that originates a home loan in its own name in a table-funded transaction, not otherwise included in clauses (i) or (ii); (vi) the cost of all premiums

Case: 13-1557     Document: 00116603663     Page: 162     Date Filed: 10/29/2013     Entry ID: 5775769

financed by the creditor, directly or indirectly for any credit life, credit disability, credit unemployment or credit property insurance, or any other life or health insurance, or any payments financed by the creditor directly or indirectly for any debt cancellation or suspension agreement or contract, except that insurance premiums or debt cancellation or suspension fees calculated and paid on a monthly basis shall not be considered financed by the creditor. Points and fees shall not include the following: (1) taxes, filing fees, recording and other charges and fees paid to or to be paid to a public official for determining the existence of or for perfecting, releasing or satisfying a security interest; and, (2) fees paid to a person other than a lender or to the mortgage broker for the following: fees for flood certification; fees for pest infestation; fees for flood determination; appraisal fees; fees for inspections performed before closing; credit reports; surveys; notary fees; escrow charges so long as not otherwise included under clause (i); title insurance premiums; and fire insurance and flood insurance premiums, if the conditions in sections 226.4 (d) (2) of Title 12 of the Code of Federal Regulations or 209 CMR 32.04(4)(b) of the Code of Massachusetts Regulations, as amended from time to time, are met. For open-end loans, the points and fees shall be calculated by adding the total points and fees known at or before closing, including the maximum prepayment penalties that may be charged or collected under the terms of the loan documents, plus the minimum additional fees the borrower would be required to pay to draw down an amount equal to the total credit line.

"Total loan amount", the total amount the consumer will borrow, as reflected by the face amount of the note.

Mass.gov | Site Map | Site Policy | Webmaster

Copyright © 2013 The General Court, All Rights Reserved

ADD-096



THE 188TH GENERAL COURT OF
## THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs

site search

Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events    MyLegislature

Massachusetts Laws

Massachusetts Constitution

General Laws

Rules

Session Laws

## General Laws

Print Page

| | | |
|---|---|---|
| PART II | REAL AND PERSONAL PROPERTY AND DOMESTIC RELATIONS (Chapters 183 through 210) | PREV   NEXT |
| TITLE I | TITLE TO REAL PROPERTY | PREV   NEXT |
| CHAPTER 183C | PREDATORY HOME LOAN PRACTICES | PREV   NEXT |
| Section 15 | Affirmative claims and defenses available; applicability | PREV   NEXT |

Section 15. (a) Any person who purchases or is otherwise assigned a high-cost home mortgage loan shall be subject to all affirmative claims and any defenses with respect to the loan that the borrower could assert against the original lender or broker of the loan; provided that this subsection shall not apply if the purchaser or assignee demonstrates by a preponderance of the evidence that it:

(1) has in place at the time of the purchase or assignment of the subject loans, policies that expressly prohibit its purchase or acceptance of assignment of any high-cost home mortgage loans;

(2) requires by contract that a seller or assignor of home loans to the purchaser or assignee represents and warrants to the purchaser or assignee that either (i) the seller or assignor will not sell or assign any high-cost home mortgage loans to the purchaser or assignee or (ii) that the seller or assignor is a beneficiary of a representation and warranty from a previous seller or assignor to that effect; and

(3) exercises reasonable due diligence at the time of purchase or assignment of home loans or within a reasonable period of time after the purchase or assignment of the home loans, intended by the purchaser or assignee to prevent the purchaser or assignee from purchasing or taking assignment of any high-cost home mortgage loans; provided, however, that reasonable due diligence shall provide for sampling and shall not require loan by loan review.

(b) Limited to amounts required to reduce or extinguish the borrower's liability under the high-cost home mortgage loan plus amounts required to recover costs, including reasonable attorneys' fees, a borrower acting only in an individual capacity may assert claims that the borrower could assert against a lender of the home loan against any subsequent holder or assignee of the home loan as follows:

(1) A borrower may bring an original action for a violation of this chapter in connection with the loan within 5 years of the closing of a high-cost home mortgage loan;

Case: 13-1557      Document: 00116603663      Page: 164      Date Filed: 10/29/2013      Entry ID: 5775769

(2) A borrower may, at any time during the term of a high-cost home mortgage loan, employ any defense, claim, counterclaim, including a claim for a violation of this chapter, after an action to collect on the home loan or foreclose on the collateral securing the home loan has been initiated or the debt arising from the home loan has been accelerated or the home loan has become 60 days in default, or in any action to enjoin foreclosure or preserve or obtain possession of the home that secures the loan.

(c) This section shall be effective notwithstanding any other provision of law; provided, that nothing in this section shall be construed to limit the substantive rights, remedies or procedural rights available to a borrower against any lender, assignee or holder under any other law. The rights conferred on borrowers by subsections (a) and (b) are independent of each other and do not limit each other.

Show / Hide Site Map

Copyright © 2013 The General Court. All Rights Reserved

ADD-098

10/28/2013 2:05 PM

Case: 13-1557     Document: 00116603663     Page: 165     Date Filed: 10/29/2013     Entry ID: 5775769



THE 188TH GENERAL COURT OF
THE COMMONWEALTH OF MASSACHUSETTS

Home   Glossary   FAQs

*site search*

Options

Massachusetts Laws        Bills        State Budget        People        Committees        Educate & Engage        Events        MyLegislature

Massachusetts Laws

Massachusetts Constitution

General Laws

Rules

Session Laws

## General Laws

Print Page

| PART II | REAL AND PERSONAL PROPERTY AND DOMESTIC RELATIONS (Chapters 183 through 210) | PREV   NEXT |
|---|---|---|
| TITLE I | TITLE TO REAL PROPERTY | PREV   NEXT |
| CHAPTER 183C | PREDATORY HOME LOAN PRACTICES | PREV   NEXT |
| Section 16 | Default in connection with refinancing | PREV   NEXT |

Section 16. A lender shall not recommend or encourage default on an existing loan or other debt prior to and in connection with the closing or planned closing of a high-cost home mortgage loan that refinances all or any portion of the existing loan or debt.

Show / Hide Site Map

Mass.gov | Site Map | Site Policy | Webmaster

Copyright © 2013 The General Court, All Rights Reserved

ADD-099

10/28/2013 2:05 PM

Case: 13-1557    Document: 00116603663    Page: 166    Date Filed: 10/29/2013    Entry ID: 5775769



THE 188TH GENERAL COURT OF
# THE COMMONWEALTH OF MASSACHUSETTS

Home   Glossary   FAQs

site search

Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events    MyLegislature

Massachusetts Laws

Massachusetts Constitution

General Laws

Rules

Session Laws

## General Laws

Print Page

| | | |
|---|---|---|
| **PART II** | **REAL AND PERSONAL PROPERTY AND DOMESTIC RELATIONS** (Chapters 183 through 210) | PREV   NEXT |
| **TITLE I** | **TITLE TO REAL PROPERTY** | PREV   NEXT |
| **CHAPTER 183C** | **PREDATORY HOME LOAN PRACTICES** | PREV   NEXT |
| **Section 17** | **Application of chapter; violations** | PREV   NEXT |

Section 17. (a) This chapter shall apply to any lender who attempts to avoid its application by dividing any loan transaction into separate parts for the purpose of evading this chapter.

(b) A lender making a high-cost home mortgage loan who, when acting in good faith, fails to comply with this chapter, shall not be considered to have violated this chapter if the lender establishes that either: (1) Within 30 days of the loan closing and prior to the institution of any action under this chapter, the lender notifies the borrower of the compliance failure and makes appropriate restitution and whatever adjustments are necessary are made to the loan, at the choice of the borrower, to either: (i) make the high-cost home mortgage loan satisfy the requirements of this chapter or (ii) change the terms of the loan in a manner beneficial to the borrower so that the loan will no longer be considered a high-cost home mortgage loan; or, (2) the compliance failure was not intentional and resulted from a bona fide error notwithstanding the maintenance procedures reasonably adapted to avoid the errors, and within 60 days after the discovery of the compliance failure and before the institution of any action under this chapter or the receipt of written notice of the compliance failure, the borrower is notified of the compliance failure, appropriate restitution is made and whatever adjustments are necessary are made to the loan, at the choice of the borrower, to either (i) make the high-cost home mortgage loan satisfy the requirements of this chapter or (ii) change the terms of the loan in a manner beneficial to the borrower so that the loan will no longer be considered a high-cost home mortgage loan. Examples of a bona fide error may include clerical errors, errors in calculation, computer malfunction and programming, and printing errors. An error in legal judgment with respect to a person's obligation under this chapter shall not be considered a bona fide error.

Show / Hide Site Map

Copyright © 2013 The General Court, All Rights Reserved



THE 188TH GENERAL COURT OF
## THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs

*site search*

Options

Massachusetts Laws     Bills     State Budget     People     Committees     Educate & Engage     Events     MyLegislature

Massachusetts Laws

## General Laws

Massachusetts Constitution

General Laws

Rules

Session Laws

Print Page

| PART II | REAL AND PERSONAL PROPERTY AND DOMESTIC RELATIONS (Chapters 183 through 210) | PREV  NEXT |
| TITLE I | TITLE TO REAL PROPERTY | PREV  NEXT |
| CHAPTER 183C | PREDATORY HOME LOAN PRACTICES | PREV  NEXT |
| Section 18 | Relief; remedies | PREV  NEXT |

Section 18. (a) A violation of this chapter shall constitute a violation of chapter 93A.

(b) An aggrieved borrower or borrowers may bring a civil action for injunctive relief or damages in a court of competent jurisdiction for any violation of this chapter.

(c) In addition the court shall, as the court may consider appropriate: (1) issue an order or injunction rescinding a home mortgage loan contract which violates this chapter, or barring the lender from collecting under any home mortgage loan which violates this chapter; (2) issue an order or injunction barring any judicial or non judicial foreclosure or other lender action under the mortgage or deed of trust securing any home mortgage loan which violates this chapter; (3) issue an order or injunction reforming the terms of the home mortgage loan to conform to this chapter; (4) issue an order or injunction enjoining a lender from engaging in any prohibited conduct; or (5) impose such other relief, including injunctive relief, as the court may consider just and equitable.

(d) In addition, any lender found to be in violation of this chapter shall be subject to sections 2A and 2D of chapter 167.

(e) Originating or brokering a home loan that violates a provision of this section shall constitute a violation of this chapter.

Show / Hide Site Map

Mass.gov | Site Map | Site Policy | Webmaster
Copyright © 2013 The General Court, All Rights Reserved

Case: 13-1557   Document: 00116603663   Page: 168   Date Filed: 10/29/2013   Entry ID: 5775769



THE 188TH GENERAL COURT OF
# THE COMMONWEALTH OF MASSACHUSETTS

Home   Glossary   FAQs
site search
Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events

Massachusetts Laws

## General Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

Print Page

| | | |
|---|---|---|
| PART II | REAL AND PERSONAL PROPERTY AND DOMESTIC RELATIONS (Chapters 183 through 210) | PREV   NEXT |
| TITLE I | TITLE TO REAL PROPERTY | PREV   NEXT |
| CHAPTER 183 | ALIENATION OF LAND | PREV   NEXT |
| Section 54B | Mortgage discharge, release, assignment, foreclosure, etc.; execution before officer entitled to acknowledge instruments; effect | PREV   NEXT |

*[Text of section applicable as provided by 2010, 282, Sec. 7.]*

Section 54B. Notwithstanding any law to the contrary, (1) a discharge of mortgage; (2) a release, partial release or assignment of mortgage; (3) an instrument of subordination, non-disturbance, recognition, or attornment by the holder of a mortgage; (4) any instrument for the purpose of foreclosing a mortgage and conveying the title resulting therefrom, including but not limited to notices, deeds, affidavits, certificates, votes, assignments of bids, confirmatory instruments and agreements of sale; or (5) a power of attorney given for that purpose or for the purpose of servicing a mortgage, and in either case, any instrument executed by the attorney-in-fact pursuant to such power, if executed before a notary public, justice of the peace or other officer entitled by law to acknowledge instruments, whether executed within or without the commonwealth, by a person purporting to hold the position of president, vice president, treasurer, clerk, secretary, cashier, loan representative, principal, investment, mortgage or other officer, agent, asset manager, or other similar office or position, including assistant to any such office or position, of the entity holding such mortgage, or otherwise purporting to be an authorized signatory for such entity, or acting under such power of attorney on behalf of such entity, acting in its own capacity or as a general partner or co-venturer of the entity holding such mortgage, shall be binding upon such entity and shall be entitled to be recorded, and no vote of the entity affirming such authority shall be required to permit recording.

Show / Hide Site Map

Case: 13-1557    Document: 00116603663    Page: 169    Date Filed: 10/29/2013    Entry ID: 5775769



THE 188TH GENERAL COURT OF
THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs
site search
Options

Massachusetts Laws    Bills    State Budget    People    Committees    Educate & Engage    Events

Massachusetts Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

## General Laws

Print Page

PART III        COURTS, JUDICIAL OFFICERS AND PROCEEDINGS IN CIVIL CASES
                (Chapters 211 through 262)
                                                                    PREV  NEXT

TITLE III       REMEDIES RELATING TO REAL PROPERTY
                                                                    PREV  NEXT

CHAPTER 244     FORECLOSURE AND REDEMPTION OF MORTGAGES
                                                                    PREV  NEXT

Section 14      Foreclosure under power of sale; procedure; notice; form
                                                                    PREV  NEXT

*[ Text of section effective until November 1, 2012. For text effective November 1, 2012, see below.]*

Section 14. The mortgagee or person having his estate in the land mortgaged, or a person authorized by the power of sale, or the attorney duly authorized by a writing under seal, or the legal guardian or conservator of such mortgagee or person acting in the name of such mortgagee or person, may, upon breach of condition and without action, do all the acts authorized or required by the power; but no sale under such power shall be effectual to foreclose a mortgage, unless, previous to such sale, notice thereof has been published once in each of three successive weeks, the first publication to be not less than twenty-one days before the day of sale, in a newspaper, if any, published in the town where the land lies or in a newspaper with general circulation in the town where the land lies and notice thereof has been sent by registered mail to the owner or owners of record of the equity of redemption as of thirty days prior to the date of sale, said notice to be mailed at least fourteen days prior to the date of sale to said owner or owners to the address set forth in section sixty-one of chapter one hundred and eighty-five, if the land is then registered or, in the case of unregistered land, to the last address of the owner or owners of the equity of redemption appearing on the records of the holder of the mortgage, if any, or if none, to the address of the owner or owners as given on his deed or on the petition for probate by which he acquired title, if any, or if in either case no address appears, then to the address to which the tax collector last sent the tax bill for the mortgaged premises to be sold, or if no tax bill has been sent for the last preceding three years, then to the address of any of the parcels of property in the name of said owner of record which are to be sold under the power of sale and unless a copy of said notice of sale has been sent by registered mail to all persons of record as of thirty days prior to the date of sale holding an interest in the property junior to the mortgage being foreclosed, said notice to be mailed at least fourteen days prior to the date of sale to each such person at the address of such person set forth in any document evidencing the interest or to the last

ADD-103

Case: 13-1557    Document: 00116603663    Page: 170    Date Filed: 10/29/2013    Entry ID: 5775769

address of such person known to the mortgagee. Any person of record as of thirty days prior to the date of sale holding an interest in the property junior to the mortgage being foreclosed may waive at any time, whether prior or subsequent to the date of sale, the right to receive notice by mail to such person under this section and such waiver shall be deemed to constitute compliance with such notice requirement for all purposes. If no newspaper is published in such town, or if there is no newspaper with general circulation in the town where the land lies, notice may be published in a newspaper published in the county where the land lies, and this provision shall be implied in every power of sale mortgage in which it is not expressly set forth. A newspaper which by its title page purports to be printed or published in such town, city or county, and having a circulation therein, shall be sufficient for the purpose.

The following form of foreclosure notice may be used and may be altered as circumstances require; but nothing herein shall be construed to prevent the use of other forms.

(Form.)

MORTGAGEE'S SALE OF REAL ESTATE.

By virtue and in execution of the Power of Sale contained in a certain mortgage given by .......... to .......... dated .......... and recorded with .................Deeds, Book .........., page .........., of which mortgage the undersigned is the present holder, ..........

(If by assignment, or in any fiduciary capacity, give reference.)

.........................

for breach of the conditions of said mortgage and for the purpose of foreclosing the same will be sold at Public Auction at .......... o'clock, ....M. on the .......... day of .......... A.D. (insert year), .......... (*place*) .......... all and singular the premises described in said mortgage,

(In case of partial releases, state exceptions.)

To wit: "(Description as in the mortgage, including all references to title, restrictions, encumbrances, etc., as made in the mortgage.)"

Terms of sale: (State here the amount, if any, to be paid in cash by the purchaser at the time and place of the sale, and the time or times for payment of the balance or the whole as the case may be.)

Other terms to be announced at the sale.

(Signed) ........................

..............................

Present holder of said mortgage.

A notice of sale in the above form, published in accordance with the power in the mortgage and with this chapter, together with such other or further notice, if any, as is required by the mortgage, shall be a sufficient notice of the sale; and the premises shall be deemed to have been sold, and the deed thereunder shall convey the premises, subject to and with the benefit of all restrictions, easements, improvements, outstanding tax titles, municipal or other public

Case: 13-1557    Document: 00116603663    Page: 171    Date Filed: 10/29/2013    Entry ID: 5775769

taxes, assessments, liens or claims in the nature of liens, and existing encumbrances of record created prior to the mortgage, whether or not reference to such restrictions, easements, improvements, liens or encumbrances is made in the deed; but no purchaser at the sale shall be bound to complete the purchase if there are encumbrances, other than those named in the mortgage and included in the notice of sale, which are not stated at the sale and included in the auctioneer's contract with the purchaser.

### Chapter 244: Section 14. Foreclosure under power of sale; procedure; notice; form

*[ Text of section as amended by 2012, 194, Sec. 1 effective November 1, 2012. See 2012, 194, Sec. 9. For text effective until November 1, 2012, 2013, see above.]*

Section 14. The mortgagee or person having estate in the land mortgaged, or a person authorized by the power of sale, or the attorney duly authorized by a writing under seal or the legal guardian or conservator of such mortgagee or person acting in the name of such mortgagee or person, may, upon breach of condition and without action, perform all acts authorized or required by the power of sale; provided, however, that no sale under such power shall be effectual to foreclose a mortgage, unless, previous to such sale, notice of the sale has been published once in each of 3 successive weeks, the first publication of which shall be not less than 21 days before the day of sale, in a newspaper published in the city or town where the land lies or in a newspaper with general circulation in the city or town where the land lies and notice of the sale has been sent by registered mail to the owner or owners of record of the equity of redemption as of 30 days prior to the date of sale, said notice to be mailed by registered mail at least 14 days prior to the date of sale to said owner or owners to the address set forth in section 61 of chapter 185, if the land is then registered or, in the case of unregistered land, to the last address of the owner or owners of the equity of redemption appearing on the records of the holder of the mortgage, if any, or if none, to the address of the owner or owners as given on the deed or on the petition for probate by which the owner or owners acquired title, if any, or if in either case no owner appears, then mailed by registered mail to the address to which the tax collector last sent the tax bill for the mortgaged premises to be sold, or if no tax bill has been sent for the last preceding 3 years, then mailed by registered mail to the address of any of the parcels of property in the name of said owner of record which are to be sold under the power of sale and unless a copy of said notice of sale has been sent by registered mail to all persons of record as of 30 days prior to the date of sale holding an interest in the property junior to the mortgage being foreclosed, said notice to be mailed at least 14 days prior to the date of sale to each such person at the address of such person set forth in any document evidencing the interest or to the last address of such person known to the mortgagee. Any person of record as of 30 days prior to the date of sale holding an interest in the property junior to the mortgage being foreclosed may waive at any time, whether prior or subsequent to the date of sale, the right to receive notice by mail to such person under this section and such waiver shall constitute compliance with such notice requirement for all purposes. If no newspaper is published in such city or town, or if there is no newspaper with general circulation in the city or town where the land lies, notice may be published in a newspaper published in the county where the land lies, and this provision shall be implied in every power of sale mortgage in which it is not expressly set forth. A newspaper which by its title page purports to be printed or published in such city, town or county, and having a circulation in that city, town or county, shall be sufficient for the purposes of this

section.

The following form of foreclosure notice may be used and may be altered as circumstances require; but nothing in this section shall be construed to prevent the use of other forms.

(Form.)

MORTGAGEE'S SALE OF REAL ESTATE.

By virtue and in execution of the Power of Sale contained in a certain mortgage given by .......... to .......... dated .......... and recorded with

..........

Deeds, Book .........., page .........., of which mortgage the undersigned is the present holder, ...........

(If by assignment, or in any fiduciary capacity, give reference to the assignment or assignments recorded with .......... Deeds, Book .........., page .........., of which mortgage the undersigned is the present holder, ...........

for breach of the conditions of said mortgage and for the purpose of foreclosing the same will be sold at Public Auction at .......... o'clock, ..........M. on the .......... day of .......... A.D. (insert year), .......... (place) .......... all and singular the premises described in said mortgage,

(In case of partial releases, state exceptions.)

To wit: "(Description as in the mortgage, including all references to title, restrictions, encumbrances, etc., as made in the mortgage.)"

Terms of sale: (State here the amount, if any, to be paid in cash by the purchaser at the time and place of the sale, and the time or times for payment of the balance or the whole as the case may be.)

Other terms to be announced at the sale.

(Signed) _____

Present holder of said mortgage. _____

A notice of sale in the above form, published in accordance with the power in the mortgage and with this chapter, together with such other or further notice, if any, as is required by the mortgage, shall be a sufficient notice of the sale; and the premises shall be deemed to have been sold and the deed thereunder shall convey the premises, subject to and with the benefit of all restrictions, easements, improvements, outstanding tax titles, municipal or other public taxes, assessments, liens or claims in the nature of liens, and existing encumbrances of record created prior to the mortgage, whether or not reference to such restrictions, easements, improvements, liens or encumbrances is made in the deed; provided, however, that no purchaser at the sale shall be bound to complete the purchase if there are encumbrances, other than those named in the mortgage and included in the notice of sale, which are not

stated at the sale and included in the auctioneer's contract with the purchaser.

For purposes of this section and section 21 of chapter 183, in the event a mortgagee holds a mortgage pursuant to an assignment, no notice under this section shall be valid unless (i) at the time such notice is mailed, an assignment, or a chain of assignments, evidencing the assignment of the mortgage to the foreclosing mortgagee has been duly recorded in the registry of deeds for the county or district where the land lies and (ii) the recording information for all recorded assignments is referenced in the notice of sale required in this section. The notice shall not be defective if any holder within the chain of assignments either changed its name or merged into another entity during the time it was the mortgage holder; provided, that recited within the body of the notice is the fact of any merger, consolidation, amendment, conversion or acquisition of assets causing the change in name or identity, the recital of which shall be conclusive in favor of any bona fide purchaser, mortgagee, lienholder or encumbrancer of value relying in good faith on such recital.

Show / Hide Site Map

Copyright © 2013 The General Court, All Rights Reserved



THE 188TH GENERAL COURT OF
# THE COMMONWEALTH OF MASSACHUSETTS

Home  Glossary  FAQs

site search

Options

| Massachusetts Laws | Bills | State Budget | People | Committees | Educate & Engage | Events |

---

Massachusetts Laws

## General Laws

Massachusetts Constitution

General Laws

Session Laws

Rules

Print Page

| PART III | COURTS, JUDICIAL OFFICERS AND PROCEEDINGS IN CIVIL CASES (Chapters 211 through 262) |
| | PREV  NEXT |
| TITLE III | REMEDIES RELATING TO REAL PROPERTY |
| | PREV  NEXT |
| CHAPTER 244 | FORECLOSURE AND REDEMPTION OF MORTGAGES |
| | PREV  NEXT |
| Section 18 | Persons authorized to redeem |
| | PREV  NEXT |

Section 18. The mortgagor or person claiming or holding under him may, after breach of condition, redeem the land mortgaged, unless the mortgagee, or person claiming or holding under him, has obtained possession of the land for breach of condition and has continued that possession for three years, or unless the land has been sold pursuant to a power of sale contained in the mortgage deed.

Copyright © 2013 The General Court, All Rights Reserved